2014 WL 715741
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas,
San Antonio Division.

Cleopatra DE LEON, Nicole Dimetman,
Victor Holmes, and Mark Phariss, Plaintiffs,
v.
Rick PERRY, in his official capacity as Governor
of the State of Texas; Greg Abbott, in his
official capacity as Texas Attorney General;
Gerard Rickhoff, in his official capacity as
Bexar County Clerk; and David Lakey, in his
official capacity as Commissioner of the Texas
Department of State Health Services, Defendants.

Cause No. SA–13–CA–
00982–OLG.   |   Feb. 26, 2014.

**Synopsis**
**Background:** Two homosexual couples, one wishing
to marry in Texas and another seeking to have their
Massachusetts marriage recognized under Texas law, brought
action to challenge prohibition of same-sex marriage
under Texas constitutional amendment. Couples moved for
preliminary injunction to bar enforcement of prohibition.

**Holdings:** The District Court, Orlando L. Garcia, J., held that:

[1] couples established Article III standing;

[2] Supreme Court's summary dismissal in *Baker v. Nelson*
was no longer controlling precedent;

[3] although court would apply rational basis review, couples'
showing that heightened scrutiny was warranted supported
finding of likely success on merits;

[4] purported reasons for prohibition were not rationally
related to legitimate state interests;

[5] couple wishing to marry sought existing right to marry,
not new right to same-sex marriage;

[6] state did not identify any rational, much less compelling,
reason for prohibiting same-sex marriage;

[7] Defense of Marriage Act (DOMA) did not bar couples'
challenge;

[8] state's refusal to recognize out-of-state same-sex marriage
did not survive rational basis review;

[9] couples suffered irreparable harm;

[10] equities favored preliminary injunction; and

[11] court would stay its decision pending appeal.

Motion granted.

**West Codenotes**

**Held Unconstitutional**
Vernon's Ann.Texas Const. Art. 1, § 32(a, b); V.T.C.A.,
Family Code §§ 2.001, 6.204

**Recognized as Unconstitutional**
1 U.S.C.A. § 7

**Attorneys and Law Firms**

Barry A. Chasnoff, Daniel McNeel Lane, Jr., Matthew E.
Pepping, Akin Gump Strauss Hauer & Feld, LLP., Frank
Stenger–Castro, Attorney at Law, San Antonio, TX, Jessica
M. Weisel, Akin Gump Strauss Hauer & Feld LLP, Los
Angeles, CA, Michael P. Cooley, Akin Gump Strauss Hauer
& Feld LLP, Dallas, TX, for Plaintiff.

Michael P. Murphy, Texas Attorney General, William T.
Deane, Office of the Attorney General, Austin, TX, Susan A.
Bowen, San Antonio, TX, for Defendant.

**Opinion**

### ORDER GRANTING PLAINTIFFS' MOTION
### FOR PRELIMINARY INJUNCTION

ORLANDO L. GARCIA, District Judge.

**\*1** On this day the Court considered Plaintiffs' Opposed
Motion for Preliminary Injunction (docket no. 28) and
attached exhibits (docket no. 29), Defendants' response in
opposition (docket nos. 40 and 41), Plaintiffs' reply (docket

no. 52), and the parties' oral argument held on February 12, 2014. Plaintiffs in this lawsuit include two couples: a gay couple who wishes to marry in the State of Texas but who is unable to do so because the Texas Constitution prohibits same-sex marriage, and a lesbian couple who married in Massachusetts, a state that allows same-sex marriage, and who now seek to have their marriage recognized in Texas.

Plaintiffs challenge Texas' prohibition on same-sex marriage, set forth in Article I, Section 32 of the Texas Constitution and corresponding provisions of the Texas Family Code (hereinafter "Section 32"). They argue that the state's ban on same-sex marriage violates their rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution. Accordingly, Plaintiffs seek a preliminary injunction enjoining Defendants from enforcing Section 32, and a declaratory judgment that Texas' ban on same-sex marriage and Texas' failure to recognize out-of-state same-sex marriages is unconstitutional.

Regulation of marriage has traditionally been the province of the states and remains so today. However, any state law involving marriage or any other protected interest must comply with the United States Constitution. In United States v. Windsor, — U.S. ——, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013), the United States Supreme Court recently held that the federal government cannot refuse to recognize a valid state-sanctioned same-sex marriage. Now, the lower courts must apply the Supreme Court's decision in Windsor and decide whether a state can do what the federal government cannot—discriminate against same-sex couples.

The issue before this Court is whether Texas' current definition of marriage is permissible under the United States Constitution. After careful consideration, and applying the law as it must, this Court holds that Texas' prohibition on same-sex marriage conflicts with the United States Constitution's guarantees of equal protection and due process. Texas' current marriage laws deny homosexual couples the right to marry, and in doing so, demean their dignity for no legitimate reason. Accordingly, the Court finds these laws are unconstitutional and hereby grants a preliminary injunction enjoining Defendants from enforcing Texas' ban on same-sex marriage.

# I. BACKGROUND

## A. The Plaintiffs

The Plaintiffs in this case are two couples who either desire to marry in Texas or are legally married in another state and now wish to have their same-sex marriage recognized in Texas. The following facts regarding the parties in this case are undisputed and established in the pleadings and supporting declarations.

### 1. Cleopatra de Leon and Nicole Dimetman

 *2  Plaintiffs De Leon and Dimetman have been in a committed relationship since they met in 2001. De Leon is a United States Air Force veteran. She was on active duty for four years and served six years in the Texas Air National Guard. De Leon was honorably discharged after ten years of service. At the time she met Dimetman, De Leon was serving in the Texas Air National Guard while also working as a statistical analyst. Dimetman was running her own business.

As a couple, De Leon and Dimetman have supported one another as they pursued further education. During their time together, De Leon attended and completed graduate school, receiving a Master's degree in Applied Statistics from the University of Texas at San Antonio. Meanwhile, Dimetman attended the University of Texas Law School and became an attorney licensed to practice in the State of Texas. De Leon and Dimetman continue to share finances, live together, and have a loving, stable relationship.

De Leon and Dimetman wanted to have a family, and it was important to them to marry one another before they became parents. The couple wanted to marry in Texas, their home state, but Section 32 prevented them from doing so. Therefore, they chose to marry in Massachusetts, a state that recognizes same-sex marriage. They married in Boston on September 11, 2009, after having an eight-year solid, loving relationship.

In 2012, De Leon and Dimetman became parents to a child, C. [1] Although De Leon is C's biological mother, both her and Dimetman consider themselves C's mothers. They both share child-rearing duties and obligations. Because Texas does not recognize same-sex marriage, Dimetman could not be considered C's legal parent without going through the adoption process. Therefore, to obtain recognition as C's parent, Dimetman formally adopted C at considerable expense.

### 2. Victor Holmes and Mark Phariss

Plaintiffs Holmes and Phariss met in the spring of 1997. At the time, Holmes was in the Air Force and stationed in San Antonio. Phariss was and remains an attorney licensed to practice in Texas. The couple quickly developed a friendship that became a dating relationship. On August 9, 1997, the couple went on their first date. They celebrate August 9 as their anniversary.

After dating for several months, Holmes and Phariss started living together. Holmes, who joined the Air Force when he was eighteen, began a military program to become a physician's assistant. After completing the program, the Air Force stationed Holmes at different bases throughout the country. Because Phariss continued to live and work in Texas, he and Holmes spent the next eleven years in a long-distance relationship. Depending on where Holmes was serving, Phariss and Holmes would travel as often as every week to see each other. During Holmes' final assignment at Sheppard Air Force base in Wichita Falls, Texas, Holmes and Phariss generally saw one another each weekend and on special occasions during the week.

**\*3** Holmes honorably served our nation for nearly twenty-three years and retired as a Major at the end of 2010. After enduring an eleven-year, long-distance relationship, Holmes and Phariss were able to live together again. Holmes and Phariss now want to marry in Texas. On October 3, 2013, the couple applied for a marriage license at the Bexar County Clerk's office, but Defendant Gerard Rickhoff refused to issue one because Holmes and Phariss are both men.

**B. The Defendants**

Defendant Rick Perry is the Governor of Texas, and Defendant Greg Abbot is Texas' Attorney General. They are both responsible for executing and defending the laws of the State of Texas and its Constitution.

Defendant Gerard Rickhoff is the Bexar County Clerk. His duties include providing marriage applications, issuing marriage licenses, and determining whether individuals meet the requirements for marriage.

Defendant David Lakey is the Commissioner of the Texas Department of State Health Services, which includes the bureau of vital statistics. He is responsible for prescribing and furnishing to local clerks' offices the marriage forms that require applicants to list the names of a "bride" and a "groom."

**C. Texas Laws at Issue**

Plaintiffs seek this Court to preliminarily enjoin Defendants from enforcing Article I, Section 32 of the Texas Constitution and corresponding provisions in the Texas Family Code that ban same-sex marriage. This Order addresses these laws and the corresponding legislative history leading to their enactment.

*1. Texas Family Code and the initial state ban on same-sex marriage*

The Texas legislature's ban on same-sex marriage dates back to 1997 when Section 2.001 of the Texas Family Code was enacted. Section 2.001 prohibits the clerk of any Texas county from issuing a marriage license to persons of the same gender. *See* TEX. FAM.CODE ANN. § 2.001(b) (West 2013).

In 2003, the Texas legislature amended the Texas Family Code to add Section 6.204, which among other things, prohibits recognition in Texas of lawful same-sex marriages executed in other jurisdictions. [2] Section 6.204 declares void all marriages between persons of the same sex and all civil unions. TEX. FAM.CODE ANN. § 6.204(b). It also prohibits the State and any of its agencies and political subdivisions from giving effect to any:

(1) public act, record, or judicial proceeding that creates, recognizes, or validates a marriage between persons of the same sex or a civil union in the state or in any other jurisdiction; or

(2) right or claim to any legal protection, benefit, or responsibility asserted as a result of a marriage between persons of the same sex or a civil union in this state or in any other jurisdiction.

TEX. FAM.CODE ANN. § 6.204(c). Supporters of Section 6.204 claimed:

> The protective marriage relationship between a man and a woman is a fundamental institution whose purpose is the propagation of the species in humanity's collective interest. The state has an interest in protecting this relationship, because it gives women and children the surest protection against poverty and abuse, provides for the healthy psychological development of children, and avoids

health risks of same-sex relations and promiscuity. The state's recognition of same-sex marriages would undermine the institution of marriage and society's ability to transmit its values to younger generations.

**\*4** HOUSE RESEARCH ORG., FOCUS REPORT, MAJOR ISSUES OF THE 78TH LEG., REG. SESS., No. 78–12, at 83 (Tex. Aug. 6, 2003). In addition to the grounds cited in the legislative report, supporters of the bill claimed it was necessary to prohibit the recognition of out-of-state civil unions because these: (1) "would create a new class of children without mothers or fathers" that "would increase costs to corporations and governmental entities;" (2) "could lead to the recognition of bigamy, incest, pedophilia, and group marriage," and (3) "[i]f the state does not draw the line here, it would be difficult to draw it anywhere." *See* HOUSE RESEARCH ORG., DAILY FLOOR REPORT, 78TH LEG., REG. SESS., at 27–29 (Tex. Apr. 29, 2003).

### 2. Texas Constitutional Amendment
Article I, Section 32 of the Texas Constitution began as House Joint Resolution No. 6 (hereinafter "H.J.R. 6"), which proposed to amend the Texas Constitution to define marriage as "the union of only one man and one woman." H.J.R. Res. 6, 79th Leg., Reg. Sess. (Tex. 2005). On April 25, 2005, subdivision (b) was added, which expressly bars the State and any political subdivision thereof from creating or recognizing any legal status identical or similar to marriage. *See* TEX. CONST. art. I, § 32(b).

The legislative history of H.J.R. 6 shows that the amendment was supported by the same purported rationale as Section 6.204 of the Texas Family Code. The primary argument in support of H.J.R. 6 was:

> [T]raditional marriage consisting of a man and a woman is the basis for a healthy, successful, stable environment for children. It is the surest way for a family to enjoy good health, avoid poverty, and contribute to their community. The sanctity of marriage is fundamental to the strength of Texas' families, and the state should ensure that no court decision undermine this fundamental value.

HOUSE RESEARCH ORG., H.J.R. 6 BILL ANALYSIS, 79TH LEG., REG. SESS., at 34 (Tex. Apr. 25, 2005). The authors of the amendment drafted it to preclude not only same-sex couples from marrying, but also any "separate but equal" same-sex institution, such as a civil union. *See* HOUSE RESEARCH ORG., FOCUS REPORT, AMENDMENTS PROPOSED FOR NOVEMBER 2005 BALLOT, No. 79–10, at 9 (Tex. Sept. 15, 2005) (noting civil unions should not be permitted because they would be a "way for same-sex couples to circumvent laws protecting marriage by creating a legal arrangement that is substantially the same as marriage").

H.J.R. 6 passed following votes in both houses of the Texas legislature. Under Texas law, the governor's approval is not necessary to put a proposed constitutional amendment on an electorate ballot. *See* TEX. CONST. art. 17, § 1(a). Nevertheless, in early June 2005, Governor Rick Perry signed the proposed constitutional amendment at the Calvary Christian Academy in Fort Worth, Texas.

After approval by the Texas legislature and Defendant Perry, H.J.R. 6 was placed on the electorate ballot in 2005 as Proposition 2. Proposition 2 passed with approximately 76% of the vote. As a result, Article I of the Texas Constitution now includes the following amendments under Section 32:

**\*5** (a) Marriage in this state shall consist only of the union of one man and one woman.

(b) This state or a political subdivision of this state may not create or recognize any legal status identical or similar to marriage.

TEX. CONST. art. I, § 32.

### D. National Debate on Same–Sex Marriage
In the last couple of decades, our nation has experienced a politically charged and controversial debate regarding the right to marry, and particularly, the right of same-sex couples to marry in the United States. Both state and federal governments have taken center stage in this debate, participating in court proceedings or enacting legislation that either supports or bans same-sex marriage.

### 1. Other states' positions on same-sex marriage
In 1993, the Hawaii Supreme Court was the first court that opened the door to same-sex marriage, holding that the state's prohibition on same-sex marriage was discriminatory under

the Hawaii Constitution. *Baehr v. Lewin,* 74 Haw. 530, 852 P.2d 44, 59 (1993). The court remanded the case to allow the state to justify its position and show if the marriage statute was narrowly drawn to further a compelling state interest. *Id.* at 68. [3]

In 1999, the Vermont Supreme Court held that the state of Vermont was required to offer all the benefits of marriage to same-sex couples. *Baker v. Vermont,* 170 Vt. 194, 744 A.2d 864, 866–67 (1999). The determination of whether to provide such benefits to same-sex partners by including them within the marriage statutes, or by creating a parallel domestic partnership system or some equivalent statutory alternative, was left to the Vermont legislature. *See id.* at 886. The Vermont legislature complied with this mandate by creating a legal status for civil unions. *See* An Act Relating to Civil Unions, 2000 Vt. Acts & Resolves 91 § 1(1) (legislative findings). This was the nation's first law granting gay couples nearly all marriage benefits through the formation of a civil union. [4] The reaction to this legislation was immediate and visceral in the next few years. *See Bourke v. Beshear,* No. 3:13–CV–750–H, — F.Supp.2d ——, ——, 2014 WL 556729, at *2 n. 1 (W.D.Ky. Feb. 12, 2014) (citing statutes from over twenty-seven states that enacted anti-same-sex marriage legislation).

Then, in 2003, two cases significantly changed the treatment and protection of homosexuals under the law. First, the United States Supreme Court ruled that the Due Process Clause of the Fourteenth Amendment protected the sexual relations and privacy of gay men and lesbians. *Lawrence v. Texas,* 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). Second, the Massachusetts Supreme Court declared that the Massachusetts constitution protected the right of same-sex couples to marry, and therefore, that the state's ban on same-sex marriage violated its own state constitution. *Goodridge v. Dep't of Pub. Health,* 440 Mass. 309, 798 N.E.2d 941, 948, 969 (2003).

Since 2003, states continue to have polarizing views on the issue of same-sex marriage; that is, most states have either legalized same-sex marriage or passed a constitutional amendment or other legislation prohibiting same-sex marriage and civil unions. To this day, six states have legalized same-sex marriage through state court decisions (California, Connecticut, Iowa, Massachusetts, New Jersey, New Mexico); eight states have passed same-sex marriage legislation (Delaware, Hawaii, Illinois, Minnesota, New Hampshire, New York, Rhode Island, Vermont);

and three states have legalized same-sex marriage through popular vote (Maine, Maryland, Washington). *See Kitchen v. Herbert,* No. 2:13–cv–217, 961 F.Supp.2d 1181, ——, 2013 WL 6697874, at *5 n. 4 (D.Utah Dec. 20, 2013).

### 2. Federal government and same-sex marriage

**\*6** The federal government has also participated in the same-sex marriage debate. In 1996, Congress passed the Defense of Marriage Act (DOMA), which, among other things, barred federal recognition of same-sex marriages deemed legal in other states and barred federal same-sex civil unions for purposes of federal law. Act of Sept. 21, 1996, Pub. L. 104–199, 110 Stat. 2419. In 2013, the Supreme Court held in *United States v. Windsor* that Section 3 of DOMA was unconstitutional. 133 S.Ct. at 2696.

That same year, the Supreme Court also considered an appeal from a case involving California's Proposition 8. After the California Supreme Court held that California's constitution recognized same-sex marriage, *In re Marriage Cases,* 43 Cal.4th 757, 76 Cal.Rptr.3d 683, 183 P.3d 384 (2008), California voters passed Proposition 8 in November 2008, which amended California's constitution to prohibit same-sex marriage. Then, a California federal court determined that Proposition 8 violated the guarantees of equal protection and due process under the United States Constitution. *Perry v. Schwarzenegger,* 704 F.Supp.2d 921, 1003 (N.D.Cal.2010). The Ninth Circuit Court of Appeals affirmed the district court's holding in *Perry v. Brown,* 671 F.3d 1052, 1095 (9th Cir.2012), *rev'd,* — U.S. ——, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013). The case was then appealed to the Supreme Court, but the Court did not address the merits of the question presented. *Hollingsworth v. Perry,* —U.S. ——, 133 S.Ct. 2652, 2668, 186 L.Ed.2d 768 (2013). Instead, the Court vacated the Ninth Circuit's opinion for lack of jurisdiction, finding the proponents of Proposition 8 did not have standing to appeal the district court's decision after California officials refused to defend the law. *Id.*

Most recently, six federal district courts have issued decisions declaring states' bans on same-sex marriage to be unconstitutional. *See Lee v. Orr,* No. 13–cv–8719, 2014 WL 683680 (N.D.Ill. Feb. 21, 2014) (applied only to Cook County, Illinois); *Bostic v. Rainey,* No. 2:13–cv–395, —— F.Supp.2d ——, 2014 WL 561978 (E.D.Va. Feb. 13, 2014) (Virginia); *Bourke,* ——F.Supp.2d ——, 2014 WL 556729 (Kentucky); *Bishop v. United States ex rel. Holder,* 962 F.Supp.2d 1252 (N.D.Okla.2014) (Oklahoma); *Obergefell*

*v. Wymyslo,* 962 F.Supp.2d 968 (S.D.Ohio 2013) (Ohio); *Kitchen,* 961 F.Supp.2d 1181 (Utah).

## II. ANALYSIS

### A. Preliminary Matters

### *1. Plaintiffs' standing*

**[1]** **[2]** As a preliminary matter, the Court notes that Defendants' pleadings and written briefs neither address nor challenge Plaintiffs' standing in this case.[5] However, the Court addresses the issue of standing as it is one of subject-matter jurisdiction. *See Cobb v. Central States,* 461 F.3d 632, 635 (5th Cir.2006). Federal courts have no jurisdiction unless a case or controversy is presented by a party with standing to litigate. *Taylor ex rel. Gordon v. Livingston,* 421 Fed.Appx. 473, 474 (5th Cir.2011) (quoting *Nevares v. San Marcos Consol. Ind. Sch. Dist.,* 111 F.3d 25, 26 (5th Cir.1997)).

***7** **[3]** A plaintiff must meet three elements to establish standing. First, a plaintiff must have suffered an injury in fact which is concrete and particularized. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Second, a plaintiff must establish a causal connection between the injury and the conduct complained of. *Id.* Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

**[4]** There is no dispute that Plaintiffs are loving couples in long-term committed relationships, who seek to marry in Texas or have their out-of-state same-sex marriage recognized in Texas. Plaintiffs claim they have suffered real and particularized injuries as a direct result of Defendants' enforcement of Texas' laws banning same-sex marriage. These injuries include far-reaching legal and social consequences, along with the pain of humiliation, stigma, and emotional distress.

For example, Plaintiffs note that Texas' refusal to marry or recognize same-sex marriage denies them many state law benefits. Plaintiffs argue that, among other things, current Texas laws do not allow them to:

(1) claim statutory protections afforded to married couples upon the death of a spouse, such as intestacy rights. TEX. PROBATE CODE §§ 38, 45;

(2) bring an action for wrongful death. TEX. CIV. PRAC. & REM.CODE § 71.004;

(3) claim certain protections against the partition of the homestead following the death of a spouse. TEX. CONST. art. 16, § 52;

(4) receive the community property presumption afforded to married couples. TEX. FAM.CODE § 3.003;

(5) petition the court for an equitable division of community property, including rights in any pension or retirement plan. TEX. FAM.CODE §§ 7.001, 7.003;

(6) seek spousal maintenance if they separate or divorce. TEX. FAM.CODE § 8.051;

(7) enjoy the benefit of the "zone of privacy" that heterosexual married couples enjoy in the form of evidentiary privileges between spouses. TEX.R. EVID. 504;

(8) enjoy succession rights under state laws of intestacy. TEX. PROB.CODE § 45; or

(9) have the right to make burial or other decisions regarding the handling and disposition of one another's remains.

On October 3, 2013, Plaintiffs Holmes and Phariss applied for a marriage license from the Bexar County Clerk Rickhoff's office. Defendant Rickhoff refused to issue a license because Holmes and Phariss are both men. This denial establishes an Article III injury. *See Parker v. D.C.,* 478 F.3d 370, 376 (D.C.Cir.2007) (holding that courts have consistently treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III injury); *see also Bishop,* 962 F.Supp.2d at ——, 2014 WL 116013, at *14 (noting couple proved standing because they sought marriage license and were denied such license because of their same-sex couple status); *see also Bostic,* —— F.Supp.2d at ——, 2014 WL 561978, at *14. Meanwhile, Plaintiffs De Leon and Dimetman contend that because Texas does not recognize same-sex marriage, Dimetman could not be considered their child's legal parent unless she went through the long administrative and expensive process of adoption. The Court finds these monetary damages constitute a concrete, injury in fact suffered by Plaintiffs due to Texas' ban on same-sex marriage.

**\*8** **[5]** Furthermore, Plaintiffs allege they have suffered state sanctioned discrimination, stigma, and humiliation as a result of Texas' ban on same-sex marriage. Plaintiffs claim they are considered inferior and unworthy under Texas law. Stigmatic injury is a form of injury that supports standing in this case. *See Allen v. Wright,* 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (finding that stigmatic injury often caused by discrimination is a type of noneconomic injury that may be sufficient to support standing); *see also Bostic,* --- F.Supp.2d ----, 2014 WL 561978, at \*14 (same). In this case, it is clear that Plaintiffs suffer humiliation and discriminatory treatment under the law on the basis of their sexual orientation, and this stigmatic harm flows directly from Texas' ban on same-sex marriage. *See Bishop,* 962 F.Supp.2d ----, 2014 WL 116013, at \*9. Furthermore, in equal protection cases when the government erects a barrier to prevent one group from obtaining a benefit that another group receives, "[t]he injury in fact ... is the denial of equal treatment resulting from the imposition of the barrier." *Ne. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). Accordingly, the Court finds all Plaintiffs in this case have established the denial of equal treatment under Texas law. The Court finds Plaintiffs have satisfied the first standing requirement by establishing they have suffered injuries.

Plaintiffs have also established the causation element needed for standing, as the injuries raised are directly related to Texas' ban on same-sex marriage. *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. Finally, the Court finds Plaintiffs meet the third standing requirement. If this Court issues an injunction prohibiting Defendants from enforcing Texas' marriage laws, Plaintiffs' injuries will be redressed—Plaintiffs would be allowed to marry, or have their out-of-state same-sex marriage recognized in Texas. This would allow Plaintiffs to be eligible for the many state-law benefits they are now denied. Accordingly, the Court finds Plaintiffs have standing to bring the claims before this Court.

### 2. Baker v. Nelson's Precedential Value

**[6]** The next preliminary matter involves Defendants' assertion that Plaintiffs' claims are foreclosed by Supreme Court precedent in *Baker v. Nelson,* 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). In 1971, two men from Minnesota brought a lawsuit in state court arguing that Minnesota was constitutionally required to allow same-sex marriage. *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185, 187 (1971), *appeal dismissed,* 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). The Minnesota Supreme Court

found that Minnesota's restriction of marriage to opposite-sex couples did not violate either the equal protection or the due process clause of the Fourteenth Amendment. *Id.* at 186–87. On appeal, the United States Supreme Court summarily dismissed the case "for want of a substantial federal question." *Baker,* 409 U.S. at 810, 93 S.Ct. 37. As a result, Defendants contend that the Court's summary dismissal in *Baker* is binding on this Court and the present lawsuit should be dismissed for lack of a substantial federal question.

**\*9** **[7]** **[8]** There is no dispute that summary dispositions by the Supreme Court are considered precedential and binding on lower courts. *See Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (noting summary dispositions prevent lower courts from coming to opposite conclusions on the issues presented and decided by those actions). There is also no dispute that the questions presented in *Baker* are similar to the questions presented here. Both cases involve challenges to the constitutionality of a state statute which prohibits same-sex marriage. The ruling of the Supreme Court of Minnesota rejected due process and equal protection arguments similar to those presented by Plaintiffs in this case. However, summary dispositions may lose their precedential value and are no longer binding "when doctrinal developments indicate otherwise." *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (quoting *Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth.,* 387 F.2d 259, 263 n. 3 (2d Cir.1967)). *Baker* was decided more than forty years ago. This Court finds that subsequent doctrinal and societal developments since 1972 compel this Court to conclude that the summary dismissal in *Baker* is no longer binding, and that the issue of same-sex marriage now presents a substantial federal question.

First, in 1973, the Supreme Court recognized that sex is a quasi-suspect classification. *See Frontiero v. Richardson,* 411 U.S. 677, 688, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). Then, the Supreme Court recognized a new form of heightened scrutiny and applied it to sex-based classifications. *See Lalli v. Lalli,* 439 U.S. 259, 264–65, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978); *Craig v. Boren,* 429 U.S. 190, 197–98, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). In 1996, the Supreme Court held that a Colorado constitutional amendment targeting homosexuals based upon animosity lacked a rational relation to any legitimate governmental purpose. *See Romer v. Evans,* 517 U.S. 620, 634–35, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (citing *Dep't of Agr. v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)) ("[I]f the constitutional

conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.") (emphasis added).

Then, in 2003, the Court held that homosexuals had a protected liberty interest to engage in private, sexual activity; that homosexuals' moral and sexual choices were entitled to constitutional protection; and that moral disapproval did not provide a legitimate justification for a Texas law criminalizing sodomy. *See Lawrence*, 539 U.S. at 564, 571, 123 S.Ct. 2472. The Court held that the Constitution protects "personal decisions relating to marriage, procreation, contraception, family relationships, [and] child rearing" and that homosexuals "may seek autonomy for these purposes." *Id.* at 574, 123 S.Ct. 2472.

Most recently, in 2013, the United Supreme Court held that the Constitution prevented the federal government from treating state-sanctioned heterosexual marriages differently than state-sanctioned same-sex marriages, and that such differentiation "demean[ed] the couple, whose moral and sexual choices the Constitution protects." *See Windsor*, 133 S.Ct. at 2694. Notably, that same year, while the Court declined to reach the merits in *Hollingsworth v. Perry* because the petitioners lacked standing to pursue the appeal, the Court did not dismiss the case outright for lack of a substantial federal question. *See* 133 S.Ct. at 2652.

**\*10** Accordingly, the Court finds that these cases present the type of doctrinal developments that render *Baker*'s summary dismissal of no precedential value. It is now clear that while state bans on same-sex marriage may have been deemed an "unsubstantial" question in 1972, the issue is now a "substantial" federal question based on doctrinal developments in Supreme Court law. *See Windsor v. United States*, 699 F.3d 169, 178 (2d Cir.2012), *aff'd*, ——— U.S. ———, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013) (holding that *Baker* was not controlling as to the constitutionality of DOMA, reasoning that "[i]n the forty years after *Baker*, there have been manifest changes to the Supreme Court's equal protection jurisprudence" and that "[e]ven if *Baker* might have had resonance ... in 1971, it does not today").

Defendants in this case allege that, despite the doctrinal developments in the above-mentioned cases, some courts have found that *Baker* survives as controlling precedent and precludes consideration of the issues in this lawsuit. During oral argument, Defendants referred to *Merritt v. Attorney*

*General*, No. 3:13–cv–215–BAJ–SCR, 2013 WL 6044329 (M.D.La. Nov. 14, 2013) as support for their argument that *Baker* precludes this Court from analyzing the merits of Plaintiffs' claims. Oral Arg. Tr. p. 36.

In *Merritt*, the court considered a pro se, in forma pauperis, plaintiff's lawsuit challenging Louisiana's ban on same-sex marriages. *Id.* at \*1. The plaintiff was a detainee at the East Louisiana Mental Health System Forensic Unit. *Id.* Following a show cause order and no briefing, the court dismissed plaintiff's complaint noting the "Constitution does not require States to permit same-sex marriages;" the unidentified state legislators named as defendants were "entitled to absolute immunity from liability under § 1983 for their legislative activities;" and the plaintiff failed to allege any facts against the Attorney General. *Id.* at \*2.

The court in *Merritt* did not indicate the bases for its ruling. Furthermore, the viability of *Baker* was never briefed in *Merritt*. In fact, the plaintiff did not submit briefing on any substantive issue. Therefore, this Court does not find *Merritt* to be persuasive in this case and declines to follow it. Rather, this Court joins four recent district court decisions rejecting the argument that *Baker* still has precedential value and bars courts from addressing the issue of same-sex marriage. *See Bostic*, ——F.Supp.2d at ——, 2014 WL 561978, at \*9–10; *Bourke*, —— F.Supp.2d at ——, 2014 WL 556729, at \*1; *Bishop*, 962 F.Supp.2d at ——, 2014 WL 116013, at \*15–17; *Kitchen*, 961 F.Supp.2d at ——, 2013 WL 6697874, at \*7–9. The Court finds *Baker* is not controlling and does not bar this Court from reviewing Plaintiffs' claims in this case.

**B. Preliminary Injunction**

The Court now considers Plaintiffs' constitutional challenges to Texas' laws banning same-sex marriage in the context of the preliminary injunction Plaintiffs seek.

***1. Standard of Review***

**\*11** **[9]** A plaintiff requesting the extraordinary remedy of a preliminary injunction must establish the following four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) the injunction will not disserve the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir.1997).

## 2. Application

### (A) Likelihood of Success

In order to determine whether Plaintiffs are likely to prevail on the merits, this Court must address Plaintiffs' constitutional challenges to Texas' marriage laws, primarily Section 32. Plaintiffs contend that Texas' refusal to allow and recognize same-sex marriage violates their equal protection and due process rights under the Fourteenth Amendment.

### (i) Equal Protection Challenge

 [10]     [11]    Plaintiffs in this case contend that Texas' refusal to allow them to marry—or refusal to recognize their state-sanctioned out-of-state marriage—pursuant to Article I, Section 32 of the Texas Constitution deprives them of equal protection. The Equal Protection Clause of the Fourteenth Amendment commands that no state shall deny to any person within its jurisdiction the equal protection of the laws. See U.S. CONST. amend. XIV, § 1. This essentially means that all persons similarly situated should be treated alike. See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). The Constitution "neither knows nor tolerates classes among citizens." Plessy v. Ferguson, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting). While a "law enacted for broad and ambitious purposes often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons," it must nevertheless, at least, "bear a rational relationship to a legitimate governmental purpose." Romer, 517 U.S. at 635, 116 S.Ct. 1620.

Plaintiffs argue that refusing to permit a same-sex couple to marry under Section 32(a), and failing to recognize legal out-of-state same-sex marriages pursuant to Section 32(b), "demeans the couple, whose moral and sexual choices the Constitution protects." Windsor, 133 S.Ct. at 2694 (citing Lawrence, 539 U.S. at 588, 123 S.Ct. 2472). Just like the federal law the Court in Windsor reviewed, Section 32 identifies a "subset" of relationships (i.e. same-sex relationships) for which Texas denies the same equal rights, responsibilities, and benefits that opposite-sex couples receive through marriage. Therefore, Plaintiffs contend Section 32 is subject to equal protection review.

 [12]    Laws reviewed under the Equal Protection Clause are subject to one of three levels of scrutiny: strict scrutiny, intermediate scrutiny, or rational basis review. Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). Strict scrutiny applies to suspect classifications based on race, alienage, or national origin. City of Cleburne, 473 U.S. at 440, 105 S.Ct. 3249. Under strict scrutiny review, a state must show the challenged classification is narrowly tailored to further a compelling governmental interest. Grutter v. Bollinger, 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). Intermediate or heightened scrutiny applies to quasi-suspect, discriminatory classifications based on illegitimacy and gender. Cleburne, 473 U.S. at 441, 105 S.Ct. 3249. To survive heightened scrutiny review, a classification must be substantially related to a sufficiently important governmental interest. Id. All other classifications are subject to rational basis review. Id. at 440–41, 105 S.Ct. 3249. Under rational basis review, a classification will be upheld as long as there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

### (a) Plaintiffs argue Texas' marriage laws should be subject to heightened scrutiny

 *12   [13]    Plaintiffs argue that Section 32 discriminates against them on the basis of their sexual identity in violation of the Equal Protection Clause. When a state law adversely affects members of a certain class, but does not significantly interfere with their fundamental rights, courts first determine how closely they should scrutinize the challenged regulation. Kadrmas v. Dickinson Pub. Schs., 487 U.S. 450, 458–61, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988).

 [14]     [15]    The Supreme Court consistently applies heightened scrutiny to laws that discriminate against a group that it considers a suspect or quasi-suspect classification, i.e. one that has experienced a "history of purposeful unequal treatment or [has] been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). In addition to looking at a history of discrimination, courts also consider whether the characteristics that distinguish the class indicate a typical class member's ability to contribute to society, Cleburne, 473 U.S. at 440–41, 105 S.Ct. 3249; whether the distinguishing characteristic is "immutable" or beyond the group member's control, Lyng v. Castillo, 477 U.S. 635, 638, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986); and whether the group is "a minority

or politically powerless," *Bowen v. Gilliard,* 483 U.S. 587, 602, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987). Plaintiffs argue that homosexuals fulfill all four factors to be considered a suspect or quasi-suspect classification, and therefore, that this Court should review Texas' same-sex marriage ban under heightened scrutiny.

Plaintiffs note that homosexuals have suffered a long history of discrimination. This long history of discrimination against homosexuals is widely acknowledged in federal American jurisprudence. *See, e.g., Lawrence,* 539 U.S. at 571, 123 S.Ct. 2472 ("[F]or centuries there have been powerful voices to condemn homosexual conduct as immoral" and "lesbians and gay men have suffered a long history of discrimination and condemnation."); *Rowland v. Mad River Local Sch. Dist., Montgomery Cnty., Ohio,* 470 U.S. 1009, 1014, 105 S.Ct. 1373, 84 L.Ed.2d 392 (1985) (J. Brennan, dissenting) ("Moreover, homosexuals have historically been the object of pernicious and sustained hostility, and it is fair to say that discrimination against homosexuals is 'likely ... to reflect deep-seated prejudice rather than ... rationality.' "); *High Tech Gays v. Def. Indus. Sec. Clearance Office,* 895 F.2d 563, 573 (9th Cir.1990) ("[H]omosexuals have suffered a history of discrimination."); *Ben–Shalom v. Marsh,* 881 F.2d 454, 465–66 (7th Cir.1989) ("Homosexuals have suffered a history of discrimination and still do, though possibly now in less degree."); *Baker v. Wade,* 769 F.2d 289, 292 (5th Cir.1985) (noting that "the strong objection to homosexual conduct ... has prevailed in Western culture for the past seven centuries.").

The Court agrees that throughout history, many federal and state laws have categorically discriminated against homosexuals. For example, in 1952, Congress prohibited gay men and women from entering the country. *See Obergefell,* 962 F.Supp.2d at ——, 2013 WL 7869139, at *14; *see also Boutilier v. INS,* 387 U.S. 118, 120, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967) (concluding that the legislative history of the Immigration and Nationality Act of 1952 "indicate[d] beyond a shadow of a doubt that the Congress intended the phrase 'psychopathic personality' to include homosexuals" and labeled homosexuals "ill"). In 1953, President Eisenhower issued an executive order requiring the discharge of homosexual employees, among others, from all federal employment, and this policy remained in place until 1975. *See* Exec. *Order No. 10450, 18 F.R. 2489 (1953); see also Employment of Homosexuals and Other Sex Perverts in Government, Interim Report submitted to the Commit tee by its Subcommit tee on Investigations* pursuant to S. Res.

280 81st Congress (December 15, 1960), at 9 (finding that between 1947 to 1950, approximately 1,700 applicants for federal positions were denied employment because of their homosexuality, which was considered a "sex perversion" that made them "unsuitable" and a "security risk" for the jobs). Furthermore, until the Supreme Court's decision in *Lawrence* in 2003, consensual homosexual conduct was criminalized in many states. *Golinski,* 824 F.Supp.2d at 983–84. Before 2011, homosexuals could not openly serve in the military, and the military still criminalizes sodomy today. *Obergefell,* 962 F.Supp.2d at ——, 2013 WL 7869139, at *14. Therefore, Plaintiffs have established that homosexuals have been subjected to a long history of discrimination.

**\*13** Plaintiffs argue that, like other suspect classifications, sexual orientation has no "relation to [the] ability" of a person "to perform or contribute to society." *City of Cleburne,* 473 U.S. at 440–41, 105 S.Ct. 3249; *see Pedersen v. Office of Pers. Mgmt.,* 881 F.Supp.2d 294, 318–19 (D.Conn.2012) ("[T]he long-held consensus of the psychological and medical community is that 'homosexuality per se implies no impairment in judgment, stability, reliability or general or social or vocational capabilities.' ") (quoting 1973 RESOLUTION OF THE AMERICAN PSYCHOLOGICAL ASSOCIATION); *Perry v. Schwarzenegger,* 704 F.Supp.2d 921, 1002 (N.D.Cal.2010) ("[B]y every available metric, opposite-sex couples are not better than their same-sex counterparts; instead, as partners, parents and citizens, opposite-sex couples and same-sex couples are equal."); *see also Watkins v. U.S. Army,* 875 F.2d 699, 725 (9th Cir.1989) ("Sexual orientation plainly has no relevance to a person's ability to perform or contribute to society.")

Plaintiffs also contend sexual orientation is immutable. As the Supreme Court acknowledged, sexual orientation is so fundamental to a person's identity that one ought not be forced to choose between one's sexual orientation and one's rights as an individual—even if one could make a choice. *Lawrence,* 539 U.S. at 576–77, 123 S.Ct. 2472 (recognizing that individual decisions by consenting adults concerning the intimacies of their physical relationships are "an integral part of human freedom"). Many federal courts agree with Plaintiffs' assertion. *See, e.g., Perry,* 704 F.Supp.2d at 964–66 (holding sexual orientation is fundamental to a person's identity); *Hernandez–Montiel v. INS,* 225 F.3d 1084, 1093 (9th Cir.2000) (holding that sexual orientation and sexual identity are immutable). Furthermore, the scientific consensus is that sexual orientation is an immutable characteristic. *See Pedersen,* 881 F.Supp.2d at

320–21 (finding that the immutability of sexual orientation "is supported by studies which document the prevalence of long-lasting and committed relationships between same-sex couples as an indication of the enduring nature of the characteristic."); *Perry,* 704 F.Supp.2d at 966 ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation."); *see also* G.M. Herek, et al., *Demographic, Psychological, and Social Characteristics of Self–Identified Lesbian, Gay, and Bisexual Adults in a U.S. Probability Sample,* 7 SEXUALITY RES. & SOC. POL'Y 176, 186, 188 (2010) (noting that in a national survey, 95 percent of gay men and 84 percent of lesbian women reported that they "had little or no choice about their sexual orientation.").

Finally, Plaintiffs note that homosexual citizens constitute a minority group that lacks sufficient political power to protect themselves against discriminatory laws. In fact, the history of same-sex marriage bans across the nation illustrates the historical lack of political power possessed by gays and lesbians. Plaintiffs point out that not only do homosexuals fit all factors to be considered a suspect classification, but in fact, several courts have already admitted as much. *See, e.g.,* *SmithKline Beecham Corp. v. Abbott Labs.,* 740 F.3d 471, 480–84 (9th Cir.2014) (holding use of peremptory strike against gay juror failed heightened scrutiny); *see also* *Pedersen,* 881 F.Supp.2d at 294 (finding statutory classifications based on sexual orientation are entitled to heightened scrutiny); *Golinski v. Office of Pers. Mgmt.,* 824 F.Supp.2d 968, 989 (N.D.Cal.2012) (same).

**\*14** The Court finds Plaintiffs' arguments compelling, and at this preliminary injunction stage, it shows an increased likelihood that they will ultimately prevail on the merits. Likely, the Fifth Circuit, and eventually the United States Supreme Court, will weigh in on this issue with clear instructions. For now, the Court finds it is not necessary to apply heightened scrutiny to Plaintiffs' equal protection claim since Texas' ban on same-sex marriage fails even under the most deferential rational basis level of review.

**(b) Section 32 fails equal protection challenge even under rational basis review**

 **[16]**  To survive a rational basis review, Section 32 must bear at least some rational relationship to a legitimate governmental purpose. *Romer,* 517 U.S. at 631, 116 S.Ct. 1620; *see City of Cleburne,* 473 U.S. at 446, 105 S.Ct. 3249 (holding that even when there is a legitimate government

purpose, the discrimination must bear at least some rational relationship to that purpose); *Heller,* 509 U.S. at 321, 113 S.Ct. 2637 (noting that rational basis test requires that the proffered justification for a law "must find some footing in the realities of the subject addressed by the legislation."). Courts insist on knowing the relation between the classification adopted and the object to be attained. *Romer,* 517 U.S. at 632, 116 S.Ct. 1620. A law will not survive rational basis unless it is "narrow enough in scope and grounded in a sufficient factual context for [the court] to ascertain some relation between the classification and the purpose it serve[s]." *Id.* at 632–33, 116 S.Ct. 1620.

Defendants in this case have identified two bases or purposes for Section 32: (1) to increase the likelihood that a mother and a father will be in charge of childrearing; and (2) to encourage stable family environments for responsible procreation. These bases fail rational basis review as explained below.

**(1) Childrearing**

 **[17]**    **[18]**  There is no doubt that the welfare of children is a legitimate state interest; however, limiting marriage to opposite-sex couples fails to further this interest. Instead, Section 32 causes needless stigmatization and humiliation for children being raised by the loving same-sex couples being targeted. *See Bostic,* ––– F.Supp.2d at ––––, 2014 WL 561978, at \*18. "Like opposite-sex couples, same-sex couples have happy, satisfying relationships and form deep emotional bonds and strong commitments to their partners." *Perry,* 704 F.Supp.2d at 967. Homosexual couples are as capable as other couples of raising well-adjusted children. *See id.* at 980 ("Children raised by gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful and well-adjusted"); *Varnum v. Brien,* 763 N.W.2d 862, 899 (Iowa 2009) ("Plaintiffs presented an abundance of evidence and research, confirmed by our independent research, supporting the proposition that the interests of children are served equally by same-sex parents and opposite-sex parents.").

Defendants have not provided any evidentiary support for their assertion that denying marriage to same-sex couples positively affects childrearing. Accordingly, this Court agrees with other district courts that have recently reviewed this issue and concludes that there is no rational connection between Defendants' assertion and the legitimate interest of successful childrearing. To the contrary, this Court finds that far from encouraging a stable environment for childrearing, Section 32 denies children of same-sex parents the protections and

stability they would enjoy if their parents could marry. *See Obergefell,* 962 F.Supp.2d at ——, 2013 WL 7869139, at *20 (noting the only effect the marriage recognition bans have on children's well-being is harming the children of same-sex couples who are denied the protection and stability of having parents who are legally married); *see also Golinski,* 824 F.Supp.2d at 992 ("The denial of recognition and withholding of marital benefits to same-sex couples does nothing to support opposite-sex parents, but rather merely serves to endanger children of same-sex parents."); *Pedersen,* 881 F.Supp.2d at 336–37 (finding that the denial of marriage to same-sex parents "in fact leads to a significant unintended and untoward consequence by limiting the resources, protections, and benefits available to children of same-sex parents.").

**\*15** Furthermore, Defendants' preferred reason fails rational basis because Defendants have failed to establish how recognizing a same-sex marriage can influence, if at all, whether heterosexual couples will marry, or how other individuals will raise their families. *See Bishop,* 962 F.Supp.2d, at ——, 2014 WL 116013, at *29 ("Marriage is incentivized for naturally procreative couples to precisely the same extent regardless of whether same-sex couples (or other non-procreative couples) are included."). As the Utah court in *Kitchen* noted:

> [I]t defies reason to conclude that allowing same-sex couples to marry will diminish the example that married opposite-sex couples set for their unmarried counterparts. Both opposite-sex and same-sex couples model the formation of committed, exclusive relationships, and both establish families based on mutual love and support.

961 F.Supp.2d at ——, 2013 WL 6697874, at *25. Defendants' preferred rationale presumes that same-sex couples cannot be good parents—this is the same type of unconstitutional and unfounded presumption that the Supreme Court has held "cannot stand." *See, e.g. Stanley v. Illinois,* 405 U.S. 645, 653, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (holding a state could not conclusively presume that any particular unmarried father is unfit to raise a child). The Court finds same-sex couples can be just as responsible for a child's welfare as the countless heterosexual couples across the nation.

**(2) Procreation**

**[19]  [20]**  The procreation argument raised by Defendants also fails. The notion that banning same-sex marriage will encourage responsible procreation assumes that heterosexual marriage is "naturally procreative." However, procreation is not and has never been a qualification for marriage. *Lawrence,* 539 U.S. at 605, 123 S.Ct. 2472 (Scalia, J., dissenting) ("[W]hat justification could there possibly be for denying the benefits of marriage to homosexual couples exercising 'the liberty protected by the Constitution'? Surely not the encouragement of procreation since the sterile and elderly are allowed to marry."); *Golinski,* 824 F.Supp.2d at 993 ("The ability to procreate cannot and has never been a precondition to marriage."). This procreation rationale threatens the legitimacy of marriages involving post-menopausal women, infertile individuals, and individuals who choose to refrain from procreating. *See Bishop,* 962 F.Supp.2d at ——, 2014 WL 116013, at *30. These individuals—who cannot or will not procreate—are allowed to marry under Texas' current laws.

Therefore, Section 32 makes "no sense in light of how [it] treat[s] other groups similarly situated in relevant respects," and consequently, "encouraging stable environments for procreating" does not provide a rational basis for Section 32. *See Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 366 n. 4, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *see also Goodridge v. Dep't of Public Health,* 440 Mass. 309, 798 N.E.2d 941, 962 (2003) ("General Laws c. 207 contains no requirement that applicants for a marriage license attest to their ability or intention to conceive children by coitus. Fertility is not a condition of marriage, nor is it grounds for divorce. People who have never consummated their marriage, and never plan to, may be and stay married."); *Baker v. State,* 170 Vt. 194, 744 A.2d 864, 881 (1999) ("It is equally undisputed that many opposite-sex couples marry for reasons unrelated to procreation, that some of these couples never intended to have children, and that others are incapable of having children. Therefore, if the purpose of the statutory exclusion of same-sex couples is to 'further the link between procreation and child rearing,' it is significantly underinclusive.").

**\*16** Defendants have failed to establish how banning same-sex marriage in any way furthers responsible procreation. "Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages." *Perry,* 704 F.Supp.2d at 972. Same-sex marriage does not make it more or less

likely that heterosexuals will marry and engage in activities that can lead to procreation. *See, e.g., id.* at 999; *Goodridge,* 798 N.E.2d at 962. As the Ninth Circuit aptly put it: "It is implausible to think that denying two men or two women the right to call themselves married could somehow bolster the stability of families headed by one man and one woman." *Perry,* 671 F.3d at 1089.

In fact, rather than serving the interest of encouraging stable environments for procreation, Section 32 hinders the creation of such environments. *See Bishop,* 962 F.Supp.2d at ——, 2014 WL 116013, at *31; *Gill v. Office of Pers. Mgmt.,* 699 F.Supp.2d 374, 378 (D.Mass.2010) (concluding that Section 3 of DOMA did nothing to help children of opposite-sex parents but prevented children of same-sex couples from enjoying advantages flowing from a stable family structure); *Goodridge,* 798 N.E.2d at 963–64. As Plaintiffs De Leon and Dimetman can attest, same-sex couples, although unable to "naturally procreate," can and do have children. *See Windsor,* 133 S.Ct. at 2694 (recognizing that laws prohibiting same-sex marriage "humiliate[ ] tens of thousands of children now being raised by same-sex couples."); *see also Bishop,* 962 F.Supp.2d, at ——, 2014 WL 116013, at *29. Just like heterosexual couples, same-sex couples can have children through assisted reproductive technology and adoption. *See Golinski,* 824 F.Supp.2d at 992 ("[S]ame sex parents can and do have and adopt children."); *Baker,* 744 A.2d at 882 ("[T]he reality today is that increasing number of same-sex couples are employing increasingly efficient assisted-reproductive techniques to conceive and raise children.").

Therefore, Section 32 is not connected to any legitimate interest that justifies the denial of same-sex marriage or recognition of legal out-of-state same-sex marriages. To the contrary, as an Ohio district court recently found when confronted with the same question, the only "purpose served by treating same-sex married couples differently than opposite-sex married couples is the same improper purpose that failed in *Windsor* and in *Romer:* 'to impose inequality' and to make gay citizens unequal under the law." *Obergefell v. Kasich,* 2013 WL 3814262, at *6 (S.D.Ohio July 22, 2013). [6]

Therefore, the Court finds the argument that allowing same-sex couples to marry will undermine procreation is nothing more than an unsupported "overbroad generalization" that cannot be a basis for upholding discriminatory legislation. *See Plyler,* 457 U.S. at 217–18, 102 S.Ct. 2382.

**(3) Tradition**

 [21]   While Defendants do not expressly advance "tradition" as a rational basis for Section 32, they refer to the "traditional definition of marriage" and appeal to how it is "traditionally understood." However, tradition, alone, cannot form a rational basis for a law. *See Lawrence,* 539 U.S. at 602, 123 S.Ct. 2472 (Scalia, J., dissenting) ("Preserving the traditional institution of marriage ... is just a kinder way of describing the State's moral disapproval of same-sex couples," which, in turn, is not a legitimate reason); *Williams v. Illinois,* 399 U.S. 235, 239, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970) ("Neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack."); *Perry,* 704 F.Supp.2d at 998 ("[T]he state must have an interest apart from the fact of the tradition itself."); *Golinski,* 824 F.Supp.2d at 998 ("[T]he argument that the definition of marriage should remain the same for the definition's sake is a circular argument, not a rational justification.").

 *17   Notably, the rationale provided by Defendants as legitimate interests to support Section 32 (procreation, childrearing, and perhaps tradition), is the same rationale that has been uniformly rejected by district courts in the most recent same-sex marriage cases. *See, e.g., Bostic,* —— F.Supp.2d at ——, 2014 WL 561978, at *15 (noting that "tradition alone cannot justify denying same-sex couples the right to marry any more than it could justify Virginia's ban on interracial marriage."); *Bourke,* — F.Supp.2d at ——, 2014 WL 556729, at *7 (holding that tradition cannot alone justify the infringement on individual liberties); *Bishop,* 962 F.Supp.2d at ——, 2014 WL 116013, at *29 (holding that permitting same-sex couples to receive a marriage license does not harm or erode the procreative origins of the marriage institution, any more than marriages of couples who cannot or do not ever wish to "naturally procreate"); *Obergefell,* 962 F.Supp.2d at ——, 2013 WL 7869139, at *20 (holding there is simply no rational connection between Ohio's same-sex marriage recognition bans and the asserted goal of responsible childrearing, given that Ohio's ban does not prevent gay couples from having children); *Kitchen,* 961 F.Supp.2d at ——, 2013 WL 6697874, at *25 (noting that where state offered no evidence that opposite-sex couples would be affected by allowing same-sex marriage, "any relationship between [the ban] and the state's interest in responsible procreation 'is so attenuated as to render the distinction arbitrary or irrational.' ") (quoting *City of Cleburne,* 473 U.S. at 446, 105 S.Ct. 3249]; *Griego v. Oliver,* 316 P.3d 865, 886 (N.M.2013) ("Regarding responsible procreation, we fail to

see how forbidding same-gender marriages will result in the marriages of more opposite-gender couples for the purpose of procreating, or how authorizing same-gender marriages will result in the marriages of fewer opposite-gender couples for the purpose of procreating.").

Accordingly, the Court finds Defendants have failed to show—and the Court has been unable to find—some rational relationship between Section 32 and a legitimate governmental purpose. The Court finds Section 32 is unconstitutional because without a rational relationship to a legitimate governmental purpose, it denies same-sex couples the benefits, dignity and value of celebrating marriage and having their out-of-state marriage recognized. Therefore, the Court holds all Plaintiffs have established a likelihood of prevailing on the merits of their equal protection challenge to Texas's ban on same-sex marriage and refusal to recognize out-of-state same-sex marriages.

Because Plaintiffs have shown that Texas' same-sex marriage ban violates their equal protection rights, the law is unconstitutional without the need to reach any other constitutional challenge. Accordingly, Plaintiffs are likely to succeed on the merits of their case.

### (ii) Due Process Challenge

Since this is a preliminary order, the Court also considers Plaintiffs' due process challenge and their likelihood of success on this separate constitutional claim.

### (a) Right to marry

### (1) Marriage as a fundamental right

**\*18** **[22]** The Due Process Clause of the Fourteenth Amendment guarantees that all citizens have certain fundamental rights. *See Planned Parenthood v. Casey,* 505 U.S. 833, 846–47, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Plaintiffs Holmes and Phariss contend that Texas' refusal to allow them to marry, pursuant to Article I, Section 32(a) of the Texas Constitution, deprives them of one of these fundamental rights. Plaintiffs argue that while states have the right to adopt regulations including defining marriage, such regulations may not infringe on an individual's fundamental constitutional rights. Defendants counter that it is the State's right to define marriage free from federal interference. They assert that the issues before this Court are "inherently political questions" and not "constitutional issues." Oral Arg. Tr. p. 32.

**[23]** While Texas has the "unquestioned authority" to regulate and define marriage, *see Windsor,* 133 S.Ct. at 2693, the State must nevertheless do so in a way that does not infringe on an individual's constitutional rights. *See id.* at 2692 (noting that the incidents, benefits, and obligations of marriage may vary from state to state but are still subject to constitutional guarantees); *see Roberts v. U.S. Jaycees,* 468 U.S. 609, 620, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (holding that our federal Constitution "undoubtedly imposes constraints on the state's power to control the selection of one's spouse"); *see also Carey v. Population Servs. Int'l,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) ("[I]t is clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education.").

**[24]** Therefore, contrary to Defendants' assertion that the issues before this Court are "inherently political questions," *see* Oral Arg. Tr. p. 32, this Court finds that it must determine: (1) what individual rights are at stake in this case; (2) whether those rights are protected by the United States Constitution; (3) and if so, whether Texas' current definition and regulation of marriage impermissibly infringes on those constitutional rights.

**[25]** The Constitution guarantees that all citizens have certain fundamental rights. These rights vest in every person whom the Constitution protects and, because they are so important, *an individual's fundamental rights may not be submitted to vote and may not depend on the outcome of elections. W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (emphasis added).

**[26]** The State does not dispute that the right to marry is one of the fundamental rights protected by the United States Constitution. Oral Arg. Tr. p. 37 (arguing Texas marriage law does not violate Plaintiffs' "fundamental" right to marry). *See, e.g., Zablocki v. Redhail,* 434 U.S. 374, 384, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) ("[D]ecisions of this Court confirm that the right to marry is of fundamental importance for all individuals."); *United States v. Kras,* 409 U.S. 434, 446, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) (concluding the Court has come to regard marriage as fundamental); *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."); *Skinner v. Okla. ex. rel. Williamson,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (noting

marriage is one of the basic civil rights of man fundamental to our existence and survival); *Maynard v. Hill,* 125 U.S. 190, 205, 211, 8 S.Ct. 723, 31 L.Ed. 654 (1888) (characterizing marriage as "the most important relation in life" and as "the foundation of the family and society, without which there would be neither civilization nor progress.").

**\*19** While the right to marry is not explicitly mentioned in the text of the Constitution, this right is nevertheless protected by the guarantee of liberty under the Due Process Clause. For example, in *Casey,* the Supreme Court explicitly noted:

> Marriage is mentioned nowhere in the Bill of Rights and interracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving v. Virginia.*

505 U.S. at 847–48, 112 S.Ct. 2791; *see Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (recognizing that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment); *see also Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (holding the right to marry is a central part of the liberty protected by the Due Process Clause).

**[27]** **[28]** The Supreme Court has also recognized the right to marry implicates additional rights that are protected by the Fourteenth Amendment, including the rights to privacy, liberty, and association in marriage. *See, e.g., M.L.B. v. S.L.J.,* 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (citing *Boddie v. Connecticut,* 401 U.S. 371, 376, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)) (noting that choices about marriage, family life, and children upbringing are among the association rights the Court considers sheltered by the Fourteenth Amendment and protected against the State's unwarranted usurpation, disregard, or disrespect); *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (noting that marriage involves "a right of privacy older than the Bill of Rights" and is a "coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred."). This fundamental right to marry also entails the ability to marry the partner of one's choosing. *See generally Loving,* 388 U.S. at 12, 87 S.Ct. 1817 (noting

due process is violated by the denial of the right to marry a person of another race).

**[29]** Most recently, the Supreme Court recognized that marriage involves one of "the most intimate and personal choices a person may make in a lifetime." *Lawrence,* 539 U.S. at 574, 123 S.Ct. 2472 (quoting *Casey,* 505 U.S. at 851, 112 S.Ct. 2791). The right to marry is "central to personal dignity and autonomy ... central to the liberty protected by the Fourteenth Amendment." *Id.* The Court in *Lawrence* also recognized that "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do." *Id.*

**(2) The State may not infringe on an individual's fundamental rights**
Given the importance of marriage as a fundamental right and its relation to an individual's rights to liberty, privacy, and association, the Supreme Court has not hesitated to invalidate state marriage laws whenever such laws intrude on an individual's protected realm of liberty. For example, the Court struck down Virginia's law against interracial marriage in *Loving v. Virginia,* 388 U.S. at 12, 87 S.Ct. 1817. The Court found that Virginia's anti-miscegenation statute violated both the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *Id.*

**\*20** **[30]** In this case, Defendants argue the right to marry does not include the right to same-sex marriage. That is, Defendants claim this is a "definitional" issue, in that Plaintiffs are seeking recognition of a "new right to same-sex marriage" as opposed to the existing "right to marry." This Court finds this argument fails, as the Supreme Court did not adopt this line of reasoning in the analogous case of *Loving v. Virginia.* Instead of declaring a new right to interracial marriage, the Court held that individuals could not be restricted from exercising their "existing" right to marry on account of their chosen partner. *Loving,* 388 U.S. at 12, 87 S.Ct. 1817. That is, an interracial marriage was considered to be a subset of "marriage," in the same way that same-sex marriage is included within the fundamental right to marry. *See Casey,* 505 U.S. at 847–48, 112 S.Ct. 2791. Section 32(a) explicitly defines marriage as the union of a man and a woman, and in doing so, denies homosexuals the "existing right to marry" and to select the partners of their choosing. This, in turn, violates due process in the same fashion as the anti-miscegenation laws struck down in *Loving. See id.*

Plaintiffs Holmes and Phariss seek to exercise the right to marry the partner of their choosing, just as the plaintiffs in *Loving* did, despite the State's purported moral disdain for their choice of partner. As noted by the court in *Kitchen:*

> The alleged right to same-sex marriage that the State claims Plaintiffs are seeking is simply the same right that is currently enjoyed by heterosexual individuals: the right to make a public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustaining emotional bond.

961 F.Supp.2d at ——, 2013 WL 6697874, at *16; *see also Bostic,* ——F.Supp.2d at ——, 2014 WL 561978, at *12 ("Plaintiffs ask for nothing more than to exercise a right that is enjoyed by the vast majority of ... adult citizens.").

This Court finds that Texas cannot define marriage in a way that denies its citizens the "freedom of personal choice" in deciding whom to marry, nor may it deny the "same status and dignity" to each citizen's decision. *See Windsor,* 133 S.Ct. at 2689. By denying Plaintiffs Holmes and Phariss the fundamental right to marry, Texas denies their relationship the same status and dignity afforded to citizens who are permitted to marry. It also denies them the legal, social, and financial benefits of marriage that opposite-sex couples enjoy.

**[31]** As the Supreme Court recently recognized, a state's "definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the protection of offspring, property interests, and the enforcement of marital responsibilities." *Id.* at 2691; *see also Turner v. Safley,* 482 U.S. 78, 96, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("[M]arital status often is a precondition to the receipt of government benefits (*e.g.,* Social Security benefits), property rights (*e.g.,* tenancy by the entirety, inheritance rights), and other, less tangible benefits (*e.g.,* legitimation of children born out of wedlock)."); *Massachusetts v. US. Dep't of Health & Human Servs.,* 682 F.3d 1, 11 (1st Cir.2012) ("Loss of survivor's social security, spouse-based medical care and tax benefits are major detriments on any reckoning; provision for retirement and medical care are, in practice, the main components of the social safety net for vast numbers of Americans.").

**(3) Texas marriage laws do not survive strict scrutiny**

**\*21** **[32]** By categorically denying the fundamental right to marry to a class of citizens, Section 32(a) "interfere[s] directly and substantially with the right to marry" and can withstand constitutional challenge only if it survives strict scrutiny. *See Zablocki,* 434 U.S. at 386–87, 98 S.Ct. 673 (applying strict scrutiny because statute that prevented non-custodial parents from marrying unless they provided proof of compliance with child support obligations or obtained a court order would prevent some people from ever marrying). Section 32 survives strict scrutiny and is constitutional only if it is supported by compelling state interests and narrowly tailored to effectuate only those interests. *See Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Zablocki,* 434 U.S. at 388, 98 S.Ct. 673; *Carey,* 431 U.S. at 686, 97 S.Ct. 2010.

Overall, the Court finds Defendants have not satisfied their burden of proving that Section 32 is constitutional. Defendants have failed to identify any rational, much less a compelling, reason that is served by denying same-sex couples the fundamental right to marry. Consequently, the Court finds that Plaintiffs have shown a likelihood of success on the merits by showing that Texas' marriage laws violate their due process rights under the Fourteenth Amendment.

**(b) Out-of-state marriage recognition**

The Court now addresses Plaintiffs De Leon and Dimetman's due process challenge to Article I, Section 32(b), which prevents Texas from recognizing their legal out-of-state same-sex marriage. The Court considers the right to same-sex marriage, which the Court finds to be a "subset" of the existing fundamental right to marry, to be separate and different than the right to marriage recognition—that is, the right of same-sex couples to have their out-of-state marriage recognized in other states (i.e. Texas).

In dealing with the issue of out-of-state same-sex marriage recognition, the Supreme Court in *Windsor* held that by treating state-sanctioned same-sex married couples differently than state-sanctioned opposite-sex married couples, Section 3 of DOMA violated basic due process principles applicable to the federal government. 133 S.Ct. at 2693. In this case, the Court must decide whether a state can do what the federal government cannot—discriminate against state-sanctioned same-sex couples and deny them the benefits conferred by marriage.

The Court in *Windsor* did not clarify whether out-of-state marriage recognition implicated a fundamental right, but held that it was a right protected under the Constitution. *See id.* at 2696 (holding DOMA was unconstitutional as a deprivation of liberty of the person protected by the Fifth Amendment). Therefore, in reviewing Plaintiffs' due process constitutional challenge to Section 32(b), this Court applies a rational basis review, since Section 32(b) fails even under this most deferential standard.

**(1) Failure to recognize out-of-state marriage lacks rational basis**

[33]  [34]  Under rational basis review, the Court must determine whether Texas' marriage laws, specifically Section 32(b) banning recognition of legal out-of-state same-sex marriages, is rationally related to a legitimate government purpose. This search for a rational relationship "ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer,* 517 U.S. at 633, 116 S.Ct. 1620. Even under this most deferential standard of review, courts must still "insist on knowing the relation between the classification adopted and the object to be attained." *Id.* at 632, 116 S.Ct. 1620.

**\*22**  [35]  [36]  Under Texas law, marriages are presumptively valid in Texas and will be upheld against claims of invalidity "unless a strong reason exists for holding the marriage void or voidable." TEX. FAM.CODE ANN. § 1.101 (West 2013). Consistent with that presumption, "[t]he general rule is that a marriage valid where contracted is valid everywhere, and that one void where contracted is void everywhere." *Portwood v. Portwood,* 109 S.W.2d 515, 522 (Tex.Civ.App.1937). "The validity of a marriage is generally determined by the law of the place where it is celebrated." *Husband v. Pierce,* 800 S.W.2d 661, 663 (Tex.App.-Tyler 1990, no writ); *see also Tex. Emp'r Ins. Ass'n v. Borum,* 834 S.W.2d 395, 399 (Tex.App.-San Antonio 1992, writ denied) ("[T]he validity of the place where it is celebrated rather than the law of the place where suit is filed."); *Braddock v. Taylor,* 592 S.W.2d 40, 42 (Tex.Civ.App.1979) (same). Therefore, even if Texas itself would not allow a particular marriage to occur within its borders, that marriage generally must be recognized in Texas if lawfully performed in another state or country. *See Husband,* 800 S.W.2d at 662–63 (noting that although no county clerk in Texas could have lawfully issued a marriage license to a Texas girl without her parents' consent or a court order, a marriage performed in Mexico was legal and would be recognized under Texas law); *cf. Braddock,* 592 S.W.2d at 42 (refusing to recognize a common law marriage in Texas because California did not recognize common law marriages).

[37]  [38]  Defendants argue that Plaintiffs' claims are foreclosed by Section 2 of DOMA, 28 U.S.C. § 1738C. Section 2 provides that states may choose not to recognize same-sex marriage, which Defendants contend is authorized by the Full Faith and Credit Clause. This clause states:

> Full faith and credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the Effects thereof.

U.S. CONST., art. IV, § 1. Plaintiffs in this case are challenging Texas law, arguing that Section 32 denies them equal protection and due process. Whatever powers Congress may have under the Full Faith and Credit Clause, "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." *Graham v. Richardson,* 403 U.S. 365, 382, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). The Court in *Graham* rejected an argument similar to the one Defendants raise in this case, finding that Arizona could not impose a discriminatory fifteen-year residency requirement on aliens seeking government aid despite Arizona's claim that a federal statute gave states the authority to set their own guidelines. *Id.* at 382–83, 91 S.Ct. 1848. Therefore, the Court finds Defendants' argument unpersuasive, and holds DOMA is not a barrier to Plaintiffs' claims that Section 32 is unconstitutional because it denies recognition to out-of-state same-sex marriages.

**\*23**  [39]  As the Supreme Court has recognized, marriage conveys a host of rights, responsibilities, and benefits beyond the mere act of engaging in the ceremony of marriage. *Windsor,* 133 S.Ct. at 2694–96 (listing various marriage benefits and rights). Just as the Supreme Court noted that DOMA "divests married same-sex couples of the duties and responsibilities that are an essential part of married life and that they in most cases would be honored to accept were DOMA not in force," this Court finds that Section 32(b) prevents Texas same-sex married couples from taking on those duties and responsibilities. *See id.* at 2695; *see also Turner,* 482 U.S. at 94, 107 S.Ct. 2254 (finding that even considering limitations imposed by prison conditions, important benefits and attributes of marriage remain). This

Court finds that by declaring existing, lawful same-sex marriages void and denying married couples the rights, responsibilities, and benefits of marriage, Texas denies same-sex couples who have been married in other states their due process.

Furthermore, Section 32(b) demeans one group by depriving them of rights provided for others. As noted by the Supreme Court in Windsor:

> Responsibilities, as well as rights, enhance the dignity and integrity of the person. And [Texas' laws] contrive[ ] to deprive some couples [married out of state], but not other couples [married out of state], of both rights and responsibilities. By creating two contradictory marriage regimes within the same State, [Texas' laws] force[ ] same-sex couples to live as married for the purpose of [federal law] but unmarried for the purpose of [Texas] law.... This places same-sex couples [married out of state] in an unstable position of being in a second-tier marriage [in Texas]. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects.

See id. (quoting Windsor, 133 S.Ct. at 2693). In Texas, heterosexual couples enjoy the rights and responsibilities of marriage. By preventing same-sex couples from receiving state and federal governmental benefits afforded to heterosexual married couples, it places same-sex couples "in an unstable position of being ... second-tier [citizens]." See id.

 [40]   Applying a rational basis test, this Court does not find justification for the disparate treatment of homosexuals. Defendants have not provided any specific grounds that justify the refusal to recognize "lawful, out-of-state same-sex marriages that is not related to the impermissible expression of disapproval of same-sex married couples." See id. Defendants mention that Texas' "public policy" allows the state to deny recognition to valid out-of-state marriages, but fail to articulate what that "public policy" is. Assuming Defendants' public policy argument refers to preserving Texas' definition of traditional marriage, the Court finds that tradition alone cannot justify the infringement on individual liberties. See Heller, 509 U.S. at 326, 113 S.Ct.

2637. Moreover, Defendants fail to explain how any such public policy can reconcile recognizing some out-of-state marriages but not recognize same-sex marriages.

 *24   Plaintiffs assert that it is not enough for Texas to disapprove of same-sex marriage; rather, it must declare them void. See Husband, 800 S.W.2d at 662–63. Therefore, for Texas' public policy to allow Texas to deny recognition of out-of-state marriages, it must declare that when a same-sex married couple crossed the Texas border, their marriage not only did not exist for purpose of Texas law, but never existed at all. This Court agrees with Plaintiffs' assertion that this notion defies logic.

Accordingly, this Court finds Texas' refusal to recognize Plaintiffs' out-of-state same-sex marriage violates due process and implicates the associational rights discussed in cases like Griswold and Zablocki. See Obergefell, 2013 WL 3814262, at *6. "Even if there were proffered some attendant governmental purpose to discriminate against gay couples, other than to effect pure animus, it is difficult to imagine how it could outweigh the severe burden imposed by the ban imposed on same-sex couples legally married in other states." Id. In other words, even if Defendants had presented a legitimate reason for the enactment of Section 32(b), the Court finds it would be hard to show how this reason is directly connected and outweighs the refusal of individual rights to some citizens while the same rights are conferred on others.

Accordingly, the Court holds all Plaintiffs have established a likelihood of prevailing on the merits of their due process challenge to Texas' ban on same-sex marriage.

**(B) Irreparable injury**

 [41]   In order to receive the extraordinary remedy of a preliminary injunction, Plaintiffs also have to establish that there is a substantial threat that failure to grant the injunction will result in irreparable injury. Winter, 555 U.S. at 20, 129 S.Ct. 365; Valley, 118 F.3d at 1050. Plaintiffs allege that Texas' refusal to permit them to marry or recognize their out-of-state marriage deprives Plaintiffs of numerous federal protections, benefits, and obligations that are available to married same-sex couples. See Windsor, 133 S.Ct. at 2683 (noting that over 1,000 federal laws address marital or spousal status). These federal rights include, among others, having the same rights as heterosexual married couples in one another's Social Security benefits, 42 U.S.C. § 416, seeking protections

under the Family and Medical Leave Act, 29 U.S.C. § 2612, and federal Medicaid benefits.

Plaintiffs allege that same-sex couples residing in Texas cannot rely upon an out-of-state marriage to confer federal protections, benefits, and obligations. Texas same-sex couples who marry in another state must contend with substantial uncertainty regarding whether the federal government will recognize their marriage for all purposes. For instance, while the Internal Revenue Service recently adopted a "state of celebration" rule in recognizing same-sex marriages, it is unclear whether any other federal agencies will enact similar rules.

 *25  Indeed, the Department of Labor recently announced that the Family Medical Leave Act applies only to same-sex couples that reside in states recognizing their marriage. Section 32 and the corresponding Texas Family Code statutes similarly operate to deny certain benefits to gay and lesbian service members. In an August 30, 2013 letter to military personnel at state-run installations, Texas Military Forces were directed to deny same-sex couples enrollment access to federal healthcare and retirement benefits at Texas-based National Guard facilities. Instead, these service members and their families must travel to federal installations elsewhere in the state to enroll and obtain access to standard military benefits. In response, United States Secretary of Defense, Chuck Hagel, reprimanded Texas and the Texas National Guard for failing to grant full spousal benefits to the partners of gay and lesbian members of the armed forces. The Court finds that Texas' refusal to marry or recognize Plaintiffs' marriage also denies them many state-law benefits, previously noted in this opinion.

 [42]   [43]  Furthermore, Plaintiffs have established a likelihood of success in their constitutional challenges to Section 32. Plaintiffs have shown that continued enforcement of Section 32 infringes on their due process and equal protection rights under the Fourteenth Amendment to the United States Constitution. Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law. See, e.g., Cohen v. Coahoma County, Miss., 805 F.Supp. 398, 406 (N.D.Miss.1992). An injury is irreparable if money damages cannot compensate for the harm. Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 332 (5th Cir.1981). Not only have Plaintiffs suffered financial harm and expenses due to their inability to marry (e.g., adoption expenses), but they correctly note that no amount of money can compensate the

harm for the denial of their constitutional rights. See Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (noting that loss of constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); Deerfield, 661 F.2d at 338 (noting impairment of the constitutional right to privacy mandates a finding of irreparable harm). Accordingly, this Court finds Plaintiffs have carried their burden of establishing they would suffer irreparable injury if Section 32 continues to be enforced by Defendants.

### (C) Injury outweighs damage from injunction

 [44]   [45]  For the Court to issue a preliminary injunction enjoining Defendants from enforcing Texas' ban on same-sex marriage, Plaintiffs must establish that their threatened injuries outweigh any damage that the injunction may cause to the State. See Winter, 555 U.S. at 20, 129 S.Ct. 365; Valley, 118 F.3d at 1050. Plaintiffs allege the equities greatly favor an injunction, as there is no harm from issuing a preliminary injunction that prevents the enforcement of a likely unconstitutional statute. See Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir.2002). Plaintiffs note that a preliminary injunction is necessary because otherwise they will continue to suffer state-sanctioned discrimination and the stigma that accompanies it until they can enjoy the same rights as heterosexual couples.

 *26  Defendants argue a preliminary injunction would irreparably harm the State. Defendants argue that enjoining democratically enacted legislation harms state officials by restraining them from implementing the will of the people that they represent. Maryland v. King, ––– U.S. ––––, 133 S.Ct. 1, 3, 183 L.Ed.2d 667 (2012); New Motor Vehicle Bd. v. Orrin W. Fox. Co., 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977) ("[A]ny time a State is enjoined by a Court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). However, this Court disagrees with Defendants. As noted by Plaintiffs during oral argument, "the Fourteenth Amendment—[including] the Equal Protection Clause and the Due Process Clause [found within]—was ratified by the American people and made law. That is a protection that was voted upon. And a citizen in the United States does not have to go to the ballot box to secure equal protection of the laws." Oral Arg. Tr. p. 50. That is, an individual's federal constitutional rights are not submitted to state vote and may not depend on the outcome of state legislation or a state constitution. See Barnette, 319 U.S. at 638, 63 S.Ct. 1178. Therefore, Defendants' first argument fails.

Defendants' next argument, that Plaintiffs' harms are illusory, also fails because this Court finds Plaintiffs have established irreparable harm through the enforcement of Section 32. Accordingly, the Court finds Defendants have failed to show that the balance of harm favors the State, and finds that the balance of equities favor an injunction.

**(D)** *Public interest*

 [46]   [47]   Finally, Defendants contend that enforcement of duly enacted law is inherently in the public interest. Defendants argue that a preliminary injunction in this case would override a constitutional amendment and the statutory policy of the legislature, which are themselves "declaration[s] of public interest and policy which should be persuasive." *Virginian Ry. Co. v. Sys. Fed'n No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937). However, the Court finds that it is in the public interest to override legislation that, as found here, infringes on an individual's federal constitutional rights. "[T]he public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban Mobility for Reg. Transp.,* 698 F.3d 885, 896 (6th Cir.2012). Therefore, a preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest. *Ingebretsen v. Jackson Pub. Sch. Dist.,* 88 F.3d 274, 280 (5th Cir.1996).

Defendants also contend that an injunction at this preliminary stage would be injurious to public interest because it would effectively change the legal definition of marriage in Texas, rewriting over 150 years of Texas law, and radically altering the status quo. As mentioned earlier, this Court finds that keeping tradition and history intact is not a justification for the infringement of an individual's rights.

 **\*27**   [48]   Finally, Defendants argue that a preliminary injunction would create numerous legal and practical problems for same-sex couples and Defendants alike, because any decision from this Court would likely be undone by an interlocutory decision of the Fifth Circuit, or a ruling on appeal by the Fifth Circuit or the Supreme Court. They argue that any marriages created on the basis of the preliminary injunction will cease to exist when and if the State's definition of marriage is enforceable at a later time. However, as noted by this Court during oral argument, the Court intends to stay execution of this order pending appeal to prevent any legal and practical complications. [7]

## III. CONCLUSION

The role of the judiciary is to resolve disputes by applying the law to the facts of a particular controversy, independently and impartially. One of the court's main responsibilities is to ensure that individuals are treated equally under the law. Equal treatment of all individuals under the law is not merely an aspiration—it is a constitutional mandate. Consequently, equal protection is at the heart of our legal system and is essential for the existence of a free society.

Today's Court decision is not made in defiance of the great people of Texas or the Texas Legislature, but in compliance with the United States Constitution and Supreme Court precedent. Without a rational relation to a legitimate governmental purpose, state-imposed inequality can find no refuge in our United States Constitution. Furthermore, Supreme Court precedent prohibits states from passing legislation born out of animosity against homosexuals (*Romer* ), has extended constitutional protection to the moral and sexual choices of homosexuals (*Lawrence* ), and prohibits the federal government from treating state-sanctioned opposite-sex marriages and same-sex marriages differently (*Windsor* ).

Applying the United States Constitution and the legal principles binding on this Court by Supreme Court precedent, the Court finds that Article I, Section 32 of the Texas Constitution and corresponding provisions of the Texas Family Code are unconstitutional. These Texas laws deny Plaintiffs access to the institution of marriage and its numerous rights, privileges, and responsibilities for the sole reason that Plaintiffs wish to be married to a person of the same sex. The Court finds this denial violates Plaintiffs' equal protection and due process rights under the Fourteenth Amendment to the United States Constitution.

Accordingly, Plaintiffs have carried their burden of clearly showing that the extraordinary remedy of a preliminary injunction is appropriate in this case. Plaintiffs have shown a likelihood of success on the merits, i.e. that Section 32 is unconstitutional; have established that continued enforcement of Section 32 would cause them irreparable harm; have shown that their injuries outweigh any potential harm to Defendants; and finally, the Court concludes a preliminary injunction barring Section 32's enforcement will serve the public interest. *See Winter,* 555 U.S. at 20, 129 S.Ct. 365; *Valley,* 118 F.3d at 1050.

*28  For these reasons, the Court GRANTS Plaintiff's Motion for Preliminary Injunction (docket no. 28). The Court enjoins Defendants from enforcing Article I, Section 32 of the Texas Constitution, any related provisions in the Texas Family Code, and any other laws or regulations prohibiting a person from marrying another person of the same sex or recognizing same-sex marriage.

In accordance with the Supreme Court's issuance of a stay in *Herbert v. Kitchen*, and consistent with the reasoning provided in *Bishop* and *Bostic,* this Court stays execution of this preliminary injunction pending the final disposition of any appeal to the Fifth Circuit Court of Appeals.

It is so ORDERED.

## Footnotes

1   The Court uses the letter C in referring to Plaintiffs' child in order to protect his/her identity.

2   *See* Act of Sept. 1, 2003, 78th Leg., R.S., ch. 124, § 1 (West 2003); TEX. FAM.CODE ANN. § 6.204 (West 2013).

3   On remand, the circuit court held Hawaii's marriage statute was unconstitutional. *Baehr v. Miike,* Civ. No. 91–13945, 1996 WL 694235, at *22 (Haw.Cir.Ct. Dec. 3, 1996). The government was unable to show the statute furthered a compelling state interest. *Id.* at *21.

4   In September 1, 2009, the Vermont legislature later permitted same-sex marriage through a statute. *See* 15 V.S.A. § 9, which redefines marriage as the "legally recognized union of two people."

5   In the preliminary injunction hearing, Defendants mentioned, for the first time, that Plaintiffs had "not made a clear showing that they ha [d] standing to raise claims" in this case, because they had not explained what injury they had suffered. Oral Arg. Tr. p. 43.

6   The *Obergefell* court held that Ohio's refusal to recognize out-of-state same-sex marriages violated equal protection and issued an injunction requiring the state to recognize a same-sex marriage lawfully performed in Maryland. *Id.* at *7.

7   For the first time, during oral argument, Defendants argued that if the Court granted a preliminary injunction, it would be limited to the Plaintiffs in this case pursuant to Rule 65 of the Federal Rules of Civil Procedure. Oral Arg. Tr. p. 47. The Court disagrees. Rule 65(d) states that an injunction only binds the parties in a lawsuit. FED.R.CIV.P. 65(d). However, it does not limit the applicability of the injunction—that is, who is affected by the injunction. In this case, because Plaintiffs brought a facial challenge to Section 32, the Court's injunction applies to all same-sex couples who wish to marry in Texas or want to have their out-of-state same-sex marriage recognized in Texas. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,* 951 F.Supp.2d 891, 901 (W.D.Tex.2013) (enjoining enforcement of a provision that required abortion providers to have hospital privileges within thirty miles of the clinic where they practice, after the court held the provision did not survive a facial challenge and was deemed unconstitutional). Section 32 fails the constitutional facial challenge because, as mentioned before, Defendants have failed to provide any—and the Court finds no—rational basis that banning same-sex marriage furthers a legitimate governmental interest; that is, the Court finds "no set of circumstances" under which Section 32 would be valid. *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Barnes v. Moore,* 970 F.2d 12, 14 (5th Cir.1992) (holding that when Plaintiffs bring a facial challenge to a law, it must be established that there are no set of circumstances under which the law would be valid).

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.