2014 WL 1100794
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

April DEBOER, individually and as parent and next friend of N.D.-R, R.D.-R., and J.D.-R, minors, and Jayne Rowse, individually and as parent and next friend of N.D.-R, R.D.-R., and J.D.-R, minors, Plaintiffs,
v.
Richard SNYDER, in his official capacity as Governor of the State of Michigan, and Bill Schuette, in his official capacity as Michigan Attorney General, Defendants.

Civil Action No. 12–CV–10285.   |   Signed March 21, 2014.

**Synopsis**
**Background:** Same-sex couple brought action against governor and attorney general, alleging voter approved Michigan Marriage Amendment (MMA), which prohibited same-sex marriage, violated the Fourteenth Amendment equal protection and due process clauses.

**Holdings:** The District Court, Bernard A. Friedman, Senior District Judge, held that:

[1] MMA was not rationally related to government interest in providing optimal environment for child rearing;

[2] asserted interests in tradition and morality were not rational bases; and

[3] that Michigan had exclusive and inherent powers to define marriage did not preclude district court from finding MMA violated the Fourteenth Amendment.

Judgment for plaintiffs.

**West Codenotes**

**Held Unconstitutional**
M.C.L.A. Const. Art. 1, § 25.

**Validity Called into Doubt**
M.C.L.A. § 551.1.

**Attorneys and Law Firms**

Dana M. Nessel, Nessel Kessel, Robert A. Sedler, Wayne State University Law School, Detroit, MI, Joshua A. Block, Leslie Cooper, American Civil Liberties Union Foundation, New York, NY, Kenneth M. Mogill, Mogill, Posner, Lake Orion, MI, Mary L. Bonauto, Vickie L. Henry, Gay & Lesiban Advocates & Defenders, Boston, MA, Carole M. Stanyar Ann Arbor, MI, for Plaintiffs.

Bullard Bill, Jr., Pontiac, MI, pro se.

Joseph E. Potchen, Kristin M. Heyse, Michigan Department of the Attorney General, Michelle M. Brya, Hubbard, Fox, Lansing, MI, Tonya C. Jeter, Michigan Attorney General, Detroit, MI, Keith J. Lerminiaux, Oakland County Corporation Counsel, Pontiac, MI, Andrea J. Johnson, Beth M. Rivers, Michael L. Pitt, Pitt, McGehee, Royal Oak, MI, for Defendants.

**Opinion**

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

BERNARD A. FRIEDMAN, Senior District Judge.

**\*1** Plaintiffs April DeBoer and Jayne Rowse ("plaintiffs") challenge a November 2004 voter-approved amendment to the Michigan Constitution that prohibits same-sex marriage (hereinafter the "Michigan Marriage Amendment" or "MMA"), Mich. Const. Art. I, § 25. The Michigan Marriage Amendment states: "To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose." Plaintiffs maintain that the MMA violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and they seek to enjoin state and county officials from enforcing the provision and its implementing statutes.[1]

After reviewing the evidence presented at the trial, including the testimony of various expert witnesses, the exhibits, and stipulations, and after considering all of the legal issues involved, the Court concludes that the MMA is unconstitutional and will enjoin its enforcement.

**I.** *Background*

The underlying facts of this case are straightforward. Plaintiffs are an unmarried same-sex couple residing in Hazel Park, Michigan. They have lived together for the past eight years and jointly own their residence. Both are state-licensed foster parents. DeBoer is a nurse in the neonatal intensive care unit at Hutzel Hospital and Rowse is an emergency room nurse at Henry Ford Hospital, both located in Detroit. In November 2009, Rowse, as a single person, legally adopted child N. In October 2011, also as a single person, she legally adopted child J. In April 2011, DeBoer, as a single person, adopted child R. Unable to jointly adopt the three children, plaintiffs initially filed the instant action against the state defendants requesting that the Court enjoin them from enforcing section 24 of the Michigan Adoption Code (hereinafter "section 24"), Mich. Comp. Laws § 710.24, which restricts adoptions to either single persons or married couples. Plaintiffs claimed that section 24 violates the Equal Protection Clause because it impermissibly discriminates against unmarried couples. In response, the state defendants moved to dismiss the complaint on the grounds that, among other things, plaintiffs lacked standing to bring suit.

The Court held a hearing on the state defendants' motion and expressed reservations that plaintiffs did not possess the requisite standing to challenge section 24. The Court noted that while plaintiffs made a colorable claim that they and their children were, in fact, injured by their ineligibility to petition for joint adoption, this injury was not traceable to defendants' enforcement of section 24. Rather, plaintiffs could not jointly adopt their children because they were not married, and any legal form of same-sex union is prohibited by the MMA. The Court concluded the hearing by inviting plaintiffs to seek leave to amend their complaint to include a challenge to the MMA.

**\*2** Plaintiffs accepted the Court's invitation and sought leave to amend their complaint, which the Court granted over defendants' objection. The amended complaint included a second cause of action challenging the validity of the MMA on both due process and equal protection grounds. The state defendants then renewed their motion, this time to dismiss the amended complaint. The Court held the matter in abeyance and then denied the motion after the United States Supreme Court issued its decision in *United States v. Windsor,* ––– U.S. ––––, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013), invalidating section 3 of the Defense of Marriage Act of 1996 ("DOMA").

Thereafter, the parties both filed motions for summary judgment. The state defendants, in support of their argument that the MMA has legitimate purposes, offered the following reasons for excluding same-sex couples from Michigan's definition of marriage: (1) providing children with "biologically connected" role models of both genders that are necessary to foster healthy psychological development; (2) avoiding the unintended consequences that might result from redefining marriage; (3) upholding tradition and morality; and (4) promoting the transition of "naturally procreative relationships into stable unions." Assuming that the appropriate level of scrutiny in this case is rational basis review, the Court concluded that plaintiffs raised triable issues of fact regarding whether the proffered rationales for the MMA serve a legitimate state interest, but that plaintiffs had not demonstrated their entitlement to summary judgment. As a result, the Court scheduled the matter for trial.

**II.** *Trial Proceedings, Summary of Testimony, and Findings of Fact*

In setting the case for trial, the Court directed the parties to address a narrow legal issue: whether the MMA survives rational basis review. In other words, does the MMA proscribe conduct in a manner that is rationally related to any conceivable legitimate governmental purpose.

Plaintiffs called psychologist David Brodzinsky as their first witness. He testified that decades of social science research studies indicate that there is no discernible difference in parenting competence between lesbian and gay adults and their heterosexual counterparts. Pls.' Ex. 30 at 3–4. Nor is there any discernible difference in the developmental outcomes of children raised by same-sex parents as compared to those children raised by heterosexual parents. *Id.* Brodzinsky stressed that the primary factors influencing childhood development are:

> [the] quality of parent-child relationships; quality of the relationships between the parents ... [t]he characteristics of the parent, the styles that they adopt, parental warmth and nurturance [*sic* ], emotional sensitivity. The ability to employ age appropriate rules and structure for the child. And the kinds of educational opportunities that children are afforded is important, as well as the resources that are provided for the

> child, not only in the family itself, but the resources that, from the outside, that impact the family and the child in particular. And of course, the mental health of ... the parents.

**\*3** Brodzinsky, Tr. 2/25/14 pp. 69–70. Contrary to the state defendants' position, Brodzinsky testified that there is no body of research supporting the belief that children require parent role models of both genders to be healthy and well adjusted. *Id.* at 78–79. What matters is the "quality of parenting that's being offered" to the child. *Id.* at 78. Brodzinsky also noted that same-sex parenting has become a fact of life for many American children and that legally recognizing same-sex marriages would benefit these children by promoting family stability and investing these families with "social capital." *Id.* at 136.

Brodzinsky also addressed the criticism that most of the social science research studies informing his conclusions are statistically unreliable because they utilized small and self-selecting sample populations, i.e., "convenience studies." In addressing this criticism, Brodzinsky indicated that researchers in the fields of child development and family psychology commonly use convenience studies as a methodological tool for studying issues of interest because they, in contrast to large-scale studies, offer the opportunity for a more detailed analysis of the circumstances affecting children and their parents. While Brodzinsky acknowledged that small-scale convenience samples have their limitations, he highlighted that researchers studying same-sex households have verified the conclusions of their convenience studies by consistently replicating the results of these studies using different research strategies and sample populations. These studies, approximately 150 in number, have repeatedly demonstrated that there is no scientific basis to conclude that children raised by same-sex parents fare worse than those raised by heterosexual parents.

The Court finds Brodzinsky's testimony to be fully credible and gives it considerable weight. He testified convincingly that children's outcomes depend on the factors he cited, and not on their parents' gender and not on whether they are raised by heterosexual or same-sex couples. The quality of a person's child-rearing skills is unrelated to the person's gender or sexual orientation. Brodzinsky's credibility was not in any way lessened by the fact that the social science research upon which his opinions are based come largely from so-called "convenience studies." As Brodzinsky and others testified, such studies are the "bread and butter" of many areas of social science research, and the results of such studies are valid and reliable if, as occurred here, they are consistently replicated by different researchers studying different sample groups.

Sociologist Michael Rosenfeld supported this conclusion. In his 2010 study entitled "Nontraditional Families and Childhood Progress Through School," Rosenfeld gathered data from the 2000 United States Census to examine whether grade school children of same-sex couples progress through school at the same rate as children raised by heterosexual couples. Controlling for parental income, education levels and family stability, Rosenfeld found that children raised by same-sex couples progress through school at almost the same rate as children raised by heterosexual married couples. Regarding couple stability, Rosenfeld testified that cohabiting same-sex couples reported higher break-up rates than heterosexual married couples during the years preceding any legally recognized form of same-sex union (in the 1980s and 1990s). However, studies measuring couple stability during the era of legally recognized same-sex unions demonstrated that longevity rates among cohabiting same-sex couples was on par with heterosexual married couples. Referring to his ongoing longitudinal study[2] entitled "How Couples Meet and Stay Together," Rosenfeld confirmed that same-sex couples in legally recognized unions exhibit the same couple stability rates as their heterosexual married counterparts.

**\*4** Although he testified that the social science community has formed a strong consensus regarding the comparable outcomes of children raised by same-sex couples, Rosenfeld recognized that a small number of detractors have criticized his research. In particular, Rosenfeld referred to a 2013 study conducted by family economists Douglas Allen, Catherine Pakaluk and Joseph Price that critiqued the statistical methodology he used in his 2010 study. Allen, Palaluk and Price contended that Rosenfeld's results were inaccurate because he excluded children from his sample population who should have been included. Rosenfeld responded to this argument at trial by showing that Allen, Pakaluk and Price had overstated the statistical uncertainty of his results. Through demonstrative exhibits, Rosenfeld showed that the results of his study were not inaccurate at all. After controlling for parental education and income levels, Rosenfeld's data indicated that the children of heterosexual married couples are just as likely to be held back in school as are the children of same-sex couples. This finding led him to conclude that in terms of school progress "there is no significant difference between the children of same-sex couples and the children

of heterosexual married couples." [3] Rosenfeld, Tr. 2/25/14 p. 82.

The Court finds Rosenfeld's testimony to be highly credible and gives it great weight. His research convincingly shows that children of same-sex couples do just as well in school as the children of heterosexual married couples, and that same-sex couples are just as stable as heterosexual couples. The Court notes that the testimony of Brodzinsky and Rosenfeld is in line with a strong "no differences" consensus within the professional associations in the psychological and sociological fields. Brodzinsky made the following statement in his expert witness report, which defendants did not challenge:

> Every major professional organization in this country whose focus is the health and well-being of children and families has reviewed the data on outcomes for children raised by lesbian and gay couples, including the methods by which the data were collected, and have concluded that these children are not disadvantaged compared to children raised in heterosexual parent households. Organizations expressing support for parenting, adoption, and/or fostering by lesbian and gay couples include (but are not limited to): American Medical Association, American Academy of Pediatrics, American Psychiatric Association, American Academy of Child and Adolescent Psychiatry, American Psychoanalytic Association, American Psychological Association, Child Welfare League of America, National Association of Social Workers, and the Donaldson Adoption Institute.

Pls.' Ex. 30 at ¶ 21. In fact, the 2004 Council of Representatives of the American Psychological Association ("APA") unanimously voted in favor of issuing a position statement that "research has shown that the adjustment, development, and psychological well-being of children is unrelated to parental sexual orientation and that the children of lesbian and gay parents are as likely as those of heterosexual parents to flourish." Pls.' Ex. 111 at 2.

**\*5** Law professor Vivek Sankaran testified that the MMA destabilizes children raised by same-sex couples in the event the sole legal parent dies or becomes incapacitated. Sankaran stated that in such circumstances the "non-legal" parent could petition for guardianship over the child, but that these proceedings are burdensome and often lack finality because Michigan courts are required to review a non-legal parent's guardianship status every year until the child turns 18. Moreover, once the non-legal parent commences a guardianship proceeding there is no guarantee that the court will either award guardianship to that parent or eventually permit him or her to adopt the child. Michigan law allows any individual possessing an interest in the child's welfare to file a petition removing the guardian if the removal would serve the child's best interests. Sankaran testified that an interested person may include a distant relative of the child, a neighbor, teacher, or "anyone who claims to have an interest in the child."

Should the non-legal parent encounter any delay in pursuing the guardianship, there is also the prospect that the Michigan Department of Human Services ("DHS") could initiate a child neglect investigation because the child would be left for at least some period of time without a legal guardian. Sankaran, Tr. 2/26/14 pp. 120–121. In this event, DHS is authorized to file a petition in juvenile court to remove the child from the custody of the non-legal parent and place the child in foster care. At the removal proceeding, the non-legal parent would not be a party to the proceeding nor would the juvenile court appoint a lawyer to represent the non-legal parent's interests. According to Sankaran, the non-legal parent would have to become a licensed foster parent in order to obtain custody of the child, and even then the juvenile court is not required to place the child with the non-legal parent. These destabilizing consequences could have far reaching effects throughout the state, as demographer Gary Gates testified that currently there are approximately 14,598 same-sex couples living in Michigan and that approximately 2,650 such couples are raising 5,300 children. Gates, Tr. 2/27/14 p. 29.

The Court finds Sankaran's testimony to be fully credible and gives it great weight. He testified convincingly that children being raised by same-sex couples have only one legal parent and are at risk of being placed in "legal limbo" if that parent dies or is incapacitated. Denying same-sex couples the ability to marry therefore has a manifestly harmful and destabilizing effect on such couples' children. The testimony of Gates, whom the Court also found to be a highly credible witness, showed the magnitude of this effect by noting that 5,300

children in Michigan are currently being raised by same-sex couples.

Plaintiffs also presented expert testimony that the MMA erodes the benefits that marriage has historically promoted. Historian Nancy Cott testified that, from the founding of the colonies through the early years of the republic, civil authorities regulated marriage to foster stable households, legitimate children and designate providers to care for dependents who otherwise would become wards of the state. During the twentieth century, the state and federal governments furthered these goals by granting many benefits to married couples. For instance, Social Security survivor benefits and government sponsored healthcare benefits are available to legally married couples, but not unmarried partners. Yet, by effectively foreclosing same-sex couples from obtaining these benefits, the MMA undermines the very aim of one of the central historical bases for civil marriage, namely, family stability.

**\*6** Cott further attested that there is no historical precedent for prohibiting marriages that are incapable of creating biological offspring. After surveying the domestic legal history of every state in the country, Cott indicated that none of them have ever required a couple to possess the capacity or inclination to procreate as a prerequisite to marriage. Cott, Tr. 2/28/14 p. 14. She highlighted that sterility or infertility have never constituted legal grounds for the annulment of a marriage. Nor have states prohibited post-menopausal women or sterile men from marrying. Examining the historical grounds for divorce, Cott noted that the "inability to have a child has not been a ground of divorce in any state, including Michigan." *Id.* at 15. The Court finds Cott to be highly credible and accords her testimony great weight.

Even today, the State of Michigan does not make fertility or the desire to have children a prerequisite for obtaining a marriage license. As defendant Lisa Brown testified, Michigan county clerks are not authorized to consider a couple's stability, criminal record, ability to procreate, parenting skills, or the potential future outcomes of their children before issuing a marriage license. Brown, Tr. 3/3/14 pp. 34, 38–40. County clerks may only evaluate the age and residency of the license applicants and whether either of the applicants is currently married. [4] *Id.* at 32, 35.

The Court finds Brown to be highly credible and gives her testimony great weight. She testified convincingly that county clerks in Michigan must issue a marriage license to any couple who meet the sparse statutory requirements concerning age, residency, and single status. Clerks do not inquire about whether applicants intend to raise children, whether they possess good parenting skills, or whether they have a criminal record.

In defense of their asserted justifications for the MMA, the state defendants first called sociologist Mark Regnerus. Regnerus's testimony focused on the results of his 2012 "New Family Structures Study" ("NFSS"), a survey data collection project that was formulated to assess adult outcomes of children who reported that one of their parents had been in a "romantic relationship with someone of the same-sex" during the respondents' childhood years. Of the 15,000 participants ranging in age from 18 to 39, 248 of them reported that one of their parents had been in such a romantic relationship. From this sample, 175 reported that their mother had a same-sex romantic relationship while 73 reported that their father had been romantically involved with another man. Regnerus then compared the adult outcomes of these two subgroups with another set of participants who were raised by intact biological parents. The outcomes of these groups were significantly different.

Regnerus found that children who reported that their mothers had a same-sex relationship were less likely to pursue an education or obtain full-time employment and more likely to be unemployed and receiving public assistance, more likely to experience sexual assault, more likely to cheat on their partners or spouses and more likely to have been arrested at some point in their past. Similarly, Regnerus discovered that children who reported that their fathers had a same-sex relationship were more likely to have been arrested, more likely to plead guilty to non-minor offenses and more likely to have numerous sexual partners.

**\*7** Although Regnerus touted the NFSS as one of the few studies to use a large representative pool of participants drawn from a random population-based sample, other sociological and demographic experts, including Rosenfeld and Gates, heavily criticized the study on several grounds. First, it failed to measure the adult outcomes of children who were actually raised in same-sex households. This is because the participants' household histories revealed that many parental same-sex romantic relationships lasted for only brief periods of time. And many of the participants never lived in a same-sex household at all. Regnerus reported that "just over half (90) of the 175 respondents whose mother had a lesbian relationship reported that they did not live with both their

mother and her same-sex partner at the same time." *Id.* at 11. Second, many critics voiced their concern that the NFSS made an unfair comparison between children raised by parents who happened to engage in some form of same-sex relationship and those raised by intact biological families. This is because almost all of the children in the former group were the offspring of a failed prior heterosexual union, which produced a significant measure of household instability and parental relationship fluctuation.

Even Regnerus recognized the limitations of the NFSS. In his expert report, Regnerus acknowledged that "any suboptimal outcomes may not be due to the sexual orientation of the parent" and that "[t]he exact source of group differences" are unknown. Defs.' Ex. 28 at 5. Moreover, of the only two participants who reported living with their mother and her same-sex partner for their entire childhood, Regnerus found each of them to be "comparatively well-adjusted on most developmental and contemporary outcomes." *Id.* at 11. Nonetheless, Regnerus testified that there is no conclusive evidence that "growing up in households wherein parents are in (or have been in) same-sex relationships" does not adversely affect child outcomes. *Id.* at 16.

The Court finds Regnerus's testimony entirely unbelievable and not worthy of serious consideration. The evidence adduced at trial demonstrated that his 2012 "study" was hastily concocted at the behest of a third-party funder, which found it "essential that the necessary data be gathered to settle the question in the forum of public debate about what kinds of family arrangement are best for society" and which "was confident that the traditional understanding of marriage will be vindicated by this study." *See* Pls.' Motion in limine to Exclude Testimony of Mark Regnerus, Ex. 9. In the funder's view, "the future of the institution of marriage at this moment is very uncertain" and "proper research" was needed to counter the many studies showing no differences in child outcomes. *Id.* The funder also stated that "this is a project where time is of the essence." *Id.* Time was of the essence at the time of the funder's comments in April 2011, and when Dr. Regnerus published the NFSS in 2012, because decisions such as *Perry v. Schwarzenegger,* 704 F.Supp.2d 921 (N.D.Cal.2010), and *Windsor v. United States,* 833 F.Supp.2d 394 (S.D.N.Y.2012), were threatening the funder's concept of "the institution of marriage."

**\*8** While Regnerus maintained that the funding source did not affect his impartiality as a researcher, the Court finds this testimony unbelievable. The funder clearly wanted a certain result, and Regnerus obliged. Additionally, the NFSS is flawed on its face, as it purported to study "a large, random sample of American young adults (ages 18–39) who were *raised* in different types of family arrangements" (emphasis added), but in fact it did not study this at all, as Regnerus equated being raised by a same-sex couple with having ever lived with a parent who had a "romantic relationship with someone of the same sex" for any length of time. Whatever Regnerus may have found in this "study," he certainly cannot purport to have undertaken a scholarly research effort to compare the outcomes of children raised by same-sex couples with those of children raised by heterosexual couples. It is no wonder that the NFSS has been widely and severely criticized by other scholars, and that Regnerus's own sociology department at the University of Texas has distanced itself from the NFSS in particular and Dr. Regnerus's views in general and reaffirmed the aforementioned APA position statement.

In reviewing the many research studies that have measured the outcomes of children raised by same-sex couples, family studies professor Loren Marks and economist Joseph Price questioned the validity of these studies in view of their statistical methodologies. Both witnesses testified that the research studies of same-sex families often have relied upon small self-selecting sample sizes, rarely compared child outcomes to children raised by intact heterosexual couples, and failed to use "hard" outcome variables that are easily to measured, i.e., grade retention, criminality or unemployment.

In his testimony, Marks lauded a 1996 study performed by Australian researcher Sotirios Sarantakos entitled "Children in Three Contexts: Family, Education and Social Development." That study compared 58 children of heterosexual married parents, 58 children of heterosexual cohabiting couples, and 58 children living with same-sex couples across a wide spectrum of teacher-reported scholastic measures. Defs.' Ex. 25 at 16, 38. Marks testified that after controlling for, among other things, parental income and education levels, the study found significant differences between children raised by intact heterosexual married parents and those raised by same-sex parents. Sarantakos concluded, "children of married [heterosexual] couples are more likely to do well at school in academic and social terms, than children of cohabiting and homosexual couples." *Id.* at 17. However, on cross-examination, Marks conceded that the study's probative value was limited by the fact that most of the 58 children raised by same-sex couples experienced parental divorce at some earlier time in their lives. Marks,

Tr. 3/5/14 pp. 75–76. By comparison, none of the children raised by heterosexual married parents experienced parental separation. *Id.* at 76. At several points in the study, even Sarantakos acknowledged that this discrepancy in family stability could have accounted for the differing levels of achievement between these groups. *Id.* at 76–78.

**\*9** Price cited to his 2012 article, authored with Douglas Allen and Catherine Pakaluk, in evaluating the statistical methodology that Rosenfeld used in his 2010 study. Price opined that the Rosenfeld study was flawed because the results were statistically uncertain and the sample population was too small to observe statistically significant differences between children raised by same-sex couples and those raised by heterosexual couples. Price also stated that Rosenfeld's study was problematic because it controlled for family stability by "restricting an analysis of family structure to families that have [not] experience[d] changes for the previous five years," which "eliminates one of the important channels through which the effect of family structure is likely to operate." Defs.' Ex. 27 at ¶ 28. By expanding Rosenfeld's sample population and controlling for certain factors such as family stability, Price's study found that children raised by same-sex couples have noticeably worse outcomes than children raised by heterosexual couples. Ultimately, both Marks and Price concluded that current social science research has not definitively demonstrated that there is no difference between children raised by same-sex couples and those children raised by their heterosexual counterparts. Marks, Tr. 3/5/14 p. 24; Price, Tr. 3/5/14 pp. 54–56.

Economist Douglas Allen testified about his own study using data from the 2006 Canadian Census, which compared the high school graduation rates of young adults (ages 17–22) raised by heterosexual married couples and those raised by same-sex couples. Without controlling for any particular factors, Allen found that 72 percent of children raised in heterosexual married households graduated from high school as opposed to 60 percent of those raised in gay parent homes and 52 percent for those raised in lesbian homes. Defs.' Ex. 26 at ¶ 36. On cross-examination, Allen conceded that many of the young adults who were living in same-sex households in 2006 had previously lived in heterosexual households where their parents had either divorced or separated. *Id.* at ¶ 49; Allen, Tr. 3/6/14 pp. 119–120. Similarly, because the study relied on a "snap shot" of the sample population during the 2006 Canadian Census, Allen could not gauge how the young adult subjects progressed through school during their childhood years or when their academic progress began to decline. Allen, Tr. 3/6/14 p. 120. One of the major limitations of Allen's study was that he could not discern whether a particular young adult's academic decline coincided with a separation in the household. *Id.* at 120–121. This led Allen to acknowledge in a footnote that his "paper does not study the effect of *growing up* in a same-sex household, but rather examines the association of school performance for those children who lived with same-sex parents in 2006." Defs.' Ex. 15 at 4 (emphasis added). Moreover, when Allen controlled for parental education, marital status and five years of residential stability, he discovered that there was no statistically significant difference in graduation rates. Allen, Tr. 3/6/14 pp/ 128–129.

**\*10** The Court was unable to accord the testimony of Marks, Price, and Allen any significant weight. Marks's testimony is largely unbelievable. He characterized the overwhelming consensus among sociologists and psychologists who endorse the "no differences" viewpoint as "group think," by which he said he meant a politically correct viewpoint that the majority has accepted without subjecting it to proper scientific scrutiny. Marks undertook an excruciatingly detailed examination of the 59 published studies cited by the APA in support of its 2005 "Brief on Lesbian and Gay Parenting," in which it concluded that "[n]ot a single study has found children of lesbian or gay parents to be disadvantaged in any significant respect relative to children of heterosexual parents." Marks, as well as Price and Allen, faulted many of these studies for their small sample sizes, the non-random methods used to obtain subjects, and the fact that some lacked heterosexual comparison groups, among other criticisms. Marks, Price and Allen all failed to concede the importance of "convenience sampling" as a social science research tool. They, along with Regnerus, clearly represent a fringe viewpoint that is rejected by the vast majority of their colleagues across a variety of social science fields. The most that can be said of these witnesses' testimony is that the "no differences" consensus has not been proven with scientific certainty, not that there is any credible evidence showing that children raised by same-sex couples fare worse than those raised by heterosexual couples.

### III. *Conclusions of Law*

**A. Legal Standards**
The Court finds that the MMA impermissibly discriminates against same-sex couples in violation of the Equal Protection Clause because the provision does not advance

any conceivable legitimate state interest. In light of this determination, the Court finds it unnecessary to address whether the MMA burdens the exercise of a fundamental right under the Due Process Clause.[5] *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.")

The Equal Protection Clause forbids a state from denying "to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1, and promotes the ideal that "all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). On the other hand, states are empowered to "perform many of the vital functions of modern government," *Nat'l Fed'n of Indep. Bus. v. Sebelius,* ––– U.S. ––––, 132 S.Ct. 2566, 2578, 183 L.Ed.2d 450 (2012), which necessarily involves adopting regulations which distinguish between certain groups within society. *See Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). A balance must therefore be struck between equal protection principles and the practicalities of governance.

*11  To this end, the United States Supreme Court has fashioned a three-tiered framework for evaluating whether a provision of law offends the Equal Protection Clause. The most rigorous tier is "strict" scrutiny, which is reserved for laws that discriminate against "suspect classes" such as racial, ethnic or religious minorities. *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (applying strict scrutiny to racial classification); *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (applying strict scrutiny to classification based upon national origin). A more relaxed form of inquiry is "intermediate" or "heightened" scrutiny, which courts have applied to laws that discriminate against groups on the basis of gender, alienage or illegitimacy, also known as "quasi-suspect classes." *See Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (applying intermediate scrutiny to classification based upon illegitimacy); *Miss. Univ. for Women v. Hogan,* 458 U.S. 718, 723–724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (applying intermediate scrutiny to gender classification). The least exacting tier is "rational basis" review, which assesses the propriety of legislation that does not implicate either suspect or quasi-suspect classes.

In this case, plaintiffs moved to bifurcate the trial in the event the Court decided to hear testimony about whether classifications based on sexual orientation are deserving of heightened scrutiny. The Court granted the motion, although governing Sixth Circuit precedent does not consider gay, lesbian, bisexual or transgender persons to constitute suspect or quasi-suspect classes. *See Davis v. Prison Health Servs.,* 679 F.3d 433, 438 (6th Cir.2012); *Scarbrough v. Morgan County Bd. of Educ.,* 470 F.3d 250, 261 (6th Cir.2006). While some federal courts have held that a more exacting level of scrutiny should be applied in reviewing the constitutionality of same-sex marriage bans, *see Windsor v. United States,* 699 F.3d 169, 185 (2d Cir.2012); *Massachusetts v. United States Dep't of Health and Human Servs.,* 682 F.3d 1, 11 (1st Cir.2012), the Court need not decide the issue because the MMA does not survive even the most deferential level of scrutiny, i.e., rational basis review.

[1] [2] [3]  Under this standard, the Court must determine whether the MMA proscribes conduct in a manner that is rationally related to the achievement of a legitimate governmental purpose. *See Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Guzman v. United States Dep't of Homeland Sec.,* 679 F.3d 425, 432 (6th Cir.2012). Courts will not invalidate a provision of law on equal protection grounds "unless [its] varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a reviewing court] can only conclude that the government's actions were irrational." *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). "The government [also] has no obligation to produce evidence to support the rationality of its ... [imposed] classifications and may rely entirely on rational speculation unsupported by any evidence or empirical data." *Hadix v. Johnson,* 230 F.3d 840, 843 (6th Cir.2000). Rather, it is incumbent upon plaintiffs to refute "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

### B. Asserted Reasons for the MMA

*12  Largely in keeping with the justifications offered in their summary judgment motion, at trial, the state defendants asserted that the MMA serves the following legitimate state interests: (1) providing an optimal environment for child rearing; (2) proceeding with caution before altering the traditional definition of marriage; and (3) upholding

tradition and morality. Additionally, the state defendants consistently asserted that defining marriage is within the exclusive purview of the state's police power. None of these proffered reasons provides a rational basis for adopting the amendment.

### 1. Optimal Environment

 [4]   The state defendants argued that the citizens of Michigan adopted the MMA on the premise that heterosexual married couples provide the optimal environment for raising children. The Court rejects this rationale for several reasons.

First, the evidence adduced at trial disproved this premise. Rosenfeld's study shows that children raised by same-sex couples progress at almost the same rate through school as children raised by heterosexual married couples. In fact, the difference between the two groups is nearly immeasurable. Brodzinsky similarly testified that approximately 150 sociological and psychological studies of children raised by same-sex couples have repeatedly confirmed Rosenfeld's findings that there is simply no scientific basis to conclude that children raised in same-sex households fare worse than those raised in heterosexual households. Brodzinsky also testified that parental gender plays a limited role, if any, in producing well-adjusted children. Brodzinsky, Tr. 2/25/14 p. 78. He stated that:

> It's not the gender of the parent that's the key. It's the quality of parenting that's being offered by whoever is there, husband or wife, two women, two men, a single parent, as long as the factors that we listed ... are present: good mental health, good parent-child relationships, what we call an authoritative parenting style, which is warmth, stimulation, structure, and the availability of resources. Then we're going to have a child who is much more likely to be healthy.

*Id.* at 78–79.

In response, state defendants cited a small number of outlier studies in support of the optimal child-rearing rationale. In an effort to show that children raised by same-sex couples fare worse than those raised by heterosexual couples, the state defendants relied principally upon Regnerus's NFSS study and Allen's 2006 Canadian Census study, but these efforts were unavailing. The common flaw of the Regnerus and Allen studies was the failure to account for the fact that many of the subjects who were raised in same-sex households experienced prior incidents of family instability (e.g., divorce or separation) or were initially placed in the foster care system. Both researchers acknowledged that poor school performance could result from a child's exposure to divorce or parental separation. Regnerus's NFSS study also suffered from another defect in that it failed to measure the adult outcomes of children who were actually raised in same-sex households. In short, the isolated studies cited by the state defendants do not support the argument that children raised by heterosexual couples have better outcomes than children raised by same-sex couples. To the contrary, the overwhelming weight of the scientific evidence supports the "no differences" viewpoint.

 *13  Second, the optimal child-rearing justification for the MMA is belied by the state's own marriage requirements. The prerequisites for obtaining a marriage license under Michigan law do not include the ability to have children, a requirement to raise them in any particular family structure, or the prospect of achieving certain "outcomes" for children. By the same token, the state does not allow for the annulment of a marriage once a couple discovers it cannot conceive, or if the family structure changes, or if the couple's children do poorly in school.

Third, contrary to the state defendants' contentions, the MMA actually fosters the potential for childhood destabilization. For instance, in this particular case should either of the plaintiffs die or become incapacitated, the surviving non-legal parent would have no authority under Michigan law to make legal decisions on behalf of the surviving children without resorting to a prolonged and complicated guardianship proceeding. And in the event that a state court were to award guardianship of the surviving children to the non-legal parent, the guardianship would have to be renewed annually and would remain susceptible to the challenge of an interested party at any time. This, as Brodzinsky testified, places such children in a legally precarious situation and deprives them of "social capital."

Fourth, the state defendants' position suffers from a glaring inconsistency. Even assuming that children raised by same-sex couples fare worse than children raised by heterosexual married couples, the state defendants fail to explain why Michigan law does not similarly exclude

certain classes of heterosexual couples from marrying whose children persistently have had "sub-optimal" developmental outcomes. According to Rosenfeld's study, children raised by suburban residents academically outperformed those children raised by rural and urban residents. Likewise, "middle class and poor families are 'sub-optimal' compared to well-off families, and couples with less formal education are "sub-optimal" compared to couples with more formal education." Pls.' Ex. 31 at 5. A child's racial background is another predictive indicator of future success, as the study showed that "the probability of making good progress through school is greater in the U.S. for children of Asian descent than for children of all other racial groups." *Id.* Taking the state defendants' position to its logical conclusion, the empirical evidence at hand should require that only rich, educated, suburban-dwelling, married Asians may marry, to the exclusion of all other heterosexual couples. Obviously the state has not adopted this policy and with good reason. The absurdity of such a requirement is self-evident. Optimal academic outcomes for children cannot logically dictate which groups may marry.

Finally, the Court rejects the "optimal environment" justification because that goal is simply not advanced by prohibiting same-sex couples from marrying. As Gates testified, there are thousands of same-sex couples currently raising thousands of children in Michigan, and these numbers have steadily increased over the past 20 years. Prohibiting gays and lesbians from marrying does not stop them from forming families and raising children. Nor does prohibiting same-sex marriage increase the number of heterosexual marriages or the number of children raised by heterosexual parents. There is, in short, no logical connection between banning same-sex marriage and providing children with an "optimal environment" or achieving "optimal outcomes."

**2. Proceeding With Caution**

**\*14** Throughout the trial, the state defendants asserted that Michigan has a legitimate interest in proceeding with caution before altering the traditional definition of marriage. The state defendants' experts all concluded that it is too soon to understand the societal impact of allowing same-sex couples to marry because further study is required. This "wait-and-see" justification is not persuasive.

 **[5]**  **[6]**  **[7]** Legislatures and regulatory agencies often cite to such reasoning when postponing decisions related to issues of public importance, as matters of public policy are resolved with more candor and insight when they are decided after an open debate based on sufficient facts. This is why federal administrative agencies must provide the public with a notice and comment period before exercising their rule-making authority. Hearings must be held, studies must be conducted, and legislators must deliberate. These things necessarily take time. But the calculus is fundamentally altered when constitutional rights are implicated because "any deprivation of constitutional rights calls for prompt rectification." *Watson v. Memphis,* 373 U.S. 526, 532–533, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963). "The basic guarantees of our Constitution are warrants for the here and now and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled." *Id.* The state may not shield itself with the "wait-and-see" approach and sit idly while social science research takes its plodding and deliberative course. Were the Court to accept this position, "it would turn the rational basis analysis into a toothless and perfunctory review" because "the state can plead an interest in proceeding with caution in almost any setting." *Kitchen v. Herbert,* No. 13–217, 961 F.Supp.2d 1181, 1213 (D.Utah 2013). Rather, the state must have some rationale beyond merely asserting that there is no conclusive evidence to decide an issue one way or another. *See Perry,* 704 F.Supp.2d at 972 (quoting *Romer* for the proposition that "[e]ven under the most deferential standard of review ... the court must 'insist on knowing the relation between the classification adopted and the object to be attained.' "). Since the "wait-and-see" approach fails to meet this most basic threshold it cannot pass the rational basis test.

**3. Tradition and Morality**

 **[8]** Implicit in the "wait-and-see" approach is the state defendants' underlying contention that preserving traditional marriage is a legitimate goal in and of itself. The difficulty with this justification is two-fold. First, the Supreme Court has held that tradition alone does not satisfy rational basis review. *See Heller v. Doe,* 509 U.S. 312, 326, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (stating that the "[a]ncient lineage of a legal concept does not give it immunity from attack for lacking a rational basis."). Second, traditional notions of marriage are often enmeshed with the moral disapproval of redefining marriage to encompass same-sex relationships. On this point, many federal courts have noted that moral disapproval is not a sufficient rationale for upholding a provision of law on equal protection grounds.

See *Massachusetts v. U.S. Dept. of Health and Human Servs.,* 682 F.3d 1, 15 (1st Cir.2012) (invalidating section 3 of the Defense of Marriage Act because the statute expressed a moral disapproval of homosexuality); *De Leon v. Perry,* No. 13–0982, 2014 WL 715741, at *16–17, 2014 U.S. Dist. LEXIS 26236, at *48–49 (W.D.Tex. Feb. 26, 2014) (rejecting morality as a justification); *Bishop v. United States,* 962 F.Supp.2d 1252, 1290 (N.D.Okla.2014) (stating that "upholding one particular moral definition of marriage ... is not a permissible justification."); *Kitchen,* 961 F.Supp.2d at 1213–14 (same).

**\*15** In delivering their opening and closing remarks, plaintiffs' attorneys contended that the voters who approved the MMA were motivated by animus towards lesbian, gay, bisexual and transgender individuals. Since the Court is unable discern the intentions of each individual voter who cast their ballot in favor of the measure, it is cannot ascribe such motivations to the approximately 2.7 million voters who approved the measure. Many Michigan residents have religious convictions whose principles govern the conduct of their daily lives and inform their own viewpoints about marriage. Nonetheless, these views cannot strip other citizens of the guarantees of equal protection under the law. The same Constitution that protects the free exercise of one's faith in deciding whether to solemnize certain marriages rather than others, is the same Constitution that prevents the state from either mandating adherence to an established religion, U.S. Const. amend I, or "enforcing private moral or religious beliefs without an accompanying secular purpose." *Perry,* 704 F.Supp.2d at 930–931 (citing *Lawrence v. Texas,* 539 U.S. 558, 571, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003)). As a result, tradition and morality are not rational bases for the MMA.

### 4. Federalism

 **[9]**  Citing to the Supreme Court's decision in *Windsor,* the state defendants maintain that the authority to define marriage falls within the exclusive and inherent powers of the state. [6] In finding section 3 of DOMA unconstitutional, the *Windsor* Court acknowledged that:

> The recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens. See *Williams v. North Carolina,* 317 U.S. 287, 298, 63 S.Ct. 207, 87 L.Ed. 279 (1942) ("Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders"). The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the "[p]rotection of offspring, property interests, and the enforcement of marital responsibilities." *Ibid.*

*Id.* at 2691. The state defendants gloss over one important caveat. While the justices recognized the state's expansive power in the realm of domestic relations, they also noted that this power has its limits. Writing for the majority, Justice Kennedy stated that domestic relations "laws defining and regulating marriage, of course, must respect the constitutional rights of persons ... but, subject to those guarantees, regulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the states," *id.* (citing *Loving* ) (internal quotations omitted), and that "[t]he states' interest in defining and regulating the marital relation [is] subject to constitutional guarantees ..." *Id.* at 2692. These statements are not merely surplusage, and as one district astutely remarked, "[a] citation to *Loving* is a disclaimer of enormous proportion." *Bishop,* 962 F.Supp.2d at 1279.

**\*16** *Loving* has profound implications for this litigation. In that case, the Supreme Court overturned Virginia's anti-miscegenation statutes prohibiting interracial marriage because they violated substantive due process and equal protection. In doing so, the Court rejected Virginia's argument that "under the Constitution the regulation and control of marital and family relationships are reserved to the States." *Kitchen,* 961 F.Supp.2d at 1215 (citation omitted). This position, which the state defendants advance again in the present case, is just as ineffectual now as it was in *Loving.* Taken together, both the *Windsor* and *Loving* decisions stand for the proposition that, without some overriding legitimate interest, the state cannot use its domestic relations authority to legislate families out of existence. Having failed to establish such an interest in the context of same-sex marriage, the MMA cannot stand.

 **[10]**  Further, the Court rejects the contention that Michigan's traditional definition of marriage possesses a heightened air of legitimacy because it was approved by voter referendum. The popular origin of the MMA does nothing to insulate the provision from constitutional scrutiny. As Justice Robert H. Jackson once wrote,

> [t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of

political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *see e.g. Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) (stating that the right to equal protection is incorporated within the Fifth Amendment's Due Process Clause). The Court is not aware of any legal authority that entitles a ballot-approved measure to special deference in the event it raises a constitutional question. On the contrary,

the Supreme Court has clearly stated that if ... an enactment violates the U.S. Constitution—whether passed by the people or their representatives—judicial review is necessary to preserve the rule of law ... [t]he electorate cannot order a violation of the Due Process or Equal Protection Clauses by referendum or otherwise, just as the state may not avoid their application by deferring to the wishes or objections of its citizens.

*Obergefell v. Wymyslo,* 962 F.Supp.2d 968, 981 (S.D.Ohio 2013) (citing *Cleburne,* 473 U.S. at 448, 105 S.Ct. 3249). In view of the foregoing, the state's domestic relations authority cannot trump federal constitutional limitations.

**IV.** *Conclusion*

In attempting to define this case as a challenge to "the will of the people," Tr. 2/25/14 p. 40, state defendants lost sight of what this case is truly about: people. No court record of this proceeding could ever fully convey the personal sacrifice of these two plaintiffs who seek to ensure that the state may no longer impair the rights of their children and the thousands of others now being raised by same-sex couples. It is the Court's fervent hope that these children will grow up "to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Windsor,* 133 S.Ct. at 2694. Today's decision is a step in that direction, and affirms the enduring principle that regardless of whoever finds favor in the eyes of the most recent majority, the guarantee of equal protection must prevail.

 **\*17**  Accordingly,

IT IS HEREBY DECLARED that Article I, § 25 of the Michigan Constitution and its implementing statutes are unconstitutional because they violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

IT IS FURTHER ORDERED that the State of Michigan is enjoined from enforcing Article I, § 25 of the Michigan Constitution and its implementing statutes.

Footnotes

1   The defendants in this matter are Michigan Governor Richard Snyder and Attorney General Bill Schuette (collectively the "state defendants"). Plaintiffs later added former Oakland County Clerk, Bill Bullard, Jr. as a party defendant, who was eventually replaced by his successor in office, defendant Lisa Brown. Although Brown is named as a defendant in this matter, she has adopted plaintiffs' legal position challenging the MMA.

2   A longitudinal study is one that measures specific indicators over the course of time.

3   Rosenfeld's study showed that children raised by heterosexual married couples are less than one percent less likely to be held back in school than children raised by same-sex couples. According to Rosenfeld, this minuscule difference is statistically insignificant.

4   Under Michigan law, the statutory requirements applicable to those wishing to marry are minimal. Applicants must (1) be of the opposite sex; (2) consent to be married; (3) not be directly related to one another; (4) not already be married to another person; (5) be at least 18 years old (or at least 16 years old with the consent of a parent or guardian); and (6) pay $20 for a license from the clerk of the county where either party resides or where the marriage will be performed. *See* Mich. Comp. Laws §§ 551.1, 551.2, 551.3, 551.4, 551.5, 551.101, 551.103. Once a license is issued, the marriage must be solemnized before two witnesses and a person with statutory authority. *See* Mich. Comp. Laws §§ 551.7, 551.9.

5   The Court notes, however, that the Supreme Court has repeatedly recognized marriage as a fundamental right. *See Turner v. Safley,* 482 U.S. 78, 95, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (stating that "the decision to marry is a fundamental right"); *Cleveland Bd. of Educ. v. La Fleur,* 414 U.S. 632, 639–640, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (stating that "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment)." *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (same); *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (same).

6   Forty years before the Supreme Court decided *Windsor,* the Minnesota Supreme Court held in *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185 (1971), that same-sex couples have no Fourteenth Amendment right to marry. The following year, in a single sentence, the United States Supreme Court dismissed the appeal "for want of a substantial federal question." *Baker v. Nelson,* 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). The state defendants have argued in the present case that *Baker* is binding precedent.

The answer to this argument was ably articulated by Judge Shelby in *Kitchen,* 961 F.Supp.2d at 1194–97:

[T]he Supreme Court has stated that a summary dismissal is not binding "when doctrinal developments indicate otherwise." *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975).

Here, several doctrinal developments in the Court's analysis of both the Equal Protection Clause and the Due Process Clause as they apply to gay men and lesbians demonstrate that the Court's summary dismissal in *Baker* has little if any precedential effect today. Not only was *Baker* decided before the Supreme Court held that sex is a quasi-suspect classification, *see Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Frontiero v. Richardson,* 411 U.S. 677, 688, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality op.), but also before the Court recognized that the Constitution protects individuals from discrimination on the basis of sexual orientation. *See Romer v. Evans,* 517 U.S. 620, 635–636, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Moreover, *Baker* was decided before the Supreme Court held in *Lawrence v. Texas* that it was unconstitutional for a state to "demean [the] existence [of gay men and lesbians] or control their destiny by making their private sexual conduct a crime." 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). As discussed below, the Supreme Courts decision in *Lawrence* removes a justification that states could formerly cite as a reason to prohibit same-sex marriage.

3

As discussed above, the Court's decision in *Windsor* does not answer the question presented here, but its reasoning is nevertheless highly relevant and is therefore a significant doctrinal development. Importantly, the *Windsor* Court foresaw that its ruling would precede a number of lawsuits in state and lower federal courts raising the question of a state's ability to prohibit same-sex marriage, a fact that was noted by two dissenting justices.... It is also notable that while the Court declined to reach the merits in *Hollingsworth v. Perry* because the petitioners lacked standing to pursue the appeal, the Court did not dismiss the case outright for lack of a substantial federal question. *See* ––– U.S. ––––, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013). Given the Supreme Court's disposition of both *Windsor* and *Perry,* the court finds that there is no longer any doubt that the issue currently before the court in this lawsuit presents a substantial question of federal law.

The Court finds this reasoning persuasive and adopts the above quoted passage in full. *Baker* no longer has any precedential effect.

---

**End of Document**   © 2014 Thomson Reuters. No claim to original U.S. Government Works.