UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

PAUL HARD, spouse and next best friend of
CHARLES DAVID FANCHER, deceased;

             Plaintiff,

             v.

ROBERT BENTLEY, in his official capacity as
Governor of the State of Alabama; LUTHER
JOHNSON STRANGE, III in his official capacity
as Attorney General of the State of Alabama; PAT
FANCHER

             Defendants.

Civil Action No. 2:13-cv-922-WKW

PLAINTIFF PAUL HARD'S
MOTION FOR SUMMARY
JUDGMENT

## TABLE OF CONTENTS

I.     INTRODUCTION...................................................................... 1

II.    UNDISPUTED FACTS...............................................................3

       A.     Plaintiff's Marriage and Wrongful Death of Husband........................  3

       B.     The Sanctity Laws.............................................................5

       C.     Harms of Sanctity Laws........................................................5

       D.     State Rationales For Sanctity Laws...........................................7

III.   ARGUMENT..........................................................................8

       A.     Alabama's Sanctity Laws Infringe on The Fundamental Right To Marry... 8

              1.     The Fundamental Right To Marry Is Held by Individuals.............. 10

              2.     The Right to Marriage Is Historically Rooted.......................... 11

              3.     The Sanctity Laws Impermissibly Burden Plaintiff's Right To
                     Marria..........................................................................11

              4.     Married Couples Also Have a Fundamental Right To Remain
                     Married, Which the Sanctity Laws Impermissible Burden..............12

              5.     An Inability To Procreate Biologically Does Not Vitiate an
                     Individual's Fundamental Right To Marry.............................. 14

       B.     Alabama's Sanctity Laws Are Subject to Heightened Scrutiny
              Under the Equal Protection Clause.............................................16

       C.     Alabama's Sanctity Laws Violate the Due Process and Equal Protection
              Clauses Because They Cannot Withstand Any Level of Scrutiny.............19

              1.     Alabama Excludes LGBT People from Marriage Purportedly Because of
                     Child Welfare Concerns and a Preference for "Traditional Marriage"..20

              2.     The Sanctity Laws Are Not Rationally Related to Any Purported
                     Goals of Child Welfare Such as Better Outcomes.......................20

              3.     "Tradition" Is an Impermissible Justification for Burdening a
                     Fundamental Right or Discrimination as a Matter of Law..............27

       D.     The Sanctity Laws Violate The Equal Protection Clause for the Additional
              Reason That They Reflect and Effectuate Impermissible Animus............29

IV.   CONCLUSION  ....................................................................33

## TABLE OF AUTHORITIES

### CASES

Baskin v. Bogan, 1:14-CV-00355-RLY, 2014 WL 2884868 (S.D. Ind. June 25, 2014)......... 9, 22

Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001) ................................ 34

Bishop v. Smith, 14-5003, 2014 WL 3537847 (10th Cir. July 18, 2014) ........................... passim

Bostic v. Schaefer, 14-1167, 2014 WL 3702493 (4th Cir. July 28, 2014) .................................... 12

Bourke v. Beshear, 3:13-CV-750-H, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014).............. passim

Carey v. Population Servs., 431 U.S. 678 (1977)............................................................... 11

Chambers v. Thompson, 150 F.3d 1324 (11th Cir. 1988)................................................... 20

City of Cleburne v. Cleburne Living Center, 473 U.S. 432 (1985)...................................... passim

Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632 (1974).................................................... 10

De Leon v. Perry, 975 F. Supp. 2d 632 (W.D. Tex. 2014).................................................. passim

DeBoer v. Snyder, 973 F. Supp. 2d 757 (E.D. Mich. 2014).............................................. passim

Turner v. Safley, 482 U.S. 78 (1987)....................................................... 10, 13, 16, 22

Geiger v. Kitzhaber, 994 F. Supp. 2d 1128 (D. Or. 2014)........................................... 22

Golinski v. U.S. Office of Pers. Mgmt., 824 F. Supp. 2d 968 (N.D. Cal. 2012)........ 21, 27, 28, 31

Goodridge v. Dept. of Public Health, 798 N.E.2d 9412 (Mass. 2003).................................. 13, 30

Griswold v. Connecticut, 381 U.S. 479 (1965)................................................................... 17

Grutter v. Bollinger, 539 U.S. 306 (2003) ................................................................. 18

Heller v. Doe by Doe, 509 U.S. 312 (1993) .............................................................. 31

Henry v. Himes, 1:14-CV-129, 2014 WL 1418395 (S.D. Ohio Apr. 14, 2014)..................... 9

Hollingsworth v. Perry, 133 S. Ct. 2652, 186 L. Ed. 2d 768 (2013) ........................................ 10

In re Marriage Cases, 43 Cal. 4th 757, 183 P.3d 384 (2008)........................................ 13, 17, 23

J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994)................................................. 32

Kitchen v. Herbert, 755 F.3d 1193 (10th Cir. 2014).............................................. passim

Kitchen v. Herbert, 961 F. Supp. 2d 1181 (D. Utah 2013)....................................... passim

Latta v. Otter, 1:13-CV-00482-CWD, 2014 WL 1909999 (D. Idaho May 13, 2014)............. 9, 22

Lawrence v. Texas, 539 U.S. 558 (2003) ........................................................... passim

Lofton v. Secretary of Dep't. of Children and Family Services, 358 F.3d 804 (11th Cir. 2004)............................................................................................... 19, 20, 21

Love v. Beshear, 2014 WL 2957671 (W.D. Ky. 2014)............................................... 20

Love v. Beshear, 989 F. Supp. 2d 536 (W.D. Ky. 2014)........................................... 22

Loving v. Virginia, 388 U.S. 1 (1967)............................................................... 11, 12, 13

N.Y.C. Transit Auth. v. Beazer, 440 U.S. 568 (1979) ................................................. 33

Obergefell v. Wymyslo, 962 F. Supp. 2d 968 (S.D. Ohio 2013) ........................... passim

Perry v. Brown, 671 F.3d 1052 (9th Cir. 2012) ................................................... 10, 28

Perry v. Schwarzenegger, 704 F. Supp. 2d 921 (N.D. Cal. 2010) ........................ passim

Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256 (1979) ............................................... 36

Strauss v. Horton, 46 Cal. 4th 364, 207 P.3d 48 (2009) ...................................... 15, 16

SmithKline Beecham Corp. v. Abbott Laboratories, 740 F.3d 471 (9th Cir. 2014).................... 19

Troxel v. Granville, 530 U.S. 57 (2000) ................................................................. 10

United States v. Windsor, 113 S. Ct. 2675 (2013) ......................................................... 8

Vance v. Bradley, 440 U.S. 93 (1979) ..................................................................... 33

Varnum v. Brien, 763 N.W.2d 862 (Iowa 2009) .................................................. 21, 31

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977) ............................. 35

Whitewood v. Wolf, 992 F. Supp. 2d 410 (M.D. Pa. 2014) ........................................ 9, 20

Williams v. State, 2014 WL 2677722 (Ala. Ct. Crim. App. June 13, 2014) ............................... 37

Windsor v. United States, 699 F.3d 169 (2d Cir. 2012) ........................................ 20, 21

Wolf v. Walker, 986 F. Supp. 2d 982, 1028 (W.D. Wis. 2014) ........................... 9, 20, 22

Zablocki v. Redhail, 434 U.S. 374 (1978) ..................................................... 10, 11, 13

Zobel v. Williams, 457 U.S. 55 (1982)........................................................................ 34

## STATUTORY AUTHORITIES

28 U.S.C. § 2201 ................................................................................................ 38

28 U.S.C. § 2202, ............................................................................................... 38

Ala. Code § 16-40A-2 ........................................................................................ 36

Ala. Code § 26-17-204 ....................................................................................... 26

Ala. Code § 26-17-607 ....................................................................................... 26

Ala. Code § 30-1-19 ............................................................................................. 5

Ala. Code § 30-1-19 ............................................................................................. 6

28 U.S.C.A. § 1738C, ................................................................................... 13, 14

## I.   **INTRODUCTION**

Paul Hard, a Montgomery widower, filed this lawsuit to challenge Alabama's refusal to recognize his Massachusetts marriage. This refusal has had, and continues to have, significant, unjustified, and painful consequences for Paul.

When Paul rushed to the hospital where his husband, gravely injured in a car accident, had been taken by ambulance, the hospital refused to provide Paul any information or let him speak to a doctor or nurse because "Alabama doesn't recognize same-sex marriage." Days later at the funeral home, the funeral director insisted on indicating on the deceased husband's official death certificate that he was "NEVER MARRIED," again relying upon Alabama's refusal to recognize same-sex marriage. Soon thereafter, lawyers signed Paul up to participate in a wrongful death case relating to his husband's death. But Paul later learned that, because he could not be considered a "surviving spouse" under Alabama law, he would be legally precluded from sharing in any proceeds from that lawsuit, despite that Paul's husband had left a will naming Paul as the sole beneficiary.

The Governor and Attorney General attempt to justify Alabama's refusal to recognize Paul's marriage – and these painful indignities these laws have caused Paul – by invoking in sworn interrogatory responses a purported interest in supporting the rights of children to maintain ties with biological parents, and in encouraging extended kin networks to provide mutual support. But there is a stark and telling disconnect between these state interests, and the means by which Alabama has purportedly chosen to advance them. The facts of this case aptly demonstrate this disconnect. It strains credulity to think that Alabama has made things better for children or families by denying Paul the dignity of learning of his husband's condition on the day he died, by humiliating him at the funeral home by preventing acknowledgment of the fact of

1

marriage, or by denying him the right to compensation from a lawsuit against the people who caused his husband's death.

Indeed, we show below that Alabama's decision to deny recognition to same-sex married couples does absolutely nothing to further the state's purported interests in child and family welfare, and therefore should be held unconstitutional as a violation of both the Due Process Clause and the Equal Protection Clause of the United States Constitution. Alabama's law and constitutional amendment preventing recognition of lawful same-sex marriages (collectively "Sanctity Laws"), just like the provision of the federal Defense of Marriage Act ("DOMA") found unconstitutional in *United States v. Windsor,* 133 S. Ct. 2675 (2013), infringe on the fundamental right to marry without sufficient justification, and improperly deny to LGBT people a right enjoyed by all other citizens. Just as the Supreme Court concluded with respect to DOMA, the Sanctity Laws violate the Constitution because "[t]he avowed purpose and practical effect of the law here in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States." *See Windsor,* 133 S.Ct. at 2693.

This brief proceeds in four parts. *First* we show that the Sanctity Laws infringe a fundamental liberty interest – the right to be married – and therefore are subject to heightened scrutiny under the Due Process Clause. *Second,* we explain why the Sanctity Laws – which classify people on the basis of sexual orientation and deny marriage to LGBT people but not others – should be evaluated under heightened scrutiny under the Equal Protection Clause as well. *Third,* we demonstrate that, even if this Court were to apply only rational basis scrutiny, the Sanctity Laws are unconstitutional under the Due Process Clause and the Equal Protection Clause because they are not even rationally related to the state's purported interest in child and

2

family welfare. *Fourth* and finally, we show that the Sanctity Laws violate the Equal Protection Clause for the additional reason that they reflect Alabama's longstanding animosity towards LGBT people, a constitutionally prohibited basis for any legislation.

## II.   UNDISPUTED FACTS

### A.   Plaintiff's Marriage and Wrongful Death of Husband

1.    Plaintiff Paul Hard first met Charles David Fancher ("David") on July 4th, 2004 and soon afterward they became a couple. Throughout their time together, David occasionally asked Paul to marry him. Paul resisted at first, but eventually and enthusiastically agreed to marry him. Paul Hard Aff. ¶ 2, Aug. 28, 2014, attached hereto as Ex. A.

2.    Paul and David were lawfully married on a beach on Cape Cod, in Massachusetts, on May 20, 2011. Hard Aff. ¶ 3.

3.    They made their life together in Alabama. Their home was in Montgomery. David worked as a director of information technology for a company in Birmingham and Paul is an associate professor at a university in Montgomery. *Id.* at ¶ 5.

4.    David made Paul the sole beneficiary of his will. *Id.* at ¶ 6.

5.    David was killed in a traffic accident on Interstate 65 during the night of August 1, 2011. David's car slammed into a UPS truck that had overturned and was blocking the North-bound lanes of the highway. David died instantly. *Id.* at ¶ 7.

6.    Paul had said goodbye to David in the early, dark morning of August 1, 2011 as David left to Birmingham for work. Paul received a call later that morning from Prattville Baptist Hospital informing him that David had been in an accident. *Id.* at ¶ 8.

3

7.     The complaint in a subsequent wrongful death case that was filed in this Court and that

recently settled for a substantial but confidential amount states that defendants in that case, truck

drivers and a shipping company, were

> a.   traveling North on Interstate 65 . . . in rural Autauga County, Alabama.
> Defendants' vehicle negligently and wantonly collided with another
> vehicle . . . causing Defendants' vehicle to overturn in the highway,
> blocking both Northbound lanes of Interstate 65. . . . At said time and
> place . . . Charles David Fancher, was also operating a motor vehicle,
> traveling North on Interstate 65. . . . Due to the negligence and wanton
> operation of the Defendants' vehicle and the nighttime lighting conditions
> and lack of adequate emergency reflectors, tape, and emergency warning
> lights and devices in place by Defendants, Plaintiff's decedent, Charles
> David Fancher, was caused to collide with the 2009 Sterling TK UPS
> tractor trailer truck being driven by [the Defendants].

*Id.* at ¶ 9.

8.     As soon as Paul received the telephone call informing him of the accident, he rushed to

the hospital carrying the couple's marriage license and other papers such as a power of attorney.

Paul asked to see his husband or learn of his condition, but a hospital employee initially refused,

telling him, "we don't recognize same-sex marriage." Paul pleaded for information, but no

doctor or nurse from Prattville Baptist Hospital ever spoke to him, despite Paul's desperate

attempt to learn the condition of his husband. *Id.* at ¶ 10.

9.     After about a half hour, Paul was eventually permitted beyond the nurse's station to go

see David, still not knowing David's condition. *Id.* at ¶ 11.

10.    An attendant arrived and walked Paul down the hall towards David. Off-handedly, the

attendant turned to Paul, and said, "you know he's dead, right?" *Id.* at ¶ 12.

11.    Paul lost strength in his legs, falling to the ground. He reached to the attendant who stood

to the side, offering no support as Paul collapsed. *Id.* at ¶ 13.

4

12.     Paul made arrangements and paid for David's burial services at Highland Memorial

Gardens, in Bessemer, Alabama. By law, the funeral director must note certain biographical

information about the deceased on the death certificate. Despite Paul's protests, the Highland

Memorial funeral director indicated on the death certificate that David was "Never Married." He

left blank the space for the name of the "Surviving Spouse." *Id*. at ¶ 14, Ex. B.

### B.     The Sanctity Laws

13.     In 1998, the Alabama Legislature enacted the Alabama Marriage Protection Act. *See* Ala.

Code § 30-1-19. That law prohibits, among other things, the recognition of "any marriage of

parties of the same sex that occurred or was alleged to have occurred as a result of the law of any

jurisdiction."

14.     Notwithstanding the Attorney General's opinion that the Marriage Protection Act

adequately protected Alabama from out-of-state same-sex unions, the legislature took additional

action just years later to further safeguard Alabama from the specter of same-sex unions.

15.     In 2005, the Alabama Legislature proposed a constitutional amendment, entitled the

Sanctity of Marriage Amendment. This amendment utilized language nearly identical to the

language of the Marriage Protection Act seeking to ensure, as a matter of state constitutional law,

that Alabama will not recognize out-of-state same-sex marriages.

16.     The Legislature submitted the proposed amendment to voters on June 6, 2006. The voters

approved it, and it was proclaimed ratified on June 28, 2006.

### C.     Harms of Sanctity Laws

17.     The class of persons harmed by the Sanctity Laws – married same-sex couples – is

substantial yet discrete. 2010 census data reveal that 1,704 of 6,528 same-sex couples in

Alabama identified at that time as spouses, according to reporting by the <u>Williams Institute. See</u>

http://williamsinstitute.law.ucla.edu/wp-content/uploads/Census2010Snapshot_Alabama_v2.pdf.

18.     Being married confers numerous rights and protections, and imposes numerous

obligations, recognized by the state. In short, Alabama confers a host of benefits, and imposes

numerous responsibilities, on people who are married. This collection of benefits and

responsibilities provides official recognition of the dignity and legitimacy of the married

couple's union, and the unique status of married persons under law.

19.     Ala. Code § 30-1-19 ("Marriage Protection Act") and Ala. Const. Amend. No. 774

("Sanctity of Marriage Amendment") prevent Plaintiff from obtaining any proceeds from the

wrongful death lawsuit – proceeds that would be due to him if he were in a different-sex

marriage. Hard Aff. ¶ 15.

20.     This is because Paul cannot be deemed a surviving "spouse" under Alabama law, even

though he and David were lawfully married at the time of David's death.

21.     David's estate has agreed to preserve the amount possibly due to Paul as the surviving

spouse from the wrongful death lawsuit pending resolution of this lawsuit. *Id.* at ¶ 16; ECF No.

6-1.

22.     Alabama's refusal to recognize Paul's marriage, including through the profound loss of

his husband, was demeaning and insulting at every turn. Paul's experiences through that loss,

including those described above, made clear that he and his marriage are second-class and

stigmatized by Alabama law simply because he is gay and chose to marry a man whom he loved.

Hard Aff. ¶ 17.

### D.   State Rationales For Sanctity Laws

23.    Plaintiff asked Governor Bentley and Attorney General Strange (the "State Defendants")

by interrogatory to "[i]dentify every government interest that you contend is a rationale for the

Sanctity Laws." State Defs.' Bentley and Strange's Resp. to Pl.'s Interrogs., Jun. 27, 2014, David

Dinielli Aff., Ex. A, Aug. 29, 2014. The State Defendants provided sworn responses, in which

their rationale amounted to an assertion that the Sanctity Laws promote a government interest in

benefiting children and that Alabama has a preference to maintain what it considers traditional

marriage. The response is provided here in its entirety:

> Alabama has an interest in preserving the legal rights of children to be
> connected to their biological parents, particularly fathers. Alabama's marriage law
> secures the rights of children by codifying the ancient, common-law offices of
> father and mother, and incentivizes biological fathers and mothers to step into
> those offices by privileging marriage with special rights and benefits.
>
> In addition, Alabama has an interest in preserving the relationships
> between children and other kin, such as siblings, grandparents, aunts, uncles, and
> cousins. Kinship, with its concentric circles of altruism and self-sacrifice, plays an
> important role in rearing children and bringing them up into new generations of
> citizens. Alabama has an interest in encouraging extended family members to
> embrace those responsibilities.
>
> Alabama has chosen a traditional, conjugal, opposite-sex definition of
> marriage, as opposed to a revisionist definition that includes all consent-based
> emotional relationships involving any two or more consenting persons. Alabama
> thus maintains the offices of father and mother, encourages kinship altruism, and
> maintains consistency with other aspects of law that promote biological
> relationships, such as presumptions of paternity, laws relating to child custody,
> and laws of intestacy. To change Alabama's definition of marriage by judicial fiat
> would undermine the integrity of the courts and would alter society's
> understanding of marital norms and responsibilities, to the detriment of children
> and civil society.
>
> Alabama's marriage law supports other interests as well. By basing the
> defense of the traditional marriage definition on only some of these interests, the
> State Defendants are not disavowing others, and the State Defendants reserve the
> right to amend this response.

*Id.*

7

### III.   ARGUMENT

The Court should declare the Sanctity Laws unconstitutional, at least with respect to Alabama's refusal to recognize same-sex marriages validly solemnized elsewhere, because the Sanctity Laws offend basic principles of Substantive Due Process and Equal Protection under the Fourteenth Amendment of the U.S. Constitution including by infringing the fundamental right to marriage and by discriminating against LGBT persons.

### A.   Alabama's Sanctity Laws Infringe on The Fundamental Right To Marry

As every federal court to address similar marriage laws since *United States v. Windsor*, 113 S. Ct. 2675 (2013) has agreed, denying same-sex couples the fundamental right to marry violates Substantive Due Process. *See Bostic v. Schaeffer*, 14-1167, 2014 WL 3702493 at *9 (4th Cir. July 28, 2014) ("we conclude that the fundamental right to marry encompasses the right to same-sex marriage"); *Bishop v. Smith, 14-5003,* 2014 WL 3537847 at * 6 (10th Cir. July 18, 2014) ("State bans on the licensing of same-sex marriage significantly burden the fundamental right to marry . . . ."); *Kitchen v. Herbert,* 755 F.3d 1193, 1229–30 (10th Cir. June 25, 2014) (applying strict scrutiny to invalidate Utah's refusal to provide marriage equality to same-sex couples, which violated fundamental right to marry); *Baskin v. Bogan,* 1:14-CV-00355-RLY, 2014 WL 2884868 at *10 (S.D. Ind. June 25, 2014) ("The state, by excluding same-sex couples from marriage, violates Plaintiffs' fundamental right to marry under the Due Process Clause."); *Wolf v. Walker,* 986 F. Supp. 2d 982. 1028 (W.D. Wis. 2014) ("Because my review of that law convinces me that plaintiffs are entitled to the same treatment as any heterosexual couple, I conclude that the Wisconsin laws banning marriage between same-sex couples are unconstitutional."); *Whitewood v. Wolf,* 992 F. Supp. 2d 410, 423-24 (M.D. Pa. 2014) ("the fundamental right to marry as protected by the Due Process Clause of the Fourteenth

8

Amendment to the United States Constitution encompasses the right to marry a person of one's own sex"); *Latta v. Otter,* 1:13-CV-00482-CWD, 2014 WL 1909999 (D. Idaho May 13, 2014) ("Idaho's Marriage Laws render the Plaintiff couples legal strangers, stripping them of the choice to marry or remain married in the state they call home. Therefore, Idaho's Marriage Laws impermissibly infringe on Plaintiffs' fundamental right to marry."); *Henry v. Himes,* 1:14-CV-129, 2014 WL 1418395 at *9 (S.D. Ohio Apr. 14, 2014) ("the right to marriage is a fundamental right that is denied to same-sex couples in Ohio by the marriage recognition bans"); *De Leon v. Perry,* 975 F. Supp. 2d 632, 658 (W.D. Tex. 2014) ("The Supreme Court has also recognized the right to marry implicates additional rights that are protected by the Fourteenth Amendment, including the rights to privacy, liberty, and association in marriage."); *Obergefell v. Wymyslo,* 962 F. Supp. 2d 968, 978 (S.D. Ohio 2013) ("Here, Ohio's marriage recognition bans violate this fundamental right without rational justification."); *see also Perry v. Schwarzenegger,* 704 F. Supp. 2d 921, 995 (N.D. Cal. 2010) *aff'd sub nom. Perry v. Brown,* 671 F.3d 1052 (9th Cir. 2012) *vacated and remanded sub nom. Hollingsworth v. Perry,* 133 S. Ct. 2652, 186 L. Ed. 2d 768 (2013).

The Fourteenth Amendment's guarantee of due process protects individuals from unwarranted government intrusion into fundamental rights. *See, e.g., Troxel v. Granville,* 530 U.S. 57, 64-65 (2000). It is beyond dispute that the freedom to marry is a fundamental right protected by the Due Process Clause. E.g., Turner v. Safley, 482 U.S. 78, 95 (1987) ("[T]he decision to marry is a fundamental right"); *Zablocki v. Redhail,* 434 U.S. 374, 384 (1978) ("The right to marry is of fundamental importance to all individuals."); *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639-40 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process

9

Clause of the Fourteenth Amendment."); *Loving v. Virginia,* 388 U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.").

Laws that burden the exercise of a fundamental right, including marriage, survive constitutional scrutiny only when the government demonstrates that the law is narrowly tailored to a compelling government interest. *E.g., Zablocki,* 434 U.S. at 388; *Bostic,* 2014 WL 3702493 at *10 (applying strict scrutiny requirements against Virginia's similar marriage laws because they "impede the right to marry by preventing same-sex couples from marrying and nullifying the legal import of their out-of-state marriages").

### 1.    The Fundamental Right To Marry Is Held by Individuals

The fundamental right to marry belongs to and protects individuals. *See, e.g., Loving,* 388 U.S. at 12 ("[T]he freedom to marry, or not marry a person of another race resides with the individual and cannot be infringed by the State."); *Carey v. Population Servs.,* 431 U.S. 678, 684-85 (1977) ("among the decisions that an individual may make without unjustified government interference are 'personal decisions relating to marriage '").

That principle applies here. Plaintiff does not seek a new right to "same-sex marriage," but rather seeks to exercise the same right for his lawful marriage to be recognized by the State of Alabama enjoyed by other individuals. *See Kitchen v. Herbert,* 961 F. Supp. 2d 1181, 1203 (D. Utah 2013) (plaintiffs challenging exclusion of same-sex couples from marriage "are seeking access to an existing right, not declaration of a new right"); *Bostic v. Schaefer, 14-1167,* 2014 WL 3702493 at *9 (4th Cir. July 28, 2014) (observing that Supreme Court precedent establishes "a broad right to marry that is not circumscribed based on the characteristics of the individuals seeking to exercise that right"); *cf. Lawrence v. Texas,* 539 U.S. 558, 573–74 (2003) ("Our laws

and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education" and "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do.").

### 2.     The Right to Marriage Is Historically Rooted

Plaintiff seeks recognition of his marriage by Alabama just as any other person who had been married out of state would do. That Alabama has historically excluded same-sex couples from marriage is not a valid reason to continue that discrimination. In *Loving*, the Court did not defer to historical exclusion of mixed-race couples from marriage. "Instead, the Court recognized that race restrictions, despite their historical prevalence, stood in stark contrast to the concepts of liberty and choice inherent in the right to marry." *Perry v. Schwarzenegger*, 704 F. Supp. 2d at 992. "Thus the question as stated in *Loving*, and as characterized in subsequent opinions, was not whether there is a deeply rooted tradition of interracial marriage, or whether interracial marriage is implicit in the concept of ordered liberty; the right at issue was 'the freedom of choice to marry.'" *Kitchen*, 755 F.3d at 1209–10 (citing *Loving*, 388 U.S. at 12). The Supreme Court has never defined the right to marry by reference to those permitted to exercise that right. Instead, the Supreme Court addresses, unqualified, "the fundamental right to marry" in its decisions, *see Loving*, 388 U.S. at 12; *Turner*, 482 U.S. at 94-96; *Zablocki*, 434 U.S. at 383-86, not "the right to interracial marriage," "the right to inmate marriage," or the "right of people owing child support to marry."

### 3.     The Sanctity Laws Impermissibly Burden Plaintiff's Right To Marriage

The exclusion of same-sex couples from marriage burdens Plaintiff's fundamental right protected by the Due Process Clause. *See Bostic*, 2014 WL 3702493 at *9; *Kitchen*, 755 F.3d at

11

1229-30; *De Leon*, 975 F. Supp. 2d at 659; *Perry*, 704 F. Supp. 2d at 995; *In re Marriage Cases,*
43 Cal. 4th 757, 822, 183 P.3d 384, 429 (2008); *Goodridge v. Dept. of Public Health,* 798
N.E.2d 9412, 968 (Mass. 2003); *Obergefell*, 962 F. Supp. 2d at 978 (recognizing a same-sex
couple's right to remain married as "a fundamental liberty interest appropriately protected by the
Due Process Clause").[1]

Plaintiff and his deceased husband were lawfully married in Massachusetts. Alabama's
refusal to recognize his marriage, including through the profound loss of his husband, was
demeaning and insulting at every turn. Hard Aff. ¶ 17. Plaintiff's experiences through that loss
clarified that his marriage is second-class and stigmatized by Alabama law simply because he is
gay and chose to marry a man who he loved. *Id.* The Sanctity Laws prevent Plaintiff from
obtaining any proceeds from a wrongful death lawsuit connected with the tragic death of his
husband – proceeds that would be due to him if he were in a different-sex marriage. *Id.* at ¶ 15.
The Sanctity Laws caused the indignity of his husband's death certificate wrongly stating that he
was "Never Married" and had no surviving spouse. *Id.* at ¶ 14. It made little difference that the
couple had taken care to put in place various legal documents including powers of attorney and
that Plaintiff was the sole beneficiary in his husband's will. *See id.* at ¶ 10.

---

[1] Section 2 of the Federal Defense of Marriage Act ("DOMA"), 28 U.S.C.A. § 1738C, which
provides that no state "shall be required to give effect to" marriages from other states between
persons of the same sex do not provide the Sanctity Laws safe harbor because "Section 2 is an
entirely permissive federal law" that does not mandate any action by the states; "[t]he injury of
non-recognition stems exclusively from state law," not the federal DOMA. *Bishop*, 962 F. Supp.
2d at 12.

### 4.    Married Couples Also Have a Fundamental Right To Remain Married, Which the Sanctity Laws Impermissibly Burden

As discussed, the exclusion of same-sex couples from marrying burdens the fundamental right to marry as protected by the Due Process Clause. *See, e.g., Bostic*, 2014 WL 3702493 at *9; *Kitchen*, 755 F.3d at 1229-30; *De Leon*, 975 F. Supp. 2d at 659; *Perry*, 704 F. Supp. 2d at 995. In addition, the Sanctity Laws – by effectively terminating the marriages of same-sex couples lawfully married elsewhere – infringes on the fundamental interest *in remaining married* that courts have concluded also is protected by the Due Process Clause. *See De Leon*, 975 F. Supp. 2d at 662 ("[B]y declaring existing, lawful same-sex marriages void and denying married couples the rights, responsibilities, and benefits of marriage, Texas denies same-sex couples who have been married in other states their due process.").

The interest in remaining married has been described sometimes as a liberty interest. *See, e.g., Obergefell*, 962 F. Supp. 2d at 978 (recognizing a same-sex couple's right to remain married as "a fundamental liberty interest appropriately protected by the Due Process Clause"). The interest in remaining married also has been described as *property* interest. *Strauss v. Horton,* 46 Cal. 4th 364, 390, 207 P.3d 48, 63 (2009), as modified (June 17, 2009), addressed, among other things, whether California's Proposition 8 – a state constitutional amendment prohibiting same-sex marriage that was similar to Alabama's constitutional amendment – should be interpreted to have any effect on marriages entered prior to its passage. *See Strauss*, 46 Cal.4th at 470. The California Supreme Court concluded that the constitutional amendment could not be interpreted to have any such effect, because it would likely violate due process to void existing marriages.

The court first observed that laws that deprive persons of "vested rights" can contravene principles of due process. *See id.* at 473. The Court next observed that couples who marry acquire such vested rights, in the nature of property rights, which cannot be revoked without

13

implicating due process concerns. The Court reasoned that same-sex couples who married
"acquired vested property rights as lawfully married spouses with respect to a wide range of
subjects, including among many other, employment benefits, interests in real property, and
inheritances. . . A retroactive application of the initiative would . . . destroy[] the legal interests
and expectations of thousands of couples and their families, and potentially undermin[e] the
ability of citizens to plan their lives according to the law. . . ." *See id.* at 473-74.

But this is precisely the effect of Alabama's refusal to recognize Plaintiff's lawful
marriage, and the marriages of many other couples as well. Plaintiff and his deceased husband
were lawfully married in Massachusetts, but the Sanctity Laws effectively nullified that marriage
once they returned to their home state, thereby "undermining the ability of [Plaintiff and his
husband] to plan their lives according to the law." *See Strauss*, 46 Cal.4th at 473-74. In this way,
the Sanctity Laws have burdened Plaintiff's fundamental right to remain married and can be
upheld only if they meet heightened scrutiny.

### 5. An Inability To Procreate Biologically Does Not Vitiate an Individual's Fundamental Right To Marry

Some opponents of same-sex marriage have argued that same-sex couples are not entitled
to access the fundamental right to marry because they cannot biologically procreate together. But
the notion that biological procreation is essential to the constitutionally protected marital
relationship is inconsistent with the Supreme Court's decision in *Turner*, 482 U.S. at 78, striking
down prison regulations restricting marriage by prisoners. Rather than dismissing the claim in
that case because the union between an inmate and an unincarcerated person would lack sexual
intimacy and, thus, potential for biological procreation, the Court unanimously found that
"incidents of marriage, like the religious and personal aspects of the marriage commitment, are
unaffected" by incarceration and "are sufficient to form a constitutionally protected marital

14

relationship in the prison context." *Id.* at 96. *Turner* thus makes clear that the fundamental right to marry does not vanish if the relationship cannot lead to biological procreation.

Moreover, in striking down restrictions on the use of contraception by married couples, the Supreme Court recognized that marriage does not exist merely for the purpose of procreation; rather, "[m]arriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred." *Griswold v. Connecticut,* 381 U.S. 479, 486 (1965); *see also Lawrence,* 539 U.S. at 567 ("[I]t would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse."). The "ability to procreate . . . is not a defining characteristic of conjugal relationships from a legal and constitutional point of view." *Kitchen,* 961 F. Supp. 2d at 1201. A contrary view of marriage "demeans the dignity not just of same-sex couples, but of the many opposite-sex couples who are unable to reproduce or who choose not to have children." *Id.*

Any argument seeking to attach the fundamental right to marry to an ability of a couple to procreate is also contrary to Alabama's historical and present laws governing eligibility for marriage, which do not include any requirement that both parties to the marriage be fertile. *Cf. In re Marriage Cases,* 43 Cal. 4th at 827, 183 P.3d at 432 ("[T]he right to marry never has been limited to those who plan or desire to have children.").

Of course, many same-sex couples do in fact raise children. *See Kitchen,* 961 F. Supp. 2d at 1202 (in rejecting argument that the inability to procreate excludes same-sex couples from the right to marry, observing that "[l]ike opposite-sex couples, same-sex couples may decide to marry partly or primarily for the benefits and support that marriage can provide to the children the couple is raising or plans to raise."). But the absence of children, biological or otherwise, does not vitiate the basic liberty and fundamental right to marry all people enjoy.

15

\* \* \* \*

As discussed below, the Sanctity Laws cannot survive even rational basis review, let alone the heightened scrutiny required of being narrowly tailored to serve a compelling government interest when laws burden fundamental rights, such as the right to marry (and to remain married), protected by the Due Process clause. As more fully discussed below, Defendants' rationales for the Sanctity Laws amount to arguments that have repeatedly failed in every federal court considering marriage equality since *Windsor*: a reliance on a historical lack of marriage equality for same-sex couples and an assertion that children of same-sex parents may not assuredly have every benefit of children of different-sex couples. Those rationales have been roundly rejected by every single federal court, even under rational basis review.

### B.    Alabama's Sanctity Laws Are Subject to Heightened Scrutiny Under the Equal Protection Clause

Plaintiff urges that, because the Sanctity Laws facially disadvantage same-sex couples, but not different-sex couples, the Sanctity Laws discriminate on the basis of sexual orientation and should be subject to heightened scrutiny under the Equal Protection Clause as well. The Supreme Court has treated government classifications as "suspect" or "quasi-suspect" when they "generally provide[] no sensible ground for differential treatment." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440 (1985). Such classifications must be approached with skepticism and subjected to heightened scrutiny in order to "smoke out" whether they are being used improperly. *See Grutter v. Bollinger,* 539 U.S. 306, 326 (2003). Thus, when the government engages in such classification, it bears the burden of proving the statute's constitutionality, and must show, at a minimum, that the classification is substantially related to an important governmental interest. *Cf. United States v. Virginia*, 518 U.S. 515, 532-33 (1996).

16

The Eleventh Circuit held ten years ago that a classification based on sexual orientation was not suspect or quasi-suspect. *See Lofton v. Secretary of Dep't. of Children and Family Services*, 358 F.3d 804, 818 (11th Cir. 2004). But that decision predated the Supreme Court's *Windsor* decision in 2013, which substantially changed the landscape regarding equal protection analysis as it relates to LGBT people.

To date, one circuit court has relied upon *Windsor* to overrule prior precedent and conclude that *Windsor* requires federal courts to apply heightened scrutiny to classifications based on sexual orientation. The Ninth Circuit, in SmithKline Beecham Corp. v. Abbott Laboratories, 740 F.3d 471, 483– 44 (9th Cir. 2014), held that "*Windsor* requires heightened scrutiny" under the Equal Protection clause, and that earlier Ninth Circuit precedent could not be reconciled. *See id.* at 483. The Ninth Circuit noted that *Windsor's* analysis lacked the trappings of traditional rational basis review, notably the "'strong presumption' in favor of the constitutionality of laws and the 'extremely deferential' posture that are the marks of rational basis review," that *Windsor* "did not consider the possible bases for the law in question as is required for rational basis review," and that *Windsor* required that "a legitimate state interest justify the harm" rather than applying a presumption that laws were constitutional despite harm." *See id.* at 481–83.[2]

Plaintiff urges this Court to recognize, as the Ninth Circuit did, that *Windsor* "completely undermined to the point of abrogation" *Lofton* and similar cases. *See Chambers v. Thompson,*

---

[2] The Tenth Circuit is the only other case to address the particular issue post *Windsor*, but that panel left the question open and decided the case on other grounds. *See Kitchen*, 755 F.3d at 1233. Several district courts in other circuits, however, have held that classifications based on sexual orientation are subject to heightened scrutiny under the Equal Protection Clause, relying on *Windsor*. See, *e.g.*, *Wolf*, 986 F. Supp. 2d at 1014 ; *Whitewood*, 2014 WL 2058105 \*14; *Love v. Beshear,* 2014 WL 2957671 \*6–7 (W.D. Ky. 2014).

150 F.3d 1324, 1327 (11th Cir. 1988). *Lofton* relied only on the fact that the Circuit courts were then unanimous on the question of whether LGBT persons constituted a suspect class. *See Lofton*, 388 F.3d at 818. As *SmithKline Beecher* shows, this can no longer be said to be the case.

Further, under a traditional Equal Protection analysis reflecting modern understandings of sexual orientation, it is clear that LGBT persons qualify as at least a quasi suspect class. The Supreme Court has identified the following criteria to determine whether laws that discriminate against a particular class of people trigger heightened scrutiny: (a) whether the class has been historically subjected to discrimination; (b) whether the class has a defining characteristic that frequently bears a relation to ability to perform or contribute to society; (c) whether the class exhibits obvious, immutable, or distinguishing characteristics that define them as a discrete group; and (d) whether the class is a minority or politically powerless. *See Windsor v. United States,* 699 F.3d 169, 181 (2d Cir. 2012).

LGBT persons meet each of these criteria. They have been the subject of discrimination. *See, e.g., Obergefell*, 962 F. Supp. 2d at 987 ("The history of discrimination against gay and lesbian individuals has been both severe and pervasive."). LGBT persons are equally capable of meaningful civic participation as are heterosexuals. *See, e.g., Varnum v. Brien,* 763 N.W.2d 862, 890 (Iowa 2009) ("Not surprisingly, none of the same-sex marriage decisions from other state courts around the nation have found a person's sexual orientation to be indicative of the person's general ability to contribute to society.").

Non-heterosexual sexual orientations are distinguishing and "immutable" for purposes of constitutional analysis. *See, e.g., Golinski v. U.S. Office of Pers. Mgmt.,* 824 F. Supp. 2d 968, 986 (N.D. Cal. 2012) ("[T]he consensus in the scientific community is that sexual orientation is an immutable characteristic."). And, finally, LGBT persons, as a minority, lack "political power"

18

as defined for constitutional purposes. *See, e.g., Windsor,* 699 F.3d at 185 (LGBT people lack

sufficient political power "to adequately protect themselves from the discriminatory wishes of

the majoritarian public.").[3]

Plaintiff therefore urges this Court to apply heightened scrutiny in evaluating his Equal

Protection claim. But the sections below demonstrate that, regardless of the level of scrutiny this

Court applies, the Sanctity Laws violate both the Due Process Clause and the Equal Protection

Clause.

C.     **Alabama's Sanctity Laws Violate the Due Process and Equal Protection Clauses Because They Cannot Withstand Any Level of Scrutiny**

Since *Windsor,* in an unbroken line of federal cases, multiple federal Circuit and District

Courts have held that even under the most deferential standards of review, the exclusion of same-

sex couples from marriage or marriage recognition violates the Fourteenth Amendment under the

Due Process Clause, the Equal Protection Clause, or a combination of both. *See, e.g., DeBoer v.*

*Snyder,* 973 F. Supp. 2d  757, 769 (E.D. Mich. 2014); *Love v. Beshear,* 989 F. Supp. 2d 536, 549

(W.D. Ky. 2014) (No conceivable legitimate reason for Kentucky's laws exists to exclude same-

sex couples from marriage.); *Baskin,* 2014 WL 2884868 at*13; *Wolf,* 986 F. Supp. 2d at 1016;

*Geiger v. Kitzhaber,* 994 F. Supp. 2d 1128 (D. Or. 2014); *Latta,* 2014 WL 1909999 at *28; *De*

*Leon,* 975 F. Supp. 2d at 658; *Bostic,* 2014 WL 561978 at *14-22; *Bourke v. Beshear,* 3:13-CV-

750-H, 2014 WL 556729 at *7–8 (W.D. Ky. Feb. 12, 2014); *Bishop,* 2014 WL 3537847 at *7;

---

[3] Alabama, as described *infra* Section IV (discussing Alabama's official animus towards homosexuals), has a particularly painful history – including recent history – of official discrimination against LGBT people. This serves as yet another basis on which to distinguish the *Lofton* decision. *Lofton* arose out of Florida, and so the *Lofton* court simply had no occasion to examine whether Alabama's official policy of condemnation justifies heightened scrutiny when Alabama enacts laws that disadvantage people in Alabama on the basis of sexual orientation.

19

*Obergefell*, 962 F. Supp. 2d at 986; *Kitchen*, 961 F. Supp. 2d at 1205–06; *see also Perry*, 704 F. Supp. 2d at 997–1003.

The Sanctity laws are due the same result. Alabama has not proffered any justification for excluding same-sex couples from marriage recognition that survives even rational basis review.

### 1. Alabama Excludes LGBT People from Marriage Purportedly Because of Child Welfare Concerns and a Preference for "Traditional Marriage"

Plaintiff asked Defendants Governor Bentley and Attorney General Strange (the "State Defendants") by interrogatory to "[i]dentify every government interest that you contend is a rationale for the Sanctity Laws." The State Defendants provided sworn responses, in which they identified the following purported interests that feature child welfare as the purpose of the Sanctity Laws:

(a)     Preserving the legal rights of children to be connected to their biological parents, particularly fathers, by privileging marriage in order to encourage biological fathers and mothers to get married;

(b)     Preserving the relationships between children and other kin, such as siblings, grandparents, aunts, uncles, and cousins by encouraging extended family members to engage in altruism and self-sacrifice; and

(c)     Choosing a traditional, conjugal, opposite-sex definition of marriage.

*See supra,* Statement of Facts ¶ 23.

### 2. The Sanctity Laws Are Not Rationally Related to Any Purported Goals of Child Welfare Such as Better Outcomes

Even assuming it is legitimate for Alabama to want biological fathers and mothers to parent their children, and for extended families to be good to one another, Alabama's refusal to recognize out-of-state same-sex marriages does not advance these goals. "[E]ven in the ordinary equal protection case calling for the most deferential of standards, [the Court] insist[s] on knowing the relation between the classification adopted and the object to be attained." *Romer*,

20

517 U.S. 620, 632 (1996); *see also Cleburne*, 473 U.S. at 446 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). It is "the search for the link between classification and objective" that "gives substance to the Equal Protection Clause." *Romer*, 517 U.S. at 632. "[R]equiring that the classification bear a rational relationship to an independent and legitimate legislative end . . . ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633; *accord Windsor*, 133 S. Ct. at 2693; *U.S. Dep't of Agric .v. Moreno*, 413 U.S. 528, 534-35 (1973). The Sanctity Laws flunk rational basis, as analyzed below.

      a.    <u>The Interest in Child Welfare Is Unmoored to the Reality of Plaintiff's Marriage</u>

The State's purported rationale of child welfare for the Sanctity Laws has no connection to Plaintiff and his deceased husband, who like many married couples were childless. This disconnect between child welfare and the Sanctity Laws is especially glaring in light of the facts of this case. The State Defendants cannot possibly explain how child welfare was advanced by (a) the hospital's refusing to inform Plaintiff of his husband's death; (b) the funeral director's offensive insistence that Plaintiff's deceased husband was "never married"; (c) Alabama's prohibiting Plaintiff from benefiting from the related wrongful death lawsuit, all of which conduct resulted from compliance with the Sanctity Laws; or (d) all other indignities inherent in having one's marriage officially deemed unworthy of any recognition whatsoever.

Of course childrearing is considered by some people to be one of the purposes of marriage, but it is indisputably not the only purpose that marriage serves for Alabama families. Marriage is "a far-reaching legal acknowledgment of the intimate relationship between two people." *Windsor*, 133 S. Ct. at 2692. Marriage in Alabama is tied to a wide array of governmental protections and obligations that have nothing to do with procreation or children.

Just like the constitutional amendment struck down in *Romer*, the Sanctity Laws "identif[y] persons by a single trait and then den[y] them protection across the board." *Romer*, 517 U.S. at 633. The law's breadth "outrun[s] and belie[s]" a claimed interest related to procreation or child-rearing. *See id.* at 635.

        b.    <u>Refusing To Recognize Same Sex Marriages Is Unrelated to the Purported Goal of Promoting Biological Family Connections</u>

Defendants' similarly assert that the Sanctity Laws are justified because children are best off if raised by two biological parents. But they have no justification for why it is that the Sanctity Laws singles out same-sex couples and prohibit them and them alone from marrying in order to meet that goal. Indeed, the State does not exclude any other couples who are unable or unwilling to biologically procreate from marriage, such as infertile or elderly couples or couples in which one person already has children, only same-sex couples. Same-sex couples are similarly situated to infertile or elderly couples in all relevant respects related to procreation. Like those couples, same-sex couples may procreate through surrogates, they may adopt, they may bring children with them into a marriage, and they may serve as role models to other couples in responsible child rearing. *See Bostic*, 2014 WL 3702493 at *14; *see also Bourke*, 2014 WL 556729 at *8 ("Kentucky does not require proof of procreative ability to have an out-of-state marriage recognized. The exclusion of same-sex couples on procreation grounds makes just as little sense as excluding post-menopausal couples or infertile couples on procreation grounds."); *DeBoer*, 973 F. Supp. 2d at 771 ("The prerequisites for obtaining a marriage license under Michigan law do not include the ability to have children . . . ."); *Bishop*, 962 F. Supp. 2d at 1293 (noting that "the infertile, the elderly, and those who simply do not wish to ever procreate" are permitted to marry in Oklahoma). So it is irrational to single out same-sex couples for disfavored

treatment in connection to a lack of biological connection when there is no similar restriction to other couples who will not become biological parents.[4]

In short, the Sanctity laws are an entirely irrational manner of promoting biological relationships in Alabama. *Kitchen*, 755 F.3d at 1222 ("As between non-procreative opposite-sex couples and same-sex couples, we can discern no meaningful distinction with respect to appellants' interest in fostering biological reproduction within marriages.").

> c.  The Sanctity Laws Are Not Rationally Related to Any Purported Interest in Promoting Procreation Within a Marriage

The State Defendants' interrogatory response also could be read to suggest that Alabama believes that the Sanctity Laws encourage heterosexual couples to get married so that if they become pregnant their children will be born into a heterosexual marriage. *See supra*, Statement of Facts ¶ 23; Dinielli Decl., Ex. A. ("Alabama's marriage law . . . incentivizes biological fathers and mothers to step into [the ancient, common-law offices of father and mother] by privileging marriage with special rights and benefits."). This is sometimes called the "responsible procreation" argument. Even assuming it is a legitimate state interest to "incentivize" heterosexual people to get married and bear children, the Sanctity Laws are unrelated to that interest.

---

[4] In any event, there is reason to think that Alabama's asserted preference for biological parents is not genuine, and is mere pretext for prohibited animus. Alabama law does not uniformly privilege biological parents over all others, but rather reflects the fact that multiple forms of families can raise children. For example, the presumption of paternity specifically prefers marital fathers to biological fathers. *See* Ala. Code § 26-17-204. Indeed, so long as a presumed father "persists in his status as the legal father," a putative biological father *lacks standing* to establish his own paternity. *See* Ala. Code § 26-17-607. Neither Alabama's intestacy nor custody laws countenance any difference between biological parents and either presumed fathers or adoptive parents, and Alabama's guardianship law specifically insists that adoptive, marital and biological relatives are all equally relatives for the purpose kinship guardianship. *See* Ala. Code § 38-12-32.

There is no logical basis to think that excluding same-sex couples from marriage will affect procreative activity of heterosexual couples, or the likelihood of their marrying. *See De Leon*, 975 F. Supp. 2d at 654 ("Same-sex marriage does not make it more or less likely that heterosexuals will marry and engage in activities that can lead to procreation."); *accord Bishop*, 962 F. Supp. 2d at 1291; *Pedersen*, 881 F. Supp. 2d at 340-41; *Golinski*, 824 F. Supp. 2d at 997-98; *Bostic*, 2014 WL 3702493 at 13.

The exclusion of same-sex couples from marriage does nothing to incentivize heterosexual couples to marry. All of the benefits of marriage for heterosexual couples under Alabama law exist independent of the Sanctity Laws and will remain, presumably with the same incentivizing force as before, if the Sanctity Laws are struck down. *See Bishop*, 962 F. Supp. 2d at 1291 ("Marriage is incentivized for naturally procreative couples to precisely the same extent regardless of whether same-sex couples (or other non-procreative couples) are included."); *Perry*, 671 F.3d at 1088 ("There is no rational reason to think that taking away the designation of 'marriage' from same-sex couples would advance the goal of encouraging California's opposite-sex couples to procreate more responsibly."); *accord De Leon*, 975 F. Supp. 2d at 654; *Kitchen*, 961 F. Supp. 2d at 1201; *Golinski*, 824 F. Supp. 2d at 998.

The asserted interest in the well-being of children thus fails rational-basis review as a matter of logic because the Sanctity Laws do not plausibly affect the child-rearing plans of heterosexual or same-sex couples and serves only to harm children of same-sex couples. By excluding same-sex couples from marriage recognition, Alabama does nothing to actually increase the ability of children to have a legal relationship with their biological fathers and their extended family, it only serves to prevent the children of same-sex couples from having legal relationships with one of their parents and their extended families.

24

       d.       <u>The Sanctity Laws Are Not Rationally Related to Any Other</u>
                <u>Purported Goals of Child Welfare Such as Better Outcomes</u>

The State Defendants' interrogatory response explaining Alabama's interests in the Sanctity Laws essentially reduces to an argument that the best environment for children is to be raised by their biological mother and father, surrounded by an extended family. This rationale, and similar rationales referred to as "optimal childrearing," have "failed rational basis review in every court to consider them post-Windsor." *See Bourke*, 2014 WL 556729 at \*8; *DeBoer*, 973 F. Supp. 2d at 772; *DeLeon*, 975 F. Supp. 2d at 654; *Bostic*, 2014 WL 561978 at \*17-20; *Bishop*, 962 F. Supp. 2d at 1290-92; *Obergefell*, 962 F. Supp. 2d at 982; *Kitchen*, 961 F. Supp. 2d at 1201-02; *see also Perry*, 704 F. Supp. 2d at 999-1000 (rejecting these rationales prior to *Windsor*). These courts all have concluded that exclusion of same-sex couples from marriage recognition does not conceivably further these interests in any way.

Even if it were true that there were poorer outcomes among children raised by same-sex couples—and there is no such evidence—that would not explain the exclusion of same-sex couples from marriage. Indeed, the *DeBoer* court noted that Michigan "does not similarly exclude certain classes of heterosexual couples from marrying whose children persistently have had 'sub-optimal' developmental outcomes" in scientific studies, and that "[t]aking the state defendants' position to its logical conclusion" would require that marriage be restricted to only rich, educated, suburban-dwelling Asians. *DeBoer*, 973 F. Supp. 2d at 772; *see also Bishop*, 962 F. Supp. 2d at 1294 (the state "does not condition any other couple's receipt of a marriage license on their willingness or ability to provide an 'optimal' child-rearing environment for any potential or existing children"); *Cleburne*, 473 U.S. at 449-50 (an asserted interest that applies equally to non-excluded groups fails rational basis review).

e.   The Sanctity Laws Harm Children of Same-Sex Parents and Their Families

The "only effect the [Sanctity Laws have] on children's well-being is harming the children of same-sex couples who are denied the protection and stability of having parents who are legally married." *See Obergefell*, 962 F. Supp. 2d at 994-95; *see also Goodridge*, 798 N.E.2d at 964 ("Excluding same-sex couples from civil marriage will not make children of opposite-sex marriages more secure, but it does prevent children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of a stable family structure in which children will be reared, educated, and socialized.") (internal quotation marks omitted). "Indeed, Justice Kennedy explained [in *Windsor*] that it was the government's failure to recognize same-sex marriages that harmed children, not having married parents who happened to be of the same sex." *Bourke*, 2014 WL 556729 at *8; *see also Kitchen*, 961 F. Supp. 2d at 1212-13 ("If anything, [the marriage ban] detracts from the State's goal of promoting optimal environments for children," in part by "den[ying] the families of [children of same-sex couples] a panoply of benefits that the State and the federal government offer to families who are legally wed."); *accord Bostic*, 970 F. Supp. 2d at 478.

Moreover, like the federal DOMA invalidated in *Windsor*, Alabama's Sanctity Laws "humiliate[]" the "children now being raised by same-sex couples" and "make[] it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *See Windsor*, 133 S. Ct. at 2694; *see also Bostic*, 970 F. Supp. 2d at 478 (the marriage exclusion has the effect of "needlessly stigmatizing and humiliating children who are being raised" by same-sex couples, which "betrays" rather than serves an interest in child welfare).

26

For all of these reasons, the asserted interests related to well-being of children fail rational basis review.

### 3. "Tradition" Is an Impermissible Justification for Burdening a Fundamental Right or Discrimination as a Matter of Law

The State Defendants' interrogatory response also appears to invoke "tradition" as a justification for the Sanctity Laws. *See* Dinielli Decl. Ex. A ("Alabama has chosen a traditional, conjugal, opposite-sex definition of marriage, as opposed to a revisionist definition . . . . To change Alabama's definition of marriage by judicial fiat . . . would alter society's understanding of norms and responsibilities . . . .").

But tradition, by itself, does not constitute "an independent and legitimate legislative end" for purposes of rational-basis review. *See Romer*, 517 U.S. at 633. "[T]he government must have an interest separate and apart from the fact of tradition itself," *Golinski*, 824 F. Supp. 2d at 993, because the "justification of 'tradition' does not explain the classification; it merely repeats it." *Kerrigan*, 957 A.2d at 478; *accord Varnum*, 763 N.W.2d at 898 (asking "whether restricting marriage to opposite-sex couples accomplishes the governmental objective of maintaining opposite-sex marriage" results in "empty analysis").

The fact that a group of people has traditionally been treated unequally is not a justification for continuing that unequal treatment. "Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational basis." *Heller v. Doe by Doe,* 509 U.S. 312, 326 (1993); *see also Lawrence*, 539 U.S. at 577-78 ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack.") (quoting *Bowers*, 478 U.S. at 216 (Stevens, J., dissenting)). As the Supreme Court has explained, "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Lawrence*, 539 U.S. at 579.

27

The Supreme Court has on many occasions struck down discriminatory practices that had existed for years without raising any constitutional concerns. For example, "[l]ong after the adoption of the Fourteenth Amendment, and well into [the twentieth century], legal distinctions between men and women were thought to raise no question under the Equal Protection Clause." United States v. Virginia, 518 U.S. 515, 560 (1996) (Rehnquist, J., concurring); *see also J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 142 n. 15 (1994) ("We do not dispute that this Court long has tolerated the discriminatory use of peremptory challenges, but this is not a reason to continue to do so."). "A prime part of the history of our Constitution . . . is the story of the extension of constitutional rights and protections to people once ignored or excluded." *Virginia,* 518 U.S. at 557.

Ultimately, "'preserving the traditional institution of marriage' is just a kinder way of describing the [s]tate's *moral disapproval* of same-sex couples." *Lawrence,* 539 U.S. at 601 (Scalia, J., dissenting) (emphasis in original); *see also Bishop,* 962 F. Supp. 2d at 1295 (rejecting argument based on tradition because it "is impermissibly tied to moral disapproval of same-sex couples as a class"). The Supreme Court has made clear that moral disapproval is not a legitimate basis for government discrimination. *Windsor,* 133 S. Ct. at 2693; *Lawrence,* 539 U.S. at 582 (O'Connor, J., concurring) (noting that Texas attempted to justify its homosexual sodomy law by a government interest in the "promotion of morality").

For these reasons, "tradition" has been resoundingly rejected by federal district courts as a justification for excluding same-sex couples from marriage and marriage recognition. *See DeBoer,* 973 F. Supp. 2d at 772; *De Leon,* 975 F. Supp. 2d at 655–56; *Bostic,* 2014 WL 561978 at *15; *Bourke,* 2014 WL 556729 at *7; *Kitchen,* 961 F. Supp. 2d at 1203.

28

**D.    The Sanctity Laws Violate The Equal Protection Clause for the Additional Reason That They Reflect and Effectuate Impermissible Animus**

Because there is no rational connection between the Sanctity Laws and any of the asserted state interests, this Court can conclude that the Sanctity Laws violate equal protection even without considering whether the laws are motivated by an impermissible purpose. But here it is plain that Alabama does bear an impermissible animus towards LGBT people.

*Windsor* is the latest in a long line of cases holding that statutes whose primary purpose is to disadvantage a politically unpopular group violate equal protection. *See Windsor*, 133 S. Ct. at 2693; *Romer*, 517 U.S. at 634; *Cleburne*, 473 U.S. at 446-47; *Moreno*, 413 U.S. at 534; *Vance v. Bradley,* 440 U.S. 93, 97 (1979) (rational-basis review is deferential "absent some reason to infer antipathy"); *N.Y.C. Transit Auth. v. Beazer,* 440 U.S. 568, 593 n.40 (1979) (noting that the Court's equal protection cases have long "recognized a distinction between 'invidious discrimination,'" which it described as "classifications drawn 'with an evil eye and an unequal hand' or motivated by 'a feeling of antipathy' against a specific group" and "those special rules that 'are often necessary for general benefits"). These cases have sometimes been described as a form of "second order" or "more searching" form of rational-basis review, *see Cleburne*, 473 U.S. at 458 (Marshall, J., concurring in part); *Lawrence*, 539 U.S. at 580 (O'Connor, J., concurring), or "careful consideration," *Romer*, 517 U.S. at 633; *Windsor*, 133 S. Ct. at 2693.

But regardless of how these cases are labeled, they establish that laws based on "the unstated premise that 'some citizens are more equal than others,'" *Zobel v. Williams,* 457 U.S. 55, 71 (1982) (Brennan, J., concurring), or passed for the purpose of "impos[ing] inequality," *Windsor*, 133 S. Ct. at 2694, cannot stand. *See id.* at 2706 (Scalia, J., dissenting) (noting that because of its central holding the *Windsor* majority opinion did not "need [to] get into the strict-vs.-rational-basis scrutiny question").

The Supreme Court has sometimes described this impermissible purpose as "animus" or a "bare . . . desire to harm a politically unpopular group." *Windsor*, 133 S. Ct. at 2693. But this impermissible purpose does not have to reflect "malicious ill will." *Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 375 (2001) (Kennedy, J., concurring). It can also take the form of "moral disapproval," *Lawrence*, 539 U.S. at 582 (O'Connor, J., concurring), "negative attitudes," *Cleburne*, 473 U.S. at 448, "fear," *id.*, "irrational prejudice," *id.* at 450, "simple want of careful rational reflection," *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring), or "some instinctive mechanism to guard against people who appear to be different in some respects from ourselves," *id.*

The Supreme Court in *Windsor* found that the "history of DOMA's enactment and its own text" demonstrate that interfering with the equal dignity of same-sex couples "was more than an incidental effect of the federal statute. It was its essence." *Windsor*, 133 S. Ct. at 2693. The same is true here: Alabama's Sanctity Laws were enacted because of, not in spite of, their adverse effect on same-sex couples.

Indeed, although Alabama does not maintain legislative histories, or formally record debates, Plaintiff did uncover some contemporaneous evidence suggesting that members of the Legislature were motivated in 2004 to propose the constitutional amendment in order to express their moral disapproval of same-sex marriage, and not out of concern for child welfare. Plaintiff subpoenaed Jeff Woodward, Clerk of the Alabama House of Representatives, who produced a press release apparently issued by Representative Gerald Allen. That release attributes the following quote to Representative Allen: "This is a great moral issue that needs to be addressed once and for all." *See* Dinielli Decl. Ex. B.

30

But even without any substantial legislative history of the sort available for the Supreme Court to examine in connection with DOMA, the text of Alabama's Sanctity Laws, just like the text of DOMA, makes clear that the intent was to exclude same-sex couples from the advantages and dignity of marriage. *Windsor*, 133 S. Ct. at 2693. The laws specifically note, for example, that "the State of Alabama shall not recognize as valid any marriage of parties of the same sex that occurred . . . as the result of the law of any jurisdiction regardless of whether a marriage license was issued." *See* Ala. Const. Amend. 774. This is not a law that incidentally affects same-sex couples.

In addition, the historical background of the Sanctity Laws reflects a purpose to exclude same-sex couples, and belies the suggestion that the exclusion of same-sex couples is a mere side-effect of some broader public policy. *Cf. Windsor*, 133 S. Ct. at 2693 (examining historical context of DOMA); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 267 (1977) ("historical background of the decision" is relevant when determining legislative intent). The Sanctity Laws were not enacted long ago at a time when "many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage." *Windsor*, 133 S. Ct. at 2689.

Rather, Alabama enacted its Sanctity Laws against the backdrop of a very public debate about the propriety of same-sex marriage and the possibility of its legalization in certain jurisdictions. Alabama's decisions both in 1998, and again in 2006, to reaffirm that traditional exclusion and to void the marriages of same-sex couples entered into in other states cannot be viewed as benign. The Equal Protection Clause is violated when government has "selected or reaffirmed a particular course of action" because of its negative effects on an identifiable group. *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979) (emphasis added).

Finally, the Sanctity Amendments are just one in a series of Alabama laws that discriminate against LGBT people and their romantic and sexual relationships. Alabama has an especially painful history – that continues to this day – of official discrimination against LGBT people. As noted, Alabama law currently requires that "[c]ourse materials and instruction that relate to sexual education or sexually transmitted diseases should include . . . [a]n emphasis, in a factual manner and from a public health perspective, that *homosexuality is not a lifestyle acceptable to the general public* and that *homosexual conduct is a criminal offense* under the laws of the state." *See* Ala. Code § 16-40A-2 (emphasis added). Similarly, Alabama continued to defend its law criminalizing homosexual sex well after the Supreme Court in *Lawrence* had made clear that such laws were unconstitutional. *See Williams v. State,* 2014 WL 2677722 (Ala. Ct. Crim. App. June 13, 2014) (overturning Alabama's consensual sodomy ban on appeal). Certainly, the fact that Alabama still requires that school children be taught that homosexuality is unacceptable, and the fact that Alabama still is trying to punish LGBT people criminally for engaging in consensual sex, reflect Alabama's "moral disapproval," "negative attitudes," "fear," and "irrational prejudice," directed at its LGBT citizens.

Indeed, the current Chief Justice of the Alabama Supreme Court has bluntly described the fact that Alabama, officially through its positive laws and through its court system, expressly and intentionally displays and acts upon animus towards LGBT people. Chief Justice Moore has correctly observed that "Alabama's courts . . . have expressed a moral revulsion to homosexual activity." *See Ex. Parte H.H.*, 830 So.2d 21, 29 (Ala. 2002) (Moore, C.J., concurring). Indeed, Chief Justice Moore summarized Alabama's policy towards LGBT persons as follows: "the policy of the law in Alabama – from its civil law to its Criminal Code to the educational

programs provided to its public-school students – consistently condemns homosexual activity and the homosexual lifestyle." *See Ex Parte H.H.*, 830 So.2d at 31.

Plaintiff agrees with Chief Justice Moore on this point: Alabama *does* consistently and officially condemn homosexuals and the "homosexual lifestyle." When the state's Chief Justice pronounces that the official policy of Alabama law – in toto – is to "condemn" homosexuals, it seems more than reasonable to presume that the Sanctity Laws were intended to do so as well. The State Defendants, by contrast, would have this Court believe that, although all the many legal disadvantages imposed on LGBT Alabamians identified by Chief Justice Moore reflected, as he says, Alabama's "policy" to condemn homosexuals, the Sanctity Laws, *and those laws alone*, instead reflect merely a beneficent desire to support children and their extended families. This is a difficult pill to swallow.

The Sanctity Laws specifically target LGBT people for negative treatment. This along with Alabama's long and avowed desire to exclude LGBT from the incidents of civil society and to demean their purported "lifestyles" makes clear that Alabama's Sanctity Laws classify same-sex couples "not to further a proper legislative end but to make them unequal to everyone else. This [Alabama] cannot do." *Romer*, 517 U.S. at 635.

## IV.   CONCLUSION

For all the foregoing reasons, Plaintiff Paul Hard respectfully asks that the Court grant this motion for summary judgment and enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that those provisions of the Marriage Protection Act and the Sanctity of Marriage Amendment that prevent Alabama from recognizing the validity of lawful same-sex marriages violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and awarding costs and fees to Plaintiff as permitted by law.

Separately, and in light of the fact that Governor Bentley has disclaimed any authority to direct state officials to effectuate Alabama's marriage policies, Plaintiff may subsequently move for an injunction, pursuant to 28 U.S.C. § 2202, requiring Alabama state officials to recognize marriages of same-sex couples entered in other jurisdictions on an equal basis as the marriages of different-sex couples; requiring Defendant Lohr (who has been dismissed without prejudice) to distribute to Plaintiff any proceeds from the wrongful death action that are owing to Plaintiff as "surviving spouse," and requiring Defendants Catherine M. Donald (who has been dismissed without prejudice ) to correct David Fancher's death certificate to indicate that David was married at the time of death and that Paul Hard is his surviving spouse.

August 29, 2014

Respectfully submitted,

SOUTHERN POVERTY LAW CENTER

By:  s/David C. Dinielli
David C. Dinielli* (California Bar No. 177904)
Samuel Wolfe (ASB-2945-E63W)
400 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 956-8200
Facsimile:  (334) 856-8481
david.dinielli@splcenter.org
sam.wolfe@splcenter.org
*Application for admission *pro hac vice* forthcoming

*(Attorneys for Plaintiff)*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of August, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

> David Bryson Byrne, Jr., Esq.
> Office of the Governor
> State Capitol
> 600 Dexter Avenue
> Suite NB-05
> Montgomery, AL  36130
>
> James William Davis, Esq.
> Laura Elizabeth Howell, Esq.
> State of Alabama
> Office of the Attorney General
> 501 Washington Avenue
> Montgomery, AL  36130
>
> Gabriel Joseph Smith, Esq.
> Foundation For Moral Law
> 1 Dexter Avenue
> Opelika, AL  36103

/s/ Samuel Wolfe, Esq.