# EXHIBIT A

# Declaration Of Sherif Girgis

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| PAUL HARD, spouse and next best friend of CHARLES DAVID FANCHER, deceased;<br><br>*Plaintiff,*<br><br>v.<br><br>ROBERT BENTLEY, in his official capacity as Governor of the State of Alabama, et al.,<br><br>*Defendants.* | CIVIL ACTION NO.<br>2:13-cv-922-WKW-SRW |

## DECLARATION OF SHERIF GIRGIS

I, Sherif Girgis, declare pursuant to 28 U.S.C. § 1746 as follows:

1. My name is Sherif Girgis. I have personal knowledge of the facts contained in this statement and they are true.

2. I have been retained by the Office of the Alabama Attorney General to render my opinions on the nature and history of marriage, including whether marriage may be reasonably viewed as an intrinsically a male-female relationship, or whether Alabama's statute (Ala. Code § 30-1-19) and Constitutional amendment prohibiting same-sex marriage is motivated by animus.

3. I prepared a report in this case entitled "Expert Witness Report of Sherif Girgis," dated July 1, 2014. That report disclosed the details of my engagement, my qualifications, my opinions in this case (and bases for those opinions). My curriculum vitae and all other items required by Rule 26 have been provided. A true and correct copy of that report is attached as Exhibit A.

4. I make this declaration to reaffirm my report as set forth in Exhibit A.

5. I declare under penalty of perjury that the foregoing is true and correct,

1

Executed on September __17__, 2014.

_____
Sherif Girgis

Sworn to and subscribed before me on this the __17th__ day of __September__, 2014.

_____
Notary Public

My commission expires: _____

MARIE MOUSA
Notary Public
State of New Jersey
My Commission Expires July 24, 2019

2

## EXHIBIT A:

"Expert Witness Report of Sherif Girgis"

July 1, 2014

# Expert Witness Report of Sherif Girgis

*Paul Hard v. Governor Robert Bentley, et al.*
*Case#2:13-CV-922*
*U.S. District Court for the Middle District of Alabama*

**Sherif Girgis, 150 N. Stanworth Drive, Princeton, NJ 08540;email:
sgirgis@princeton.edu;phone: (302) 465-1671**
**7/1/2014**

## Qualifications

**Professional Appointment**
I am a research scholar for the Witherspoon Institute in Princeton, New Jersey, an independent research center dedicated to exploring the intellectual traditions underpinning free societies. I was appointed to this position in 2011.

**Education**
I obtained an A.B. in philosophy from Princeton University, where I won several academic prizes, including the best thesis on ethics and best in philosophy. Upon graduating Phi Beta Kappa and summa cum laude, I went on to earn a master's (B.Phil.) degree in moral, political, and legal philosophy and the philosophy of Aristotle from the University of Oxford as a Rhodes Scholar. I am now a Ph.D. student in philosophy at Princeton and a J.D. student at Yale Law School, where I am an editor of the *Yale Law Journal* and was the 2012-13 recipient of the Felix S. Cohen Prize for best paper in legal philosophy.

**Relevant experience**
I have studied, debated, written, spoken, and advised policy leaders on the moral, policy, and legal implications of the redefinition of civil marriage for more than four years, including in venues that represent the highest levels of legal-academic engagement. I was lead author of "What Is Marriage?", which appeared in December 2010 in the *Harvard Journal of Law and Public Policy*. My coauthors were Robert P. George (McCormick Professor of Jurisprudence, Princeton Univ.) and Ryan T. Anderson (William E. Simon Fellow in Religion and a Free Society at the Heritage Foundation). We further developed our argument for our book *What Is Marriage? Man and Woman: A Defense*, released by Encounter Books in December 2012 and cited twice by the U.S. Supreme Court. Both works make a philosophical case for the view that marriage is inherently a male-female union, and a policy-based case for enshrining or preserving that view in law.

Between those publications and since, I have participated in more than 70 lectures, debates, conferences, or panel discussions. Several have included (besides myself) mostly or exclusively academic philosophers or legal scholars, but many have been before broader audiences. I have also written pieces on the topic (including replies to critics) for legal-academic journals, an invitation-only philosophy textbook (in which most or all other contributors are full professors), national newspapers and other popular outlets; filed amicus briefs in federal- and state-court cases; and briefed government officials on marriage policy.

I write, in short, as a participant in the marriage debate and as a close observer, sensitive to its emphases and trends.

**Publications**
"Civil Rights and Liberties," *Cambridge Companion to Philosophy of Law*, with Robert P. George (Princeton Univ.), ed. John Tasioulas (forthcoming with Cambridge Univ. Press, 2015).

"Kennedy, Alito, and the Equal Protection Argument in *Windsor*," *Case Western L. Rev.* (forthcoming, 2014).

"Making Sense of Marriage," in *Contemporary Debates in Applied Ethics*, 2nd ed., edited by Cohen, Andrew I. and Christopher Heath Wellman (Oxford: Wiley Blackwell, 2014).

"The Mens Rea of Accomplice Liability: Supporting Intentions," 123 *Yale L. J.* 460 (2013).

"How the Law School Can Succeed: Intellectual Diversity in the Legal Academy," *Harv. J. of L. & Pub. Pol.* (2013).

*What Is Marriage? Man and Woman: A Defense* (Encounter Books, 2012), primary author with Robert P. George & Ryan T. Anderson.

"What Is Marriage?", 34 *Harv. J. of L. & Pub. Policy* 245 (2010), primary author with Robert P. George & Ryan T. Anderson.

Translated from Spanish into English, *The New Global Law* (Cambridge Univ. Press, 2010), by Rafael Domingo. Spanish version: *¿Qué es el derecho global?* ("What Is Global Law?"), 2007 winner of the Spanish Supreme Court's prize *Premio Rafael Martínez Emperador*.

"Introduction" in *Entre el Derecho y la moral* (Aranzadi, 2009), by Robert P. George.

**Compensation & Previous Retention**
I am being paid $275/hr for study and testimony. I have also served as a consultant for the State of New Jersey in *Garden State Equality v. Dow* (No. L-1729-11), the state of Wisconsin in *Wolf and Schumacher v. Walker* (No. 14-cv-64-bbc), and the State of Michigan in *DeBoer v. Snyder* (No. 12-CV-10285), and submitted an expert report and was deposed in the last case.

## Report

I. **There are grounds for thinking that the conjugal union of man and woman has distinctive value. These grounds—which would justify singling out male-female bonds—require no appeal to religious authority, or hostility toward anyone.**

<u>The first main point to which I can attest is summarized in these three paragraphs:</u>

Many cultures and thinkers have understood marriage as a stable sexual union of man and woman, apt for family life. It is historically impossible to attribute these cultural and intellectual traditions to any one religion, or to hostility toward people identifying as gay or lesbian.

For these reasons, they provide a non-religious basis for concluding that the conjugal union of husband and wife has distinctive personal or social value. They undermine the idea that only animus could motivate such a view.

And they support the analytic point that recognizing same-sex relationships as marriages is not simply about expanding the pool of eligibility for marriage, but about

giving it a significantly new social meaning—that the same-sex civil marriage debate is not ultimately about whom to let marry, but about what marriage is and why it is socially regulated.

This conclusion finds support in the following sorts of evidence:

A. *Many cultures and thinkers have understood marriage as a stable male-female sexual bond oriented to family life, with corresponding duties on the mother and father's part to each other and any children they might have.*

*For millennia, cultures around the world have regulated male-female sexual unions in particular, with a view to children's needs.* As one historian observes:
> Marriage, as the socially recognized linking of a specific man to a specific woman and her offspring, can be found in all societies. Through marriage, children can be assured of being born to both a man and a woman who will care for them as they mature. [1]

Another historian of marriage points out that marriage across cultures "involves certain rights and duties both . . . of the parties entering the union and . . . of the children born of it," and "implies the right of sexual intercourse."[2] For all its cultural variation, that is, marriage has been understood to impose duties on men and women to commit to each other and any children born of their union.

In this country, too, courts have held that "the procreation of children under the shield and sanction of the law" is a "principal end[] of marriage,"[3] which in turn "exists as a protected *legal* institution primarily because of societal values associated with the propagation of the human race."[4] Indeed, "virtually every Supreme court case recognizing as fundamental the right to marry indicates as the basis for the conclusion the institution's inextricable link to procreation."[5]

*But this singling out of opposite-sex bonds is not just a matter of nearly universal cultural practice. Important thinkers, too, have developed ethical frameworks that likewise distinguished the spectrum of friendships from those committed bonds embodied in coitus and uniquely apt for family life (namely, conjugal unions).*

Thus, Plato wrote favorably of legislating to have people "couple[], male and female, and lovingly pair together, and live the rest of their lives" together.[6] And for Aristotle, another great philosopher of Antiquity, the foundation of political community was "the family group," by which he "mean[t] the nuclear family."[7] In

---

[1] G. Robina Quale, A History of Marriage Systems (New York: Greenwood Press, 1988) 2.
[2] Westermarck, Edward. A Short History of Marriage (New York: Macmillan Company, 1926) 1.
[3] Sharon v. Sharon, 75 Cal. 1, 33 (1888) (quoting Steward on Marriage and Divorce, sec. 103).
[4] Singer v. Hara, 522 P.2d 1187, 1195 (Wash. App. 1974) (emphasis added).
[5] Conaway v. Deane, 903 A.2d 416, 620 (Md. 2007).
[6] Plato, Laws, 840c-841a. See Plato: The Collected Dialogues. Ed.
[7] Moffi, Alberto. "Family and Property Law," Cambridge Companion to Ancient Greek Law. Eds. Gagarin, Michael and David Cohen (Cambridge: Cambridge University Press, 2005) 254

Aristotle's view, indeed, "between man and wife friendship seems to exist by nature," and their conjugal union has primacy over political union.[8]

Likewise, the first- and second-century Greek historian Plutarch attributed to Solon, the early Athenian law-giver, the view that marriage is "a union of life between man and woman for the delights of love and the begetting of children."[9] Plutarch himself wrote of marriage as a distinct form of "friendship," specially embodied in "physical union" of coitus (which he called a "renewal" of marriage).[10] And for Musonius Rufus, the first-century Roman Stoic, a "husband and wife" should "come together for the purpose of making a life in common and of procreating children, and furthermore of regarding all things in common between them . . . even their own bodies." On his view, this form of affectionate and bodily union—and not only its fulfillment in procreation—is desirable.[11]

All these thinkers knew of same-sex sexual acts; indeed, many of them lived in cultures in which a variety of sexual acts, including certain sexual acts between men, were common. Yet they all denied that any sexual acts but coitus, whatever the sex of the parties, could seal a truly marital relationship.[12]

*In other words, these ancient thinkers developed ethical theories that corroborated the practice of nearly every culture in seeing distinctive social or personal value in the conjugal union of man and woman.*

B. *It is impossible to attribute these cross-cultural patterns to any particular religion, or to hostility toward anyone.*

Some suppose that any argument for the conjugal view of marriage requires appeal to Judaism or Christianity. But none of the above-mentioned thinkers—Plato, Aristotle, Plutarch, or Musonius Rufus—was influenced by Judaism or Christianity. Nor were they all ignorant of same-sex sexual relations, which were common, for example, between adult and adolescent males in Greece. *Rather, quite apart from motives of religion, ignorance, or hostility toward anyone, they reasoned toward the view that male-female sexual bonds have distinctive value.*

In fact, the anthropological evidence of a nearly perfect global consensus on sexual complementarity in marriage, despite the relatively recent origin of our concept of gay identity, supports broader conclusions: *First,* no *particular religion is uniquely responsible for this view. And second, it cannot be ascribed simply to animus against people identifying as gay or lesbian.* After all, it has prevailed in societies that have spanned the spectrum of attitudes toward

---

[8] Aristotle, Ethics, 1162a15ff. See Complete Works of Aristotle. Ed. Barnes, Jonathan (Princeton: Princeton University Press, 1984).
[9] Plutarch, Life of Solon 20, 4 (Loeb ed. 1961).
[10] Plutarch, Erotikos 769 (Loeb ed. 1961).
[11] Musonius Rufus, Discourses XIIIA, in Cora E. Lutz, Musonius Rufus "The Roman Socrates," Yale Classical Studies (1947) <https://sites.google.com/site/thestoiclife/the_teachers/musonius-rufus/lectures/13-0>.
[12] Finnis, John. "Law, Morality, and Sexual Orientation," 69 Notre Dame L. Rev. 1049 (1993).

homosexuality—including ones favorable toward same-sex acts, and others lacking anything like our concept of gay people as a class.

Moreover, the thinkers cited here, and successors of theirs over centuries, developed the view that only coitus could complete a marriage, in contexts where the other acts being considered were ones *between a man and woman*. (If the law were just targeting same-sex relationship for exclusion, would it not have counted any sexual act between a man and woman as adequate to consummate a marriage?) It is virtually impossible that *this* standard was motivated by animus against gays and lesbians, especially as these thinkers worked in contexts in which same-sex marriage was not being advocated by anyone.

*These facts suggest that something besides religion and animus can motivate the view that the uniquely comprehensive union of man and woman that is embodied in coitus has distinctive value.*

C. *These patterns support the point that the same-sex marriage debate is not simply about whom to let marry. It raises the more basic, and prior, question of whether to replace the traditional, longstanding conception of what marriage (and the right to marriage) consists of.*

To summarize, almost all cultures, as well as important strands of our own philosophical and legal traditions, have understood marriage fundamentally as bringing man and woman together in a sexual union oriented to family life, shaped by its demands (by, e.g., norms of stability), and regulated in ways that increase the chances of children being reared by their mother and father.

This supports the claim that recognizing same-sex relationships as marriages would not simply expand eligibility to marry, the way that manumitting slaves does in legal systems that allow only free people to form (marriage) contracts. Rather, same-sex marriage recognition is better understood as replacing the above-mentioned, nearly universal understanding of what marriage is and why it is of public concern, with a new and more general view. On this new view, presumably, marriage is basically distinguished by the romantic companionship that is common and inherent to both opposite- and same-sex partnerships.

II. **Consistent with the longstanding intellectual heritage and cultural and legal practice, Alabama marital and domestic relations law uses presumptions and (dis-)incentives to efficiently promote stable male-female bonds with an emphasis on connecting children to their biological parents and other kin.**

Alabama's laws on marriage and other domestic relations reflect a concern for serving children's interests by stabilizing their connections to natural parents and kin more broadly, especially by presumptions, disincentives, and other non-penal means that limit the state's intrusion into family life.

For example, Alabama law recognizes a "prima facie right of a natural parent to the custody of his or her child" based on "the common law concept that the primary parental right of custody is in the best interest and welfare of the child." This "presumption" is "so strong" that it is rebutted only if the natural parent seeking custody is found unfit because of misconduct or gross negligence.[13] It reflects the state's view that "a strong sense of personal identity is an asset" that depends "in large measure" on "knowledge of, and association with, individuals of biological kinship"; that "blood bonds can, and do, provide long-term stability and support."[14]

Indeed, the American legal system recognizes that a child's biological connection to a man "offers [that] natural father an opportunity that no other male possesses to develop a relationship with his offspring,"[15] and serves that interest of father and child in part through the stabilizing force of marriage law. In light of both these facts, Alabama, like most states, presumes the paternity of the husband of a mother who gives birth during or close to the couple's marriage.[16] This presumption is rebutted only by genetic testing proving that another man is the father, again reflecting a concern to link children to their biological parents.[17]

Alabama's child custody law is also shaped by an acute concern for children's interests, as served by preserving their kinship ties. For example, Alabama courts must always consider awarding divorcing parents joint custody, presume it to be in the child's best interest, and (when it is) order it even without both parents' consent.[18] In other cases, Alabama law countenances awarding kinship guardianship to a "relative" (defined to include those "related to the child by blood, marriage, or adoption within the fourth degree of kinship"[19]), who thereby acquires, with few exceptions, "the same rights, responsibilities, and authority relating to the child as a parent."[20] And it prioritizes spouses and children in the distribution of an intestate's property.[21]

Because "procedure by presumption is always cheaper and easier than individualized determination,"[22] these statutory presumptions are relatively unobtrusive, low-cost ways for the state to promote the bonds between children and their parents and other kin, with an emphasis on biological ties.

The state also recognizes the importance of stability in parenting. Thus, it requires even natural parents seeking custody after having relinquished it to prove that "a

---

[13] Ex parte Mathews, 428 So. 2d [58] at 59 [(Ala. 1983).
[14] Ex parte Jenkins, 723 So. 2d 649, 678 (Ala. 1998).
[15][15] Lehr v. Robertson, 463 U.S. 248, 262 (1983).
[16] Code of Ala. Sec. 26-17-204.
[17] Code of Ala. Sec. 26-17-631.
[18] Code of Ala. Sec 30-3-152.
[19] 2010 Al. ALS 712, 2010 Ala. Acts 712, 2010 Al. Pub. Act 712, 2010 Al. HB 617
[20] Code of Ala. § 12-15-314
[21] Code of Ala. Sec 43-8-41.
[22] Stanley v. Illinois, 405 U.S. 645, 656.

change in custody would . . . more than offset the inherently disruptive effect of uprooting the child by such a change."[23] And it promotes the stability of the natural parent-child bonds within marriage by dis-incentivizing infidelity and other misconduct: For instance, it empowers a judge granting divorce to consider one spouse's misconduct in setting an allowance for the other out of the former's estate.[24] More generally, Alabama judges must order equitable (not necessarily equal) division of property following divorce, and may take into account faults including adultery.[25] Such faults can be considered in awards of alimony and attorney's fees, too, even if the divorce was granted on no-fault grounds.[26] Alabama marriage law thus allows penalties for (and hence discourages) spousal misconduct that can lead to conflict or divorce, especially adultery.

In this and the other ways mentioned, Alabama marital and domestic relations law promotes the stability of a child's bonds to parents (especially, where possible, biological parents) and other kin, with a view to children's interests.

III. **It is reasonable to think that recognizing same-sex bonds might cause social harm by undermining the presumptions connecting parents to children and thereby increasing state intrusions into family autonomy; and by promoting a general view of marriage that would undermine the stabilizing norms of permanence and exclusivity that also strengthen families.**

<u>The second main point to which I can attest is as follows:</u>

It is reasonable to think that not only permitting but incentivizing same-sex bonds, which *cannot* link children to both their biological parents and often require case-by-case determination (rather than presumptions) of parentage, might undermine some of the above-stated goals of Alabama marriage law.

It is also reasonable to suppose that the law shapes culture, which shapes individual choices; that legally recognizing same-sex bonds would promote in culture the idea that emotional union is the most defining feature of marriage; and that the more people embraced and lived by this idea, the less they would adhere to stabilizing marital norms like permanence and exclusivity, which serve the public good.

For these reasons, it is reasonable for lawmakers to think that legally recognizing same-sex bonds as marriages might undermine important social goals.

<u>This conclusion finds support in the following sorts of evidence:</u>

    A. *The recognition of same-sex bonds as equivalent to marriage in every important respect might move Alabama ever more toward a regime of*

---

[23] Ex parte G.C., 924 So. 2d 651, 659, 2005 Ala. LEXIS 122, 19 (Ala. 2005)
[24] Code of Ala. § 30-2-52
[25] Ex parte O'Daniel, 515 So. 2d 1250, 1253, 1987 Ala. LEXIS 4348, 7 (Ala. 1987)
[26] Miller v. Miller, 361 So. 2d 577, 579, 1978 Ala. Civ. App. LEXIS 766, 4-5 (Ala. Civ. App. 1978)

> *assigning parentage case-by-case, rather than recognizing it by presumptions, and in this way undermine family autonomy.*

Privacy law tends to link the right to marriage with right to parent, and marriage and family are linked in the public understanding. So a regime or culture in which same-sex marriage is seen as normative may become one in which equality is thought to require facilitating same-sex and other couples' efforts to make children using artificial technologies.[27] But the more such efforts are encouraged or even treated as a right requiring public support, the less workable presumptions of paternity and other low-cost and minimally invasive means of parenting-recognition might become. Such means might even come to be rejected as discriminatory—as based on the now-rejected idea that opposite-sex sexual bonds are the norm. It is thus reasonable to think that changing marriage law might cause a corresponding shift in the state's law and policy from *recognizing* parentage to *assigning* or *deciding* it by ever-greater judicial involvement in the particular arrangements of particular families.[28] If it is reasonable for the state to regard these shifts as undesirable, these possible effects provide further rational support for the state's traditional marriage laws.

B.  *Marriage laws can affect social behavior*.

It is a truism that the law teaches: it shapes culture, which shapes our expectations and, ultimately, our choices.

Any marriage policy, in particular, can teach a view of marriage by its choices of which bonds to include and which to leave out. It may encourage people to think that marriage is most set apart, or defined, by what the marriage-eligible relationships have in common that the ineligible ones lack. And the more people absorb the law's lessons about what marriage is and requires, the more their behavior will tend to match those lessons.

Thus, Joseph Raz, an Oxford philosopher who opposes traditional marriage laws, writes as follows:

---

[27] See, e.g., the advocacy of two scholars here <http://www.huffingtonpost.com/dov-fox/it-is-time-for-the-us-to-_b_2900323.html>, and the California law described <here http://www.huffingtonpost.com/2013/10/09/gay-couples-fertility-coverage-california_n_4073491.html>.

[28] See, e, g., 11 Wm. & Mary Bill of Rts. J. 845, 862: "The one type of situation in which the legal system has decided individual cases of maternity involves surrogacy, in which a dispute arises between the birth mother and a woman who contracted with the birth mother. Court decisions addressing such conflicts generally have made the outcome turn either on contract rights or on adult rights predicated upon biology or gestation, not on what is best for the child. In a majority of cases, the result has been to reject the terms of the contract and attribute legal motherhood to the birth mother and legal fatherhood to the contracting man (who is usually the biological father), thereby bringing the child into the world with a fractured family. Decisions refusing to enforce such a contract on public policy grounds have rested in part on the interest of children generally in not being treated as commodities. But the result is still to make the individual child's best interests irrelevant in selecting the woman who will be his or her legal mother."

> [O]ne thing can be said with certainty [about recent changes in marriage law]. They will not be confined to adding new options to the familiar heterosexual monogamous family. They will change the character of that family. If these changes take root in our culture then the familiar marriage relations will disappear. They will not disappear suddenly. Rather they will be transformed into a somewhat different social form, which responds to the fact that it is one of several forms of bonding, and that bonding itself is much more easily and commonly dissoluble. All these factors are already working their way into the constitutive conventions which determine what is appropriate and expected within a conventional marriage and transforming its significance.[29]

One scholar corroborates this by noting that the introduction of another policy—no-fault divorce laws—yielded "new norms and expectations for marriage and family commitments in our society."[30] They not only *reflected previous* social changes but "opened the door for some couples who would not have taken that step [into divorce] without the new liberalization."[31] Accordingly, a recent review of two dozen empirical studies found evidence that no-fault divorce laws increased rates of divorce.[32] In short, *reasoned reflection and empirical findings both support the expectation that marriage law can affect social behavior*.

C.  *Redefining marriage might well promote a view of marriage that undermines its stabilizing norms*.

If marriage is revised to include gay and lesbian partnerships, it will include the romantic union of two men or two women, but not (say) the platonic bond of a widow and her sister living together to raise the widow's child. So its distinguishing feature—what any romantic pair has that these sisters lack—will be emotional (romantic) union.

But if romantic attachment is what defines a marriage, how could it be healthy or authentic to remain married once attachment waned, or grew for another? Why couldn't three or more be united in a single emotional bond? If some people felt that their emotional bond was enhanced by sexual openness, wouldn't it (on the revised view of marriage) be harmful for them to pledge sexual exclusivity?

In other words, changing civil marriage might further entrench what Johns Hopkins sociologist (and same-sex marriage supporter) Andrew Cherlin, among

---

[29] Joseph Raz, "Autonomy and Pluralism," in The Morality of Freedom (Oxford: Clarendon Press, 1988): 393.

[30] Goode, William Josiah. World Changes in Divorce Patterns (New Haven, CT: Yale University Press, 1993) xv.

[31] Id. at 144.

[32] Douglas W. Allen and Maggie Gallagher, "Does Divorce Law Affect the Divorce Rate? A Review of Empirical Research, 1995–2006," IMAPP Research Brief 1, no. 1 (July 2007), <http://www.marriagedebate.com/pdf/imapp.nofault.divrate. pdf>.

others, calls the "expressive individualist" model of marriage.[33] On this model, he says, a relationship that no longer fulfills you personally is "inauthentic and hollow," and you "will, *and must*, move on."[34] So it is no surprise when another study finds evidence that "conflict and divorce" tend to be higher where spouses internalize this view of marriage as primarily about emotional union.[35]

After all, the more people think that what sets marriage apart is emotional regard (which can be inconstant), or that marriage is for individualist expression (which can be hampered by sexual fidelity), the harder it may be for them to see reason to pledge or live by permanence or exclusivity. In other words, *reasoned reflection suggests that these norms have no basis of principle if marriage is emotional union. So they might come to seem just as arbitrary to expect of all marriages as sexual complementarity now seems to same-sex marriage advocates*.

But if law and its cultural effects often shape people's behavior, then these changes might further erode people's adherence to marital norms, to the detriment of society (primarily through children). That is, *redefining marriage might risk (further) undermining stabilizing marital norms that serve society*. At least, it could undercut social efforts to increase observance of these stabilizing norms— by more formally promoting a view of marriage that cannot make sense of them.

Likewise, recognizing same-sex bonds as marriages might well send the message—which other public institutions might then reinforce—that it doesn't matter, even as a rule, whether children are reared by their own mother and father, or by a parent of each sex at all; indeed, that it is *irrational* to think otherwise. As this message is internalized, men might feel less need to stick with their wives and children, and men and women might feel less motivation or social pressure to commit to each other in marriage before having children at all.

In fact, it is not just general reflection on the implications of redefining marriage (or of no-fault divorce, or of expressive individualism) that supports this concern. Rather, *the basis for anticipating harmful consequences becomes even more reasonable when we consider marriage revisionists' own arguments and recent legal and policy developments, as well as preliminary social science*.

Thus, since the rise of same-sex marriage advocacy, prominent gay writers (like Andrew Sullivan,[36] Dan Savage,[37] and Michelangelo Signorile[38]) have argued—

---

[33] Cherlin, Andrew J.. Marriage-Go-Round: The State of Marriage and the Family in America Today (New York: Alfred A. Knopf, 2009) 29.
[34] Id. at 30; emphasis added.
[35] Wilcox, W. Bradford, "Is Love a Flimsy Foundation? Soulmate versus institutional models of marriage," 39 Social Science Research 687 (2010).
[36] Sullivan, Andrew, Virtually Normal: An Argument about Homosexuality (New York: Vintage Books, 1996), 202–3.
[37] Oppenheimer, Mark, "Married, with Infidelities," New York Times, June 30, 2011 <http://www.nytimes.com/2011/07/03/ magazine/infidelity-will-keep-us-together.html?pagewanted=all>.
[38] Signorile, Michelangelo, "Bridal Wave," Out 42 (December–January 1994): 68, 161.

even in mainstream venues like the *New York Times*—that redefining marriage could and should encourage sexually "open" marriages throughout society. Temporary renewable marriage licenses have been advocated[39]—and considered by lawmakers.[40] "Throuples," or committed three-person bonds, have been sympathetically profiled in magazines,[41] promoted in school curricula,[42] and even granted a civil union.[43] More than 300 LGBT and allied activists and scholars (some quite prominent) have advocated legally recognizing multiple-partner, sexually open, and expressly temporary bonds.[44] Some have *expressly embraced* the goal of weakening the institution of marriage by the recognition of same-sex bonds.[45] One respected philosopher has argued for a "minimal marriage" policy allowing any number and mix of partners to determine their own preferred set of rights and duties.[46] Thus, *the efforts of same-sex marriage supporters to work out the implications of their own views, and steady trends in their advocacy, lend still further rational support to the concern that enacting same-sex marriage would undermine, in principle and in practice, other stabilizing norms of marriage*.

These developments in advocacy and policy do not prove decisively that redefining marriage would weaken norms like permanence or exclusivity. But they make it ever more reasonable to think that it might.

## Conclusion

My first conclusion is that there are non-religious and non-invidious grounds for seeing distinctive social and personal value in male-female conjugal bonds. This provides reasonable grounds for singling such bonds out by marriage policy.

---

[39] Rampell, Paul, "A High Divorce Rate Means It's time to Try 'Wedleases', Washington Post, August 4, 2013. <http://www.washingtonpost.com/opinions/a-high-divorce-rate-means-its-time-to-try-wedleases/2013/08/04/f2221c1c-f89e-11e2-b018-5b8251f0c56e_story.html>.

[40] Christina Ng, "Mexico City Considers Temporary Marriage Licenses," September 30, 2011 <http://abcnews.go.com/blogs/headlines/2011/09/mexico-city-considers-temporary-marriage-licenses/>.

[41] Molly Young, "He and He and He," New York Magazine, July 29, 2012, <http://nymag.com/news/features/sex/2012/benny-morecock-throuple/>.

[42] "Toronto School District Board Promotes Polygamy, Group Sex to Children," <http://blazingcatfur.blogspot.com/2012/09/tdsb-promotes-polygamy-group-sex-to.html>.

[43] Three-Person Civil Union Sparks Controversy in Brazil," BBC News, August 28, 2012, <http://www.bbc.co.uk/news/world-latin-america-19402508>.

[44] "Beyond Marriage: A New Strategic Vision For All Our Families and Relationships," BeyondMarriage.org, July 26, 2006, http://beyondmarriage.org/full_statement.html

[45] President George W. Bush is "right," says same-sex marriage advocate Victoria Brownworth, ". . . when he states that allowing same-sex couples to marry will weaken the institution of marriage. . . . It most certainly will do so, and that will make marriage a far better concept than it previously has been." Similarly, Professor Ellen Willis, another revisionist, celebrates the fact that "conferring the legitimacy of marriage on homosexual relations will introduce an implicit revolt against the institution into its very heart." Victoria A. Brownworth, "Something Borrowed, Something Blue: Is Marriage Right for Queers?" in I Do/I Don't: Queers on Marriage, edited by Greg Wharton and Ian Philips (San Francisco: Suspect Thoughts Press, 2004), 53, 58–59.  Ellen Willis, "Can Marriage Be Saved? A Forum," The Nation, July 5, 2004, 16.

[46] Elizabeth Brake, "Minimal Marriage: What Political Liberalism Implies for Marriage Law," Ethics 120 (2010): 303.

These points confirm that there are *non-religious* grounds for thinking that male-female conjugal bonds have a distinctive value and role: Nearly every culture has seen fit to socially regulate just such bonds. And ancient thinkers aware of same-sex sexual acts but untouched by Judaism or Christianity affirmed that the conjugal union of man and woman has special value not realizable by same-sex or other bonds not embodied in coitus.

These points, in turn, confirm that there are *non-invidious* grounds for such a view—grounds impossible to ascribe to hostility toward gays and lesbians. First, the countless cultures that have singled out such bonds for special treatment or recognition span the spectrum of attitudes toward same-sex sexual activity. Second, some of the classical thinkers who affirm the distinct value of such bonds worked amid cultures in which same-sex sexual activity was common. They and other thinkers in their tradition affirmed the distinct value of bonds embodied in coitus and inherently oriented to family life, even as compared to other *opposite-sex* bonds.

My second main conclusion is that in keeping with this long tradition, Alabama law variously seeks to stabilize male-female bonds with a view to promoting children's connections to parents (especially natural parents) and other kin, for the children's sake, and in minimally invasive ways—e.g., relying more on presumptions than case-by-case determinations.

My third conclusion is that it is reasonable to anticipate that these presumptions will be undermined by the recognition of same-sex bonds as marriages; and that changing the law to extend such recognition might undermine important social goals.

The reasons behind this second conclusion are these: Law shapes culture, which shapes people's behavior. Marriage law may well shape what people expect of themselves and others with respect to marriage. So if the law defines marriage by romantic-emotional union, people may well internalize this view. But because this view removes any basis of principle for norms like permanence and exclusivity, and promotes an expressive individualism that prioritizes personal emotional fulfillment, its prevalence might further destabilize the institution of marriage. This would harm the interests, primarily having to do with children's wellbeing, that get the state involved in marriage. Thus, it is reasonable to think that redefining marriage in law might harm some of the legitimate state interests served by marriage policy.

Thus, legitimate reasons and concerns can motivate the choice to single out opposite-sex conjugal bonds, and to decline to redefine marriage as simple romantic-emotional union.